```
                  UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS
```

```
_____
                              )
UNITED STATES OF AMERICA      )
                              )
V.                            )    Crim. No. 1:13-CR10258
                              )
MARSHALL DION                 )
                              )
_____)
```

## MOTION TO SUPPRESS

Now comes defendant Marshall Dion, who files this motion to suppress pursuant to the Fourth Amendment to the United States. In Support, the defendant states the following:

1.  Mr. Dion has standing to object to the stop, seizure, and search of the truck he was driving on June 18, 2013 as he had an expectation of privacy and a possessory in the truck and its contents. See affidavit attached as Exhibit A.

2.  The stop of Mr. Dion's car was illegal and in violation of his Fourth Amendment rights as the police lacked reasonable suspicion that he was speeding and stopped him based on a baseless intent to investigate whether any crimes were being committed.

3.  The alleged civil motor vehicle stop, exit order, and continued interrogation, illegally expanded the traffic stop into a Terry stop in violation of the defendant's Fourth Amendment rights, as the police lacked reasonable suspicion to believe that he had committed or was committing a crime.

4.  Improperly converting the civil motor vehicle stop into an intensive criminal investigation was improper and rendered all of the defendant's statements inadmissible

as fruit of the poisonous tree. Post arrest statements were the product of custodial interrogation without the benefit of Miranda and also in violation of the defendant's request for an attorney. The infected statements include but are not limited to:

    1) All statements made while in his motor vehicle before an exit order;
    2) All statements made after his exit order including statements made while detained in a police cruiser;
    3) All statements made while after being arrested and detained in a warehouse; and
    4) All phone calls made and obtained by the Kansas authorities while the defendant was in state custody.

    5. Any consent was the direct product of an illegal search, seizure, and interrogation and was not sufficiently attenuated from the illegal detention to be purged of its taint.

    6. Kansas law enforcement authorities conducted a warrantless search of the defendant's truck based on a "dog sniff." The government has the burden of proving an exception to the warrant requirement for a search to be conducted.

    7. Kansas law enforcement authorities improperly searched records, a cell phone, a computer, and a GPS taken from inside the defendant's truck without a warrant and all evidence derived from the seizures and searches are inadmissible as fruit of the poisonous tree. Further the government cannot meet its burden of showing inevitable discovery.

    8. Law enforcement in Kansas obtained a number of search warrants based on the improperly seized and searched evidence without independent probable cause, therefore rendering the information inadmissible as fruit of the poisonous tree. Further, the government cannot meet its burden of showing inevitable discovery. See attached Exhibit B.

    9. The Government utilized an Administrative subpoena served on Storage Unit 220 at Town and Country Storage at 140 main Street in North Reading.The subpoenas were a direct use of evidence tainted by the earlier

constitutional intrusions and the evidence obtained is inadmissible as fruit of the poisonous tree. Further, the government cannot meet its burden of showing inevitable discovery. Also, the Massachusetts State Police conducted a "dog sniff" of the storage facility. The government has the burden of proving a reliable "dog sniff" as a basis for probable cause.

   10. The Government applied for and was granted Search Warrants for:
   1)   Storage Unit 220 at Town and Country Storage, 140 main Street N. Reading.

   2)   Storage unit for Unit B14 at Comeau's Mini Storage facility, 20 Walden Pond Ave, Saugus, MA.

   3)   Search Warrants for 2 residences and 3 storage units in Tucson AZ.

The affidavits in support of the search warrant are replete with evidence tainted by the earlier constitutional intrusions and the evidence obtained is inadmissible as fruit of the poisonous tree. Without the tainted information the affidavit lacks probable cause to search. Further the government cannot meet its burden of showing inevitable discovery.

   11. The Government applied for and was granted a Federal Search Warrant for office space leased by MARSHALL DION, located at the law offices of Felopulos, Ditelberg and Cantor, 4 Longfellow Place, Suite 3802, Boston, Massachusetts 261 Rice Avenue Revere Massachusetts. Evidence seized at that location were a result of a search to a series of further Federal Search Warrants. The affidavit in support of the office search warrant and subsequent evidence search warrants are replete with evidence tainted by the earlier constitutional intrusions and the evidence obtained is inadmissible as fruit of the poisonous tree. Without the tainted information the affidavits lacks probable cause to search. Further the government cannot meet its burden of showing inevitable discovery.

   12. The Defendant seeks an evidentiary hearing on the above issue given it is the government's burden to prove that the warrantless search was permissible pursuant to the Fourth Amendment to the United States Constitution and all

subsequent searches necessarily rely upon the warrantless searches to establish probable cause. Further, the Kansas officer's intent is relevant demonstrating the government's inability to meet its burden of showing inevitable discovery.

FACTS

On June 18, 2013 Officer Nicholas Blake, a junction city police officer was operating a patrol cruiser patrolling Interstate 70 at mile marker 292. Officer Blake was looking for drug smugglers. That day Officer Blake reflected "I love it. I don't want to do anything else. I don't want to investigate or be a detective, I don't want to be a school resource officer I don't want to answer calls on patrol I don't want any of that man, I want to look for smugglers.[1] Officer Blake was accompanied that afternoon by his drug-sniffing dog.

Marshall Dion was travelling East on Interstate 70. He was driving with the flow of traffic in his truck with out of state license plates. Officer Blake alleges that he observed a truck, 2002 GMC Sierra with a Colorado registration number 7521 ARU pass him at an accelerated speed. Officer Blake alleges that the defendant was

---

[1] The motor vehicle stop, exit order and search were captured on audio and video recorded from the patrol vehicle. At *26:36 Pict0002.AV1.*

driving 79 mph in a posted 75 mph zone.  Officer Blake had to turn around to pursue the defendant and the defendant stopped his truck without incident.  Later while the defendant was detained in the patrol car during the purported civil infraction Officer Blake made clear the purpose of his efforts stating to the defendant "I'll just be straight with you.  In addition to the traffic enforcement I am looking for that kind of stuff." (Officer Blake pointed to the defendant's past record displayed on his computer in the patrol car).

   After Officer Blake stopped the operator, 78 year old Marshall Dion, for the civil motor vehicle infraction he noted that Mr. Dion's license was from Arizona.  After explaining the reason for the stop Officer Blake requested documentation.  Mr. Dion provided all proper documentation to Officer Blake.  Officer Blake immediately began interrogating the defendant about subject matters wholly unrelated to the civil motor vehicle infraction.  For example, Officer Blake travel. (PR 1) "Where are you coming from? (2:13) What's going on out there? (2:32). Where do you live (2:42). The defendant responded to the officer's questioning by explaining that he had a residence in Arizona and Massachusetts and that he was coming from Pennsylvania and going back to Arizona.  Without any safety

concern Officer Blake directed an exit order and ordered Mr. Dion to sit in his patrol car. Before returning to his cruiser with Mr. Dion Officer Blake pressed his face against the rear windshield and attempted to look into the back of the truck(3:47).

Rather than engage in writing a citation Officer Blake continued his interrogation for over twenty minutes asking over forty questions unrelated to the alleged civil motor vehicle infraction.  The interrogation did not relate to the civil motor vehicle offense of speeding.  Rather, Officer Blake demands for the defendant to explain his route of travel and then investigates the route on Google. Officer Blake interrogated the defendant about his past criminal record (9:49) (runs a triple I) (10:46), his source of income (13:06), and repeatedly interrogates him about his trip.

Officer Blake stated that he is "out here looking for people who are hauling it." (25:16) The defendant responded by offering to let the officer look in his truck.  (25:30). When the defendant requested to be let go Officer Blake asked if he could summons his canine and the defendant acquiesced(34:00). Officer Blake walks the canine around the truck and asserts that the canine has made a positive read. (35:48).  Officer Blake asks if the defendant has

money in the car and the defendant responds that he has six thousand dollars in the truck but maintained there were no drugs in his truck(37:00). Officer Blake arrested the defendant and without a warrant the police searched his truck and its content seizing a number of items including a computer, written logs, a phone, GPS and US currency. No drugs were in the truck. Without a warrant, the police seized and read detailed logs dating to 1999 describing when and where the defendant stopped and his activities during those stops (sleep, fuel, ect) and downloaded the contents of his phone and GPS unit on a jump drive.

The defendant was placed in custody and transported to a warehouse. Officer Blake made numerous attempts to turn him the defendant as an informant. Some of the interrogations at the warehouse were video and audio recorded. At the warehouse Officer Blake confronted the defendant with various pieces of evidence that he obtained from Mr. Dions belongings without a warrant including his travel logs, information on his laptop computer, GPS and a money , maintaining program with bank information on two of his bank accounts, one in Boston one in Tucson.

At one point Officer Blake stated "we arent' going to let you talk to no attorney."[2] The defendant repeatedly expresses that he can not speak to Officer Blake without a lawyer and asserts that he wants to speak to a lawyer. Despite the defendant's repeated assertion of his Miranda rights and attempts to speak to a lawyer, Officer Blake continued to try to get Mr. Dion to speak to him. Officer Blake persisted, eliciting Dion to make statement including that he was a mule, the money would probably go across the border, they load the truck and I drive, and other similar commentary.

- On June 21, 2013 Officer Blake submitted and application for a search warrant for the defendant's truck and computer.

- On June 27, 2013 SA Stephen Kelleher was notified by SA Putney of Homeland Security and advise that there had been a seizure of approximately $800,000 in cash and that they were notified of this seizure by the DEA in Tucson, Arizona. SA Putney further advised that the officer who made the stop, Nicholas Blake, had information that indicated that Dion's trip had originated in Boston, prior to him being stopped in Junction City and provided Officer Blake's report. SA Kelleher contacted Officer Blake telephonically and was informed that that during the search he found $827,320 in US currency and he also located detailed trip logs and a contact list that had names, phone numbers, and addresses of associates. These trip logs indicated that most of his trips originated at 4 Longfellow Place, Boston, Massachusetts. A review of this address with recorded jail calls that Dion had made lead to the identification of Attorney Dennis

---

[2] Pict0002.AV1 (9:52)

Ditelberg, who has an office at 4 Longfellow Place, Suite 3802, Boston, Massachusetts. The Junction City Police Department also forwarded information obtained from Dion's Garmin GPS that indicated he had been at several addresses in the Boston area prior to the stop of his vehicle. Those addresses included a residence at 162 Broad Sound Avenue, Revere; Town and Country Self Storage at 130 Main Street North Reading (correct numerical address is actually 140 Main Street); and 8 Ross Road, Lexington.

- On June 28, 2013 JCPD provided the FBI with the defendant's phone calls to co-defendant Landolfi. The FBI reviewed the defendant's cell taken from his truck at time of arrest and found Landolfi's number and address in the phone register.

- On June 28, 2013 – as a result of the information by JC Kellerher interviewed co- defendant Ditelberg

- On July 2, 2013 SA Kelleher served Town and Country Storage 140 Main Street North Reading with an administrative subpoena requesting a list of renters at the facility including inquiry about the defendant leading to Unit 220 rented by the defendant. The Massachusetts State Police (MSP) conducted a "dog sniff" of unit 220 with "positive" results. Attached as Exhibit C.

- A search warrant for Unit 220 was obtained and various property was taken including $11,519.900, 168 pound of marijuana, and check registers noting addition storage units at Comeau's Mini, 20 Malden Pond Ave, Saugus and several at Ina Self Storage in Tucson AZ. The information taken from Unit 220 was forwarded to TFA DEA Tucson. See Search Warrant and Affidavit attached as Exhibit D.

- On July 2, 2013 TFO James Donovan met owner of Comeau Storage located at 20 Walden Pond Road Saugus and obtained copy of the defendant's unit ledger.

- On July 3, 2013 Trooper Burke, obtained a search warrant from Lynn the Lynn District Court for Unit B14 at Comeau's Mini Storage facility seizing $136,822 and

227 pounds of marijuana. Search Warrant and affidavit attached as Exhibit E.

- On July 3, 2013 two residences and three storage units owned by the defendant were searched in Tucson, Arizona. No attachments provided.

- On July 9, 2013 SA Kelleher received two keys from JCPD.  One key fit the Comeau's Storage in Saugus that was rented by the defendant.  The other key did not fit anything.  On July 26, 2013, SA Kelleher tried these keys in the locks that were cut off of the storage units belonging to DION. The keys from the tag that read "I-95" fit the lock from the storage unit at Comeau's Mini Storage in Saugus, Massachusetts. The key from the tag that read "I-93" did not fit the lock from Town and Country Mini Storage in North Reading.

- On July 10, 2013 SA Cohoon obtained a search warrant for 261 Rice Avenue Revere.  Numerous pieces of evidence were seized including a HP Pavillion G6 laptop, $2,400.00, an Ipad - CQ24608AA90, Toshipba laptop XA109147W, Hard drive S/N SGK85HYE, Papers with phone numbers, One (1) Rever City building permit dated July 27, 2002 in name of ENNIS DITELBERG, 5 UHaul storage keys, 301, 302, 328, 1038, 1106. One shipping packaged addressed to MARSHALL H DION at 4 LONGFELLOW FL STE 3802, a check from DION family trust. Search Warrant and Affidavit attached as Exhibit F.

- On August 2, 2013 - SA Heap sought a criminal complaint for the defendant relying upon personal participation, conversation with other law enforcement, and information from variety of other sources sand reports of other officers JCPD seized travel logs and contact list including Freman, Landofi, and Wiseberg.

- On October 25, 2013, the government obtained a search warrant for the office space leased by MARSHALL DION located at the law offices of Felopulos, Ditelberg and, Cantor, 4 Longfellow Place, Suite 3802, Boston, Massachusetts (MA). Search Warrant and Affidavit attached as Exhibit G.

- On December 31, 2013, federal search warrants were authorized for property taken from the defendant's office space including:
    - 13-2375-MBB  Suite 3802
    - 13-2376-MBB  Desktop computer
    - 13-2377-MBB  Garmin
    - 13-2378-MBB  Lenova laptop
    - 13-2379-MBB  Apricorn hard drive
    - 13-2380-MBB  White iPhone
    - 13-2381-MBB  3 thumb drives
    Affidavit of Stephen J. Kelleher for Warrants 13-2375 – 13-2381 and search warrants attached as Exhibit H.

    - 13-2400-MBB  22 floppy discs
    - 13-2401-MBB  Red Nokia cellular phone
    - 13-2402-MBB  Centon 160 GB hard drive
    - 13-2403-MBB  Eagle 750 GB external drive
    - 13-2404-MBB  Maxtor 200GB hard drive
    - 13-2405-MBB  Seagate 160 GB hard drive
    - 13-2406-MBB  Seagate 320 GB hard drive
    - 13-2407-MBB  Seagate hard drive
    Affidavit of Stephen J. Kelleher for Warrants 13-2400 – 13-2407 and search warrants attached as Exhibit I.


- Numerous Kansas state warrants and subpoenas were sought for property belonging to the defendant including:
    - Prima Federal Credit Union;
    - Citizens Bank;
    - Sovereign Bank;
    - Bank of America;
    - Kansas Search Warrant for Electronic Data; dated June 21, 2013. For a black Think Pad laptop computer serial L3N5656
    - Bank of America Account ending in 3213;
    - Bank of America Account ending in 1455;
    - All accounts at Pima Federal Credit Union belonging to the Marshall Herbert Dion/Dion Family trust;
    - Sovereign bank Account ending 6743;
    - Citizens Bank Account ending 6336 and 0164;and
    - All accounts at Citizens Bank belonging to Marshall Herbert Dion/Dion Family trust. See Exhibit B.

DISCUSSION

1. **The traffic stop was an illegal seizure**

A traffic stop and detention of an automobile's occupants is a seizure under the Fourth Amendment. United States v. Jones, 700 F.3d 615, 621022 (1st Cir. 2012). Although a legitimate traffic stop based on a civil infraction can be used in many circumstances as a pre-text, the civil infraction must be legitimate as a predicate. There is no evidence that the defendant exceeded the speed limit other than the opinion of Officer Blake.  A traffic stop "must be supported by reasonable suspicion that a traffic violation has occurred." United States v. Chaney, 584 F.3d 20, 24 (1st Cir. 2009).

Officer Blake made his motives for the stop of the defendant clear when he admitted: "I love it.  I don't want to do anything else.  I don't want to investigate or be a detective, I don't want to be a school resource officer I don't want to answer calls on patrol I don't want any of that man, I want to look for smugglers."

2. **The reasonable suspicion analysis**

The alleged civil motor vehicle stop expanded into a Terry stop in violation of the defendant Fourth Amendment rights as the police lacked reasonable suspicion to believe

that the defendant had committed or was committing a crime. Police officers conducting an investigatory stop must have "reasonable suspicion" that criminal activity is afoot. United States v. Jones, 700 F.3d 615, 621 (1st Cir. 2012). An officer "'must be able to point to specific and articulable facts which, taken together with rational inferences from those facts,' justify an intrusion on a private person." Terry v. Ohio, 392 U.S. 1, 21 (1968).

The defendant had done nothing to warrant a reasonable suspicion that he was engaged in illegal activity at the time the officer converted the traffic stop into a criminal investigation. "The officer must be able to articulate more than an 'inchoate and unparticularized suspicion or hunch' of criminal activity." United States v. Golab, 325 F.3d 63, 66(2003).

3. **The exit order of and extended detention of the defendant in the police cruiser was without constitutional support**

A seizure justified solely by the state's interest in issuing a traffic warning ticket to a driver "can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." Illinois v. Caballes, 543 U.S. 405, 407 (2005). In United States v. Henderson, 463 F.3d 27, 46-47 (1st Cir. 2006). For example, the court

of appeals held that extending a traffic stop for 20 minutes to run a criminal history check on a passenger in a stopped car, without any particularized reason to prolong the stop, measurably (and impermissibly) extended the duration of the stop.

Here, Officer Blake's extended investigation violated the Fourth Amendment because there he had "no particularized reason" to suspect that criminal activity besides the traffic violation was afoot.  Like Henderson, the officer had no right to "launch into an investigation". Officer Blake demanded and exit order, interrogated the defendant and engaged in an investigation that lasted over twenty minutes without any justification.

4. **The defendant's consent was tainted by the illegal seizure and interrogation**

The defendant's consent to Officer Blake was "the product of an essentially free and unrestrained choice." Schneckloth v. Bustamonte, 412 U.S. 218, 225, (1973). contrary. See United States v. Quinn, 815 F.2d 153, 163-164 (1st Cir. 197) (providing that the defendant's consent was not valid because its "causal connection" to the illegal detention was not broken, citing Florida v. Royer, 460 U.S. 590, 605; Brown v. Illinois, 422 U.S. 590, 605). The Court determines whether consent was voluntary "by examining the

totality of the circumstances, including the interaction between the police and the person alleged to have given consent." U.S. v. Weidul, 325 F.3d 50, 53 (1st Cir. 2003). Here, the defendant's consent came during the heart of the illegal detention and after countless constitutional deprivations. His consent was directly related to the officer's illegal investigation and detention of him.

5. **The reliability of the "dog-sniff" has not been proven to support probable cause.**

The existence of probable cause based on an alert by a drug dog depends upon the dog's reliability. See United States v. Race, 529 F.2d 12, 14 (1st Cir. 1976). The government has the burden of proof to demonstrate the dog's reliability as the government bears the burden of demonstrating the lawfulness of the vehicle search. United States v. Lopez, 380 F.3d 538, 543 (1st Cir. 2004). The government conducted two "dog-sniffs". First, at the scene of the stop and second, of the Storage area at Town and County.

6. **The defendant's statements were the fruit of an unconstitutional detention, and in violation of Miranda and Right to an Attorney**

First, the statements elicited from the defendant prior to his arrest were part of an illegal seizure and

criminal investigation. After his arrest, the defendant's statements were obtained in contravention of his Fourth, Fifth, Sixth, Fourteenth Amendment rights, and in violation of Miranda v. Arizona, 384 U.S. 436 (1966). The defendant repeatedly informed the officer that he could not speak to him and on more than one occasion requested a lawyer. The officer's acknowledgement that the defendant would not be provided access to a lawyer, despite his request, is violative of his constitutional rights.

In Brown v. Illinois, 422 U.S. 590, 604-05 (1975), the Court set out factors to be examined in determining whether a Mirandized statement obtained after an illegal arrest must be suppressed. In finding that the statement must be suppressed, the Court weighed three factors: 1) temporal proximity of the illegal conduct and the later statement; 2) the existence of intervening circumstances; and 3) the flagrancy of the initial misconduct. All three factors present here support suppression.

7.  **All subsequent searches are fruit of the poisonous tree**
    All subsequent searches of the defendant's property, both by state authorities and federal authorities should be excluded as fruit of the poisonous tree. The warrantless searches by Kansas authorities and production of that

information and material to federal authorities tainted by the illegal search and seizures. "[T]he exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" Segura v. United States, 468 U.S. 796, 804, (1984). This rule equally extends to both the direct and the indirect products of unlawful searches and seizures. *See* Wong Sun, 371 U.S. 471, 484 (1963).

8.  **The government cannot demonstrate an independent source for the evidence**

The "independent source" inquiry involves a two-part test. First, the court must determine if the agents' observations during the initial, illegal search "prompted" them to seek a warrant. United States v. Dessesaure, 429 F.3d 359, 367 (1st Cir. 2005), quoting Murray, 487 U.S. 533, 542 (1988). Second, the court must decide if the affidavit, stripped of the illegally obtained evidence, contained "sufficient facts to support probable cause."

"The government bears the burden of proof on each element, and must demonstrate, by a preponderance of the evidence, that the search pursuant to a warrant was an "independent source" of the evidence that the defendant

seeks to suppress." U.S. v. Ponzo, 972 F. Supp 2d, 82 (2013) See United States v. Siciliano, 578 F.3d 61,68 (1st Cir. 2009).

There is no separate and distinct evidentiary trail that would lead the government to the evidence against the defendant. As evidenced by the factual chronology, the Massachusetts authorities actions were in direct response to the tainted evidence provided by Kansas authorities and there is an absence of other sources that led authorities to engage in any of their search efforts against the defendant. The evidence would not have been discovered by legal means. See United States v. Almeida, 434 F.3d 25, 28 (1st Cir. 2006).

8. **The exclusionary rule is appropriate in the circumstances of this case**

"Should the police acts be deliberate, reckless, or grossly negligent, disregarding Fourth Amendment rights, then the deterrent value of the exclusionary rule is strong and it outweighs the resulting social costs." U.S. v. Montijo Gonzalez,978 F.Supp.2d 95 (2013)("The [exclusionary] rule's *sole purpose* ... is to deter future Fourth Amendment violations." (emphasis added)).

"To trigger the exclusionary rule, police conduct must

be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system.... [T]he exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *Id.*

Officer's Blake own words make clear that his conduct was deliberate, intentional, flagrant, and purposeful. Armed with his drug dog, Officer Blake targeted a traveler through his jurisdiction who was from out of town. His only inters was to be "out here looking for people who are hauling it." His conduct is the type of conduct the exclusionary rule seeks to deter.

## CONCLUSION

Wherefore, defendant moves this Court for an evidentiary hearing and to grant his motion to suppress on the foregoing grounds.

MARSHALL DION

By His Attorney,

/s/Henry B. Brennan

Henry B. Brennan

B.B.O. # 634036

20 Park Plaza, Suite 400

Boston, MA 02116

617-201-5977

Dated: October 17, 2014

### Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on or before the above date.

/s/ Henry B. Brennan
Henry B. Brennan