very odd as he had never mentioned being in Boston at all up until this point. I asked Marshall if I could take the belongings out of the truck and he said I could. I note that while Dispatch was giving me Marshall's criminal history over the radio, I received a text message from Geary County Deputy Captain Coffman asking me if I wanted him to respond, which I did. Captain Coffman arrived around the time I started to search Marshall's vehicle. While I was searching, Marshall said "Officer you're not going to find anything in there." While searching, I asked Marshall how far Boston was from where his CPA was at. Marshall said it was "A couple hundred miles." I asked Marshall if he drove up there after seeing his CPA and he said he did. I note Marshall never explained this part of his travel to me initially. Marshall said "This is entertainment to me, I have nothing else to do." I confirmed with Marshall that his trip up to Boston was included in his three day stay in Pennsylvania. Marshall said that was correct. A short time later, Marshall said that he really needed to get going. What I gathered from what Marshall was saying was that he was revoking his consent for me to search his truck. I asked Marshall if I could use my K-9 partner to go around his truck to which he agreed. I note at this point my suspicion of criminal activity had grown.

I note that I have been a Police Officer for over 9 years and of that I have been a K-9 Handler for more than 5 years. I have had approximately 233 hours of documented narcotics and criminal interdiction related training. I have also been personally involved in numerous other stops (some of my own and some assisting with others) where large amounts of narcotics and/or US Currency have been found.

I retrieved my K-9 partner (Figo) and I used him to conduct an exterior sniff on Marshall's truck. As reported above, I have been the K-9 Handler for the Junction City Police Department for more than 5 years. I have been certified (4 week course) by Nelson Rivera K-9, which took place in January of 2008 in the central Kansas area. I am also certified through the Heart of America Police Dog Association (HAPDA). This is an annual certification that I have completed five times thus far. The most recent certification took place in October of 2012, in McPherson, Kansas. My certifications include narcotics detection for the odors of marijuana, cocaine, methamphetamine, heroin, and ecstasy. I started my search in the area of the front driver's side and I moved in a counter clockwise motion. Figo indicated to the odor of narcotics being present outside the vehicle in the area of the front driver side wheel well and in the area on the front bed on the passenger side. Upon observing these indications, I left those areas and worked them again to confirm the initial indications with Figo giving the same behavior changes in the same areas. I note that Figo does not have much interest in sniffing the rear portion of vehicles (Especially when the engine is running or the exhaust is hot due to a backfire incident he experienced with a previous Handler). Figo's behavior while detecting the odor of narcotics is referred to by me as either an indication or an alert. An indication is when he can smell the odor of narcotics, but cannot locate the source of the odor and he uses his nose in a searching manner. When he indicates, his posture becomes stiff, his breathing becomes shallow and rapid, and he sniffs the area very meticulously. When he indicates, he has detected the odor of narcotics, but not the source of the odor. An alert is when he has located the source and he will start to bite, bark, and/or scratch at the odor source. At this point, I was very suspicious that criminal activity was afoot.

Captain Coffman had Marshall sit in the backseat of his marked patrol unit. I then asked Marshall if he had any cocaine, heroin, ecstasy, and marijuana (In that order). Marshall confidently answered no to each of those questions. I then asked about large amounts of US Currency. Marshall response to this question was very different than the rest. Marshall said "Pardon me" again

USAO-000711

like he had been doing before, stated no, then stuttered some words that I could not understand, and then said that he may have a couple of deposits with him that totaled $6000.00. I note that Marshall's response is common when questioned about the contraband he's hauling. Marshall's response leads me to believe that he was in possession of a large amount of currency.

I continued searching Marshall's truck and soon found two FedEx boxes in front of the refrigerator that contained a large amount of US Currency. Captain Coffman found two other boxes that contained the same on the side of the refrigerator (Side closet to driver side). Three of these boxes had permanent marker writing on them that read "24 100's." The fourth one had "9 100's" written on it. It was later found that these boxes contained nothing but 100 dollar bills in $10,000 stacks and wrapped with a little stack band that indicated the same.

Captain Coffman had Deputy Parker and Deputy Warnecke respond. I had Deputy Warnecke drive Marshall's truck to the Police Department Warehouse. This was so I could get off the side of the highway, take photographs, and conduct a more thorough search. Captain Coffman transported Marshall, who was under arrest at this point.

Once we arrived at the warehouse, I had Marshall stay seated in Captain Coffman's marked patrol unit. I later had Marshall sit inside the warehouse inside a fenced area with chairs. I finished searching Marshall's truck. I found several other smaller bundles of US Currency in addition to the currency in the FedEx boxes. Some were found in the front passenger compartment. Some were in a portfolio type bag and some were in a bank deposit bag that was inside the portfolio type bag. These were on the passenger seat (Single cab truck). The others were found inside two separate pieces of luggage in the bed of the truck. With the assistance of Detective's Campbell and Parsons, I used the Geary County Sheriff's Department Cummins money counter to count the money. The amount inside the four FedEx boxes was found to be $810,900.00. The rest of the money was found to be $17,320.00. I was later provided with two print out receipts and a disk containing the money count information. These two items were later placed into evidence. I photo copied the receipts and placed that copy with the case file. Also found were a set of Arizona plates that were currently registered on and for Marshall's truck and several logs. These logs were of Marshall's trips from Boston to Tucson and they were very detailed about when and where he stopped and his activity during those stops (Sleep, fuel, etc.). These logs dated back to 1999 and it appeared as if Marshall made this trip 2, 3, or 4 times per year.

I had Detective Arnold download Marshall's phone, GPS unit, and a jump drive while Marshall was under arrest and still in my custody. Detective Arnold later burned the phone and GPS information to a disk and he printed out the information found on the jump drive. The CD was later placed into Evidence.

I verbally advised Marshall of his rights under the Miranda warning (Read from a card). Marshall said he understood his rights. Marshall started off by saying that he couldn't talk to me because we "Crossed a line." I encouraged Marshall to talk with me in hopes that he may cooperate and further this investigation. Marshall said that he thought he wasn't doing anything wrong and that he was "Just driving down the road." I replied "With a lot of money." Marshall replied "I don't even know that." Marshall added "I don't even know who loaded my truck." I told Marshall that I could believe that and he replied "You don't have to, I am a driver, I am driving, that's what I do." I continued to encourage Marshall to cooperate by giving him some examples of cases were

USAO-000712

other people cooperated. I was telling him about a case where drugs were found and later delivered. Marshall quickly replied that he doesn't "bother with dope anymore." Marshall then stated "I am a.....do you know what a mule is?" I asked if he was a mule and Marshall replied "You looking at one." I tell Marshall that I know he is going to do something when he gets to where he is going. This was in response to Marshall telling me that he doesn't know anything. Marshall says that he "Drops it when he gets to his destination" and he doesn't know "where it goes or anything else." Marshall goes on to tell me that he doesn't want to know where it goes and that he walks around with blinders on. I asked Marshall if "this money" was his. Marshall replied "I can't even tell you that." I asked Marshall if he could not say that the money is not his. Marshall said he could say that and asked "Who would believe me?" At one point I tell Marshall that someone is going to be very upset that this money was seized and I asked him if "they" were going to kill him. Marshall replied "I don't know." Marshall adds that the people he interacts with are all family people that have regular jobs and children. Marshall says he does not deal with people that are in gangs or have known violent tendencies. Marshall said that the money "Would probably go across the border." I replied "You wouldn't take it across the border?" Marshall replies "You damn right I wouldn't, I don't go across the border." I asked Marshall if he has anything when he goes East and he said he doesn't, stating "When I go East I go to see my CPA." I asked "So when you go West is when you do not know what you have." Marshall replied "They load the truck and I drive the truck." I asked Marshall where they have access to his truck at and he said "Probably in the Boston area." I asked if he just parks the truck and Marshall said he does. I asked if he goes off and minds his own business after he parks the car and Marshall said he did. Marshall added that he goes and rents a car after he parks his truck in the garage. I asked Marshall why he kept such detailed logs of his trips and he said because he was a record keeper. I asked Marshall where he was going when he got to Tucson and he said he would drive to and park his truck at his residence. I asked Marshall if someone was going to come and "get it" (Insinuating the money) and he said "Yeah, I don't want to see it." I asked if they come and get the truck or do they just get what is in the back of the truck and Marshall said he did not know. I asked if he communicates with anyone and Marshall said he didn't. A short time later Marshall said he "Knows one guy's name is Edgar."

The above conversation ends and I later come back and speak with Marshall further. We have a lot of small talk and then I tell him I know he is just doing this to make a little money. Marshall replies "You can't live on social security." Marshall later admits that he has no pension and his only source of legal income is social security which is less than $690.00 per month. I asked Marshall how much he gets paid per trip, stating that he has to be getting paid something. Marshall said that "They cover his expenses." I asked Marshall if he knew how much money he was carrying and he said he had no idea. I asked Marshall if he would tell me what money he was using other than the money in the FedEx boxes. Marshall said he had some money in the front in his satchel that he was using for his expenses. At one point during the conversation, I made sure Marshall was ok with me asking him questions and if he wanted to answer he would if not he wouldn't. Marshall was ok with this. I asked Marshall more about what happens when he gets to Boston. Marshall says he parks his truck in a parking garage. I asked how they know he is there and Marshall said because he calls them. I asked Marshall more about him calling when he gets close and Marshall said he does not want them to know where he is. Marshall said that if "they don't trust him then he doesn't want to deal with them." I asked Marshall how they know when he gets back to Tucson. Marshall said they know because they will either see him or see his truck.

USAO-000713

I had Marshall transported to the Geary County Detention Center where he was booked, processed, and detained on no bond pending a first appearance in Geary County District Court.

A check of Marshall's Triple I revealed arrests for narcotics distribution (multiple), theft, assault and battery with a dangerous weapon, and traffic charges.

I collected the above listed items in addition to various documents, a laptop computer, cell phone, GPS, and some jump drives. I note the jump drives were searched by Detective Arnold around the same time the phones and GPS were downloaded. I looked through the computer while Marshall was under arrest and still in my custody. I found a money maintaining program that contained bank information on two of Marshall's bank accounts. Both were with Bank on America with one being in Boston and the other in Tuscon. I do not recall the exact amount but I saw that both accounts had 20-30 thousand dollars in each account. I listed all of the collected items on an Evidence Custody Receipt (ECR) and they were placed into the Police Department Lab for safekeeping. This includes disks that contain the money count information and the phone and GPS downloads. I also made some videos using my personal pocket camera. I later burned these videos to a disk and they were placed in evidence.

I seized the US Currency and Marshall's truck pending asset forfeiture proceedings. I also photographed Marshall's truck and its contents. I note that while searching Marshall's truck at the warehouse, I found that the contents in the bed of the truck did not appear to be anything of value. There were table tops with no legs, cardboard boxes that had been in there so long the color was starting to fade and the cardboard itself was starting to deteriorate, and lots of other old junk. I looked at the refrigerator and saw that the manual was still inside along with the cardboard pieces in the fruit drawers etc. I looked at the energy guide information and saw that it had been dated in 2007. I am aware that this kind of activity is common among smugglers. They will haul a junk load over and over and say that they are moving from one place to another or as in this case say they are taking items from one place to another using the load of items as a "cover load."

Based on the totality of the circumstances here and on my training and experience, I believe that the US Currency in this case is drug proceeds. I also believe the 20-30 thousand dollars that the computer program on Marshall's computer showed he has is also derived from drug proceeds. I believe the drug proceeds are also used to pay Marshall to haul the money back to the source. I also believe this because Marshall told me his only legal source of income is social security which is less than $690.00 per month.

I used my K-9 to conduct a sniff of the training room at the Sheriff's Department and my K-9 did not give any indication that the odor of narcotics was present anywhere in the room. I had Captain Coffman hide the US Currency unknown to Figo and I. I then used my K-9 again to conduct a sniff of the room and the hallway outside the room. My K-9 alerted to a podium that was against the West wall. The US Currency that had been collected from the bed of the truck was hidden inside this podium. I then searched the hallway and Figo alerted to a cabinet against the South wall. The US Currency that had been found in the passenger compartment of the truck had been hidden in this cabinet. I used my pocket camera to record a video of these sniffs and it was burned to a disk and placed in evidence.

USAO-000714

There is a recorded video of this incident from my patrol vehicle. The video starts with no audio due to a one minute buffer that the camera system has. There are several ways to activate the recording system. In this case, the recording system was activated when I activated my emergency lights. So the recording is with audio when my emergency lights were activated, plus one minute with no audio prior to the activation of my lights. The recording ends just after departing the traffic stop scene.

All traffic stop times in this report were gathered from watching the traffic stop video in Windows Media Player. Due to the one minute buffer the camera system has, the actual time is what the Media Player timer says minus one minute.

I have been directly involved in numerous other cases involving large amount of drugs and US Currency. These drug cases included high grade marijuana seizures with weights of 150 pounds, 63 pounds, 52 pounds, 31 pounds, 28 pounds and heroin seizures of 41 pounds and 10 pounds. These drug related US Currency cases involve 2 seizures of over $300,000.00, $97,000.00, $59,000.00, $41,000.00, and $30,000.00. Based on my training and experience, the US Currency seized in this case ($828,220.00) is consistent with either money that was directly derived from the sales of drugs, would be used to purchase more drugs, or would be smuggled to another country to fund criminal activity (As Marshall said he thought it would go "Across the border"). It has been my experience that drug dealers/currency smugglers often use their laptop computers to either arrange drug transactions and/or store information on them related to drug transactions. It has also been my experience that drug dealer's/currency smugglers computers will contain information as to the source of their drugs/currency, the recipients of their intended deliveries, and information regarding their own money they acquired as a result of their criminal involvement. I believe that the computer will also contain documented sales that contain the amounts of US Currency used in the transactions.

As reported above, I found very detailed logs of Marshall's prior trips. It appears as if he has made 3-4 Boston to Tucson trips per year since 1999 (Total trips would be estimated at 40-50). Based on all the information gathered in this case (Including Marshall's background and criminal history), I believe that Marshall is a highly professional currency smuggler and that he has been involved in this type of criminal activity for a long time. In my 9 years of being a Police Officer I have never come in contact with someone more professional than Marshall. Everything from the way he spoke, what he chose to say or not to say, how he said it, how his vehicle was set up, how he carried two sets of license plates for his truck, his detailed logs, his background and criminal history, how he tried to represent someone that was not involved in criminal activity, how he went about picking up and dropping off his deliveries, his knowledge of Law Enforcement tactics (State and Federal), and the fact that he has never been caught or so much as pulled over in the last 14 years.

WHEREFORE, the Affiant believes that there is probable cause to believe that evidence of a crime against the State of Kansas has been committed, and certain items to wit: Data contained by or within the flowing device, are located within a Think Pad Laptop Computer (Serial # L3N5656) and prays that the court authorize the search of said items and seizure of any items of evidence found therin.

USAO-000715

FURTHER AFFIANT SAITH NAUGHT.  _____
                                       Affiant

Subscribed and sworn to before me this 20th day of June 2013.

_____
Notary Public

[Notary stamp: PATRICIA GIORDANO, Notary Public - State of Kansas, My Appt. Expires]

Reviewed and approved by T.Cruz on 06/20/13

# IN THE DISTRICT COURT OF GEARY COUNTY, KANSAS

# IN THE MATTER OF THE APPLICATION FOR A SEARCH WARRANT FOR:

Electronic Device
And Data Therin

## SEARCH WARRANT

State of Kansas, County of Geary, ss:
**THE STATE OF KANSAS TO Nicholas Blake**
or any Peace Officer of the State of Kansas:
Having evidence under oath before me from which I find there is probable cause to believe that an offense against the laws of the State of Kansas has been committed and that certain items, to-wit:

**Data containing information of drug/currency transactions and drug/currency related material**

Note: This request for a warrant involves the potential seizure and review of computer and/or digital media. The analysis of computer and/or digital media is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover digital information, to include hidden, erased, compressed, password-protected or encrypted files. The analysis of evidence from computer and digital systems commonly require the seizure of all computer related items to be processed by a qualified computer expert in a laboratory or other controlled environment. The high volume of the contents and the potential intentional concealment of criminal activity through random ordering and deceptive file names may require the examination of all stored data. This process may take weeks or months depending on the volume of the data involved and the caseload of the computer expert.

One such forensic and controlled laboratory environment is the Heart of America Regional Computer Forensics Laboratory (HARCFL), which is physically located in Clay County, Missouri. The HARCFL is a cooperative law enforcement organization comprised of federal, state and local certified Forensic Examiners, that provide digital forensic services to law enforcement throughout Kansas and the western two-thirds of Missouri.

Recognizing that specialized and highly technical equipment and software will be needed to conduct the analysis of the previously seized digital media, the media will likely be transferred to the HARCFL or other qualified laboratory with a request that a forensic examination be conducted in this matter. Additionally, under limited situations, assistance may be required by the receiving laboratory from other qualified laboratories. For example, the HARCFL may need to request assistance from its affiliated laboratory, the FBI Laboratory in Quantico, Virginia. Should such assistance be required, the receiving laboratory will likely forward the above

1