described digital evidence for further analysis as authorized by the requested warrant.

Upon issuance of the requested warrant, the receiving laboratory will attempt to initiate the process to facilitate the forensic examination within 96 hours. In those instances in which such cannot be accomplished due to the laboratory's case load, transportation and/or shipping delays, absence of available qualified Forensic Examiners, etc., the court will be appropriately notified. Additionally, due to the processes that must be conducted to analyze digital media, the volume of information normally associated therewith, and the laboratory's caseload, it is extremely likely that the entire forensic process will require more than 10 days to complete."

It is therefore requested that the Court authorize that such search be authorized to be completed within a reasonable period of time after the requested warrant is signed, and the evidence to be searched here as stated below is delivered to HARCFL for review and recovery.

which are located in or upon the following described places, things or means of conveyance, to-wit:

-A black Think Pad laptop computer (Serial # L3N5656)

**YOU ARE THEREFORE COMMANDED** forthwith to search the place, things or means of conveyance herein before specified for such persons, holding them to be dealt with according to law and make due return of this warrant within ninety-six (96) hours of the date hereof.

Issued this 21st day of June, 2013, at 9:44 o'clock A.M.

_____
JUDGE OF THE DISTRICT COURT
GEARY COUNTY, KANSAS

2

USAO-000718

STATE OF KANSAS)

COUNTY OF GEARY)

## AFFIDAVIT

COMES NOW K-9 Officer Nicholas Blake, Junction City Police Officer, being of lawful age and first duly sworn, a Police Officer with the Junction City Police Department, to advise the court of the following information in a criminal investigation in Junction City, Geary County, Kansas:

The Affiant (Also known as I) has been a Police Officer for over 9 years (All with the Junction City Police Department). During my employment in law enforcement, I have been involved in the investigation of criminal offenses, including narcotics crimes, crimes against persons, and crimes against property. I have experience in executing search warrants and in the investigation of cases involving narcotics and currency smuggling.

On 06/18/13, at approximately 0933 hours, the I was on patrol traveling East on Interstate 70, at mile marker 292, Junction City, Geary County, Kansas. This area is a four lane highway with a set of lanes for each direction of travel. The set of lanes is divided by a grassy ditch area (Median). I note that in addition to being a sworn Officer for the City of Junction City, I am also a sworn Deputy for the Geary County Sheriff's Department and I am authorized to enforce laws within all of Geary County, Kansas. The weather was clear, warm, and sunny with a temperature of approximately 80 degrees Fahrenheit. I was operating marked patrol unit 216 which is equipped with Stalker radar, a camera system, and lights and sirens. I observed a gray/silver pickup truck pass by me at what appeared to be an accelerated speed. The truck was traveling West and I checked the truck's speed using my Stalker Radar system, which I am certified to use. I checked the trucks speed at 79 MPH in a posted 75 MPH zone. As I observed the truck's speed, it increased to 80 MPH. I turned around and caught up to the vehicle. I then conducted a traffic stop on the same truck on Interstate 70, at mile marker 289, Westbound. I note the final stop location was just inside Dickinson County, Kansas.

The truck was a 2002 GMC Sierra that had Colorado registration number 751 ARU. I made a passenger side approach and I made contact with the driver (Only occupant). The driver identified himself as Marshall Herbert Dion with an Arizona license. I noticed the address on the license showed a PO Box in Tucson, Arizona. I explained the reason for the stop and Marshall replied that he was "following traffic." I asked Marshall for his vehicle documents, which he provided. While Marshall gathered his documents, I questioned him about his travel. Marshall said he had a residence in Arizona and Massachusetts. Marshall said that he was coming from Pennsylvania and going back to Arizona. I asked Marshall to come sit in my patrol car with me while I checked his license and that I would only issue him a warning citation for the traffic violation. Marshall was apologetic for the minor traffic violation he had committed.

As Marshall exited his truck, I asked him if he had any knifes or weapons on his person. Marshall said he did not and added that he was 78 years old and that I could look in his truck if I wanted to. I found this behavior a little odd as the majority of people I come in contact with regarding minor traffic violations don't just offer to let me look inside their vehicle. Marshall and I

Page 1 of 9

got into my patrol vehicle **3 minutes and 5 seconds** into the stop. Once inside my patrol vehicle, I further spoke with Marshall about his employment, his travel plans, etc. Marshall told me the following:

- He was retired from the tobacco industry
- He was invested in real estate and he does not worry about money
- He collects social security and a pension
- He was coming from Yardley, Pennsylvania
- He went there to see his Certified Public Accountant (CPA)
- The purpose of his trip to Pennsylvania was to get caught up on "Some stuff"
- In addition to getting caught up on some stuff, he visited two museums
- He started his trip to Pennsylvania in Tucson, Arizona
- He left Tucson two weeks prior
- He was not going back to Tucson
- There were CPA's in Tucson
- He goes to see Pennsylvania CPA because he has been with her for a long time and she "Gives him a break" on the charges
- He was in Pennsylvania for three days
- He slept at his CPA's house while he was in Pennsylvania
- He was not intimately involved with
- His truck had Colorado plates because he owns property in Colorado
- He used to live in Colorado
- He trains Pilots
- He had been arrested before for "All kinds of things"
- Then says he has been arrested for possession of marijuana and "That's about it"
- That arrest was 18-20 years prior
- He owns property in Arizona, Massachusetts, and Colorado
- He rents out these properties
- He is not involved in drugs
- He is going to "hang out" when he gets back to Tucson
- He is going to do some work to his house as he just had a new water heater and his irrigation system is "all screwed up."

While talking with Marshall he seemed very nervous about something even though I had already told him I planned on only issuing him a warning citation and then getting him on his way. I could see Marshall's pulse pounding in his stomach area and I could also see the same in his carotid artery. Marshall seemed so nervous that I asked him if he heard me say that I was only going to issue him a warning citation. Marshall acknowledged that he had heard me previously.

I note that I ran Marshall's information through Dispatch **9 minutes and 34 seconds** into the stop. Dispatch came back with the returns **16 minutes and 40 seconds** into the stop. Dispatch advised that Marshall had a valid license and he was not wanted. Dispatch further advised that Marshall's arrest history was quite extensive and it involved several arrests for distribution of

Page 2 of 9

marijuana and cocaine. I note that I also ran a check on Marshall through the El Paso Intelligence Center (EPIC).

I found several things that were odd about Marshall's trip and some of his responses to my questions. The following is what I found:

- Google maps showed the most likely route from Boston to Tucson would be West on Interstate 70 then down on Interstate 44 in Missouri and Oklahoma and then on Interstate 40 to Arizona.
- His trip did not make much sense that he would drive 2345 miles one way to get caught up on some stuff with his CPA when flying would have been much cheaper
- Very expensive trip to drive that far when CPA business can easily be done over the phone, by computer e-mail, or by using FedEx or some other kind of mail carrier
- He had to go that far for a CPA because he had been with her for a long time and she gave him a good deal when there are plenty of CPA's in Tucson
- Marshall said he owned properties in several states, but his Arizona and Colorado addresses were apartments
- Marshall lived in an Apartment in Tucson, but said he had problems with his irrigation system
- Offered to let me search his truck several times
- Would often say "Pardon me" when I asked him a question and then answer it without me asking the question again (Stalling while he thinks of the answer)
- Would try and change the conversation topic (About his travel) several times
- Told me several times that he is 78 years old (Seeking sympathy)
- Lengthy drug trafficking history
- Very nervous
- Very apologetic about minor traffic violation
- Lied (Downgraded) about what he had been arrested for

At this point in the traffic stop, I was suspicious that criminal activity may be afoot.

I issued Marshall Geary County traffic citation number 46332 (GESO Case # 13-02169) for speeding (See attached). I deactivated all of my forward facing emergency equipment, I gave him his copy of the citation along with all of the documents he had provided me. This occurred 22 minutes and 30 seconds into the stop. I note the times reported in this case were gathered from watching the traffic stop video in Windows Media Player. See below for further information on the traffic stop recordings and how they were taken. I explained to Marshall that I turned off all of my forward facing lights and that the traffic stop detention was over. I told Marshall if he wanted to stay and chat with me further then that was ok with me. Marshall said he wanted to chat for about ½ a minute. Marshall spoke with me about a few things that were not related to the traffic stop. I then said "Let me ask you this." Marshall replied "You want to look in my truck?" I replied "Can I?" Marshall replied "Sure, I am telling you I am clean, I've been out of the business that was 23 years ago." I replied "I would love to look in your truck if you will let me." Marshall replied "Yeah, I am giving you permission." Marshall goes on to explain that I am a decent guy and he would normally "bust my balls like I was busting his." Marshall and I then had some small talk about prior

Page 3 of 9

service. Marshall then says "Yeah you can look in the truck." We both exit my patrol car and walk to the back of Marshall's truck. Marshall turns the topper windows handles (Allowing it to open out) and opens it. I observe a refrigerator and a bunch of other items. All these other items appeared to be random junk type items. I ask Marshall if I can lower the tailgate and he said I could. I asked Marshall where all the stuff in his truck was coming from and he said Boston. I found this very odd as he had never mentioned being in Boston at all up until this point. I asked Marshall if I could take the belongings out of the truck and he said I could. I note that while Dispatch was giving me Marshall's criminal history over the radio, I received a text message from Geary County Deputy Captain Coffman asking me if I wanted him to respond, which I did. Captain Coffman arrived around the time I started to search Marshall's vehicle. While I was searching, Marshall said "Officer you're not going to find anything in there." While searching, I asked Marshall how far Boston was from where his CPA was at. Marshall said it was "A couple hundred miles." I asked Marshall if he drove up there after seeing his CPA and he said he did. I note Marshall never explained this part of his travel to me initially. Marshall said "This is entertainment to me, I have nothing else to do." I confirmed with Marshall that his trip up to Boston was included in his three day stay in Pennsylvania. Marshall said that was correct. A short time later, Marshall said that he really needed to get going. What I gathered from what Marshall was saying was that he was revoking his consent for me to search his truck. I asked Marshall if I could use my K-9 partner to go around his truck to which he agreed. I note at this point my suspicion of criminal activity had grown.

I note that I have been a Police Officer for over 9 years and of that I have been a K-9 Handler for more than 5 years. I have had approximately 233 hours of documented narcotics and criminal interdiction related training. I have also been personally involved in numerous other stops (some of my own and some assisting with others) where large amounts of narcotics and/or US Currency have been found.

I retrieved my K-9 partner (Figo) and I used him to conduct an exterior sniff on Marshall's truck. As reported above, I have been the K-9 Handler for the Junction City Police Department for more than 5 years. I have been certified (4 week course) by Nelson Rivera K-9, which took place in January of 2008 in the central Kansas area. I am also certified through the Heart of America Police Dog Association (HAPDA). This is an annual certification that I have completed five times thus far. The most recent certification took place in October of 2012, in McPherson, Kansas. My certifications include narcotics detection for the odors of marijuana, cocaine, methamphetamine, heroin, and ecstasy. I started my search in the area of the front driver's side and I moved in a counter clockwise motion. Figo indicated to the odor of narcotics being present outside the vehicle in the area of the front driver side wheel well and in the area on the front bed on the passenger side. Upon observing these indications, I left those areas and worked them again to confirm the initial indications with Figo giving the same behavior changes in the same areas. I note that Figo does not have much interest in sniffing the rear portion of vehicles (Especially when the engine is running or the exhaust is hot due to a backfire incident he experienced with a previous Handler). Figo's behavior while detecting the odor of narcotics is referred to by me as either an indication or an alert. An indication is when he can smell the odor of narcotics, but cannot locate the source of the odor and he uses his nose in a searching manner. When he indicates, his posture becomes stiff, his breathing becomes shallow and rapid, and he sniffs the area very meticulously. When he indicates, he has detected the odor of narcotics, but not the source of the odor. An alert is when he has located the source and he will start to bite, bark, and/or scratch at the odor source. At this point, I was very suspicious that criminal activity was afoot.

Page 4 of 9

Captain Coffman had Marshall sit in the backseat of his marked patrol unit. I then asked Marshall if he had any cocaine, heroin, ecstasy, and marijuana (In that order). Marshall confidently answered no to each of those questions. I then asked about large amounts of US Currency. Marshall response to this question was very different than the rest. Marshall said "Pardon me" again like he had been doing before, stated no, then stuttered some words that I could not understand, and then said that he may have a couple of deposits with him that totaled $6000.00. I note that Marshall's response is common when questioned about the contraband he's hauling. Marshall's response leads me to believe that he was in possession of a large amount of currency.

I continued searching Marshall's truck and soon found two FedEx boxes in front of the refrigerator that contained a large amount of US Currency. Captain Coffman found two other boxes that contained the same on the side of the refrigerator (Side closet to driver side). Three of these boxes had permanent marker writing on them that read "24 100's." The fourth one had "9 100's" written on it. It was later found that these boxes contained nothing but 100 dollar bills in $10,000 stacks and wrapped with a little stack band that indicated the same.

Captain Coffman had Deputy Parker and Deputy Warnecke respond. I had Deputy Warnecke drive Marshall's truck to the Police Department Warehouse. This was so I could get off the side of the highway, take photographs, and conduct a more thorough search. Captain Coffman transported Marshall, who was under arrest at this point.

Once we arrived at the warehouse, I had Marshall stay seated in Captain Coffman's marked patrol unit. I later had Marshall sit inside the warehouse inside a fenced area with chairs. I finished searching Marshall's truck. I found several other smaller bundles of US Currency in addition to the currency in the FedEx boxes. Some were found in the front passenger compartment. Some were in a portfolio type bag and some were in a bank deposit bag that was inside the portfolio type bag. These were on the passenger seat (Single cab truck). The others were found inside two separate pieces of luggage in the bed of the truck. With the assistance of Detective's Campbell and Parsons, I used the Geary County Sheriff's Department Cummins money counter to count the money. The amount inside the four FedEx boxes was found to be $810,900.00. The rest of the money was found to be $17,320.00. I was later provided with two print out receipts and a disk containing the money count information. These two items were later placed into evidence. I photo copied the receipts and placed that copy with the case file. Also found were a set of Arizona plates that were currently registered on and for Marshall's truck and several logs. These logs were of Marshall's trips from Boston to Tucson and they were very detailed about when and where he stopped and his activity during those stops (Sleep, fuel, etc.). These logs dated back to 1999 and it appeared as if Marshall made this trip 2, 3, or 4 times per year.

I had Detective Arnold download Marshall's phone, GPS unit, and a jump drive while Marshall was under arrest and still in my custody. Detective Arnold later burned the phone and GPS information to a disk and he printed out the information found on the jump drive. The CD was later placed into Evidence.

I verbally advised Marshall of his rights under the Miranda warning (Read from a card). Marshall said he understood his rights. Marshall started off by saying that he couldn't talk to me because we "Crossed a line." I encouraged Marshall to talk with me in hopes that he may cooperate

and further this investigation. Marshall said that he thought he wasn't doing anything wrong and that he was "Just driving down the road." I replied "With a lot of money." Marshall replied "I don't even know that." Marshall added "I don't even know who loaded my truck." I told Marshall that I could believe that and he replied "You don't have to, I am a driver, I am driving, that's what I do." I continued to encourage Marshall to cooperate by giving him some examples of cases were other people cooperated. I was telling him about a case where drugs were found and later delivered. Marshall quickly replied that he doesn't "bother with dope anymore." Marshall then stated "I am a…..do you know what a mule is?" I asked if he was a mule and Marshall replied "You looking at one." I tell Marshall that I know he is going to do something when he gets to where he is going. This was in response to Marshall telling me that he doesn't know anything. Marshall says that he "Drops it when he gets to his destination" and he doesn't know "where it goes or anything else." Marshall goes on to tell me that he doesn't want to know where it goes and that he walks around with blinders on. I asked Marshall if "this money" was his. Marshall replied "I can't even tell you that." I asked Marshall if he could not say that the money is not his. Marshall said he could say that and asked "Who would believe me?" At one point I tell Marshall that someone is going to be very upset that this money was seized and I asked him if "they" were going to kill him. Marshall replied "I don't know." Marshall adds that the people he interacts with are all family people that have regular jobs and children. Marshall says he does not deal with people that are in gangs or have known violent tendencies. Marshall said that the money "Would probably go across the border." I replied "You wouldn't take it across the border?" Marshall replies "You damn right I wouldn't, I don't go across the border." I asked Marshall if he has anything when he goes East and he said he doesn't, stating "When I go East I go to see my CPA." I asked "So when you go West is when you do not know what you have." Marshall replied "They load the truck and I drive the truck." I asked Marshall where they have access to his truck at and he said "Probably in the Boston area." I asked if he just parks the truck and Marshall said he does. I asked if he goes off and minds his own business after he parks the car and Marshall said he did. Marshall added that he goes and rents a car after he parks his truck in the garage. I asked Marshall why he kept such detailed logs of his trips and he said because he was a record keeper. I asked Marshall where he was going when he got to Tucson and he said he would drive to and park his truck at his residence. I asked Marshall if someone was going to come and "get it" (Insinuating the money) and he said "Yeah, I don't want to see it." I asked if they come and get the truck or do they just get what is in the back of the truck and Marshall said he did not know. I asked if he communicates with anyone and Marshall said he didn't. A short time later Marshall said he "Knows one guy's name is Edgar."

The above conversation ends and I later come back and speak with Marshall further. We have a lot of small talk and then I tell him I know he is just doing this to make a little money. Marshall replies "You can't live on social security." Marshall later admits that he has no pension and his only source of legal income is social security which is less than $690.00 per month. I asked Marshall how much he gets paid per trip, stating that he has to be getting paid something. Marshall said that "They cover his expenses." I asked Marshall if he knew how much money he was carrying and he said he had no idea. I asked Marshall if he would tell me what money he was using other than the money in the FedEx boxes. Marshall said he had some money in the front in his satchel that he was using for his expenses. At one point during the conversation, I made sure Marshall was ok with me asking him questions and if he wanted to answer he would if not he wouldn't. Marshall was ok with this. I asked Marshall more about what happens when he gets to Boston. Marshall says he parks his truck in a parking garage. I asked how they know he is there and Marshall said because he calls them. I asked Marshall more about him calling when he gets close and Marshall said he

Page 6 of 9

does not want them to know where he is. Marshall said that if "they don't trust him then he doesn't want to deal with them." I asked Marshall how they know when he gets back to Tucson. Marshall said they know because they will either see him or see his truck.

I had Marshall transported to the Geary County Detention Center where he was booked, processed, and detained on no bond pending a first appearance in Geary County District Court.

**A check of Marshall's Triple I revealed arrests for narcotics distribution (multiple), theft, assault and battery with a dangerous weapon, and traffic charges.**

I collected the above listed items in addition to various documents, a laptop computer, cell phone, GPS, and some jump drives. I note the jump drives were searched by Detective Arnold around the same time the phones and GPS were downloaded. I looked through the computer while Marshall was under arrest and still in my custody. I found a money maintaining program that contained bank information on two of Marshall's bank accounts. Both were with Bank on America with one being in Boston and the other in Tuscon. I do not recall the exact amount but I saw that both accounts had 20-30 thousand dollars in each account. I listed all of the collected items on an Evidence Custody Receipt (ECR) and they were placed into the Police Department Lab for safekeeping. This includes disks that contain the money count information and the phone and GPS downloads. I also made some videos using my personal pocket camera. I later burned these videos to a disk and they were placed in evidence.

I seized the US Currency and Marshall's truck pending asset forfeiture proceedings. I also photographed Marshall's truck and its contents. I note that while searching Marshall's truck at the warehouse, I found that the contents in the bed of the truck did not appear to be anything of value. There were table tops with no legs, cardboard boxes that had been in there so long the color was starting to fade and the cardboard itself was starting to deteriorate, and lots of other old junk. I looked at the refrigerator and saw that the manual was still inside along with the cardboard pieces in the fruit drawers etc. I looked at the energy guide information and saw that it had been dated in 2007. I am aware that this kind of activity is common among smugglers. They will haul a junk load over and over and say that they are moving from one place to another or as in this case say they are taking items from one place to another using the load of items as a "cover load."

Based on the totality of the circumstances here and on my training and experience, I believe that the US Currency in this case is drug proceeds. I also believe the 20-30 thousand dollars that the computer program on Marshall's computer showed he has is also derived from drug proceeds. I believe the drug proceeds are also used to pay Marshall to haul the money back to the source. I also believe this because Marshall told me his only legal source of income is social security which is less than $690.00 per month.

I used my K-9 to conduct a sniff of the training room at the Sheriff's Department and my K-9 did not give any indication that the odor of narcotics was present anywhere in the room. I had Captain Coffman hide the US Currency unknown to Figo and I. I then used my K-9 again to conduct a sniff of the room and the hallway outside the room. My K-9 alerted to a podium that was against the West wall. The US Currency that had been collected from the bed of the truck was hidden inside this podium. I then searched the hallway and Figo alerted to a cabinet against the South wall. The US Currency that had been found in the passenger compartment of the truck had

USAO-000725

been hidden in this cabinet. I used my pocket camera to record a video of these sniffs and it was burned to a disk and placed in evidence.

There is a recorded video of this incident from my patrol vehicle. The video starts with no audio due to a one minute buffer that the camera system has. There are several ways to activate the recording system. In this case, the recording system was activated when I activated my emergency lights. So the recording is with audio when my emergency lights were activated, plus one minute with no audio prior to the activation of my lights. The recording ends just after departing the traffic stop scene.

All traffic stop times in this report were gathered from watching the traffic stop video in Windows Media Player. Due to the one minute buffer the camera system has, the actual time is what the Media Player timer says minus one minute.

I have been directly involved in numerous other cases involving large amount of drugs and US Currency. These drug cases included high grade marijuana seizures with weights of 150 pounds, 63 pounds, 52 pounds, 31 pounds, 28 pounds and heroin seizures of 41 pounds and 10 pounds. These drug related US Currency cases involve 2 seizures of over $300,000.00, $97,000.00, $59,000.00, $41,000.00, and $30,000.00. Based on my training and experience, the US Currency seized in this case ($828,220.00) is consistent with either money that was directly derived from the sales of drugs, would be used to purchase more drugs, or would be smuggled to another country to fund criminal activity (As Marshall said he thought it would go "Across the border"). It has been my experience that drug dealers/currency smugglers often use their laptop computers to either arrange drug transactions and/or store information on them related to drug transactions. It has also been my experience that drug dealer's/currency smugglers computers will contain information as to the source of their drugs/currency, the recipients of their intended deliveries, and information regarding their own money they acquired as a result of their criminal involvement. I believe that the computer will also contain documented sales that contain the amounts of US Currency used in the transactions.

As reported above, I found very detailed logs of Marshall's prior trips. It appears as if he has made 3-4 Boston to Tucson trips per year since 1999 (Total trips would be estimated at 40-50). Based on all the information gathered in this case (Including Marshall's background and criminal history), I believe that Marshall is a highly professional currency smuggler and that he has been involved in this type of criminal activity for a long time. In my 9 years of being a Police Officer I have never come in contact with someone more professional than Marshall. Everything from the way he spoke, what he chose to say or not to say, how he said it, how his vehicle was set up, how he carried two sets of license plates for his truck, his detailed logs, his background and criminal history, how he tried to represent someone that was not involved in criminal activity, how he went about picking up and dropping off his deliveries, his knowledge of Law Enforcement tactics (State and Federal), and the fact that he has never been caught or so much as pulled over in the last 14 years.

After further investigation, it was found that Marshall held at least five different bank accounts. Some were in the Tucson area and others in the Boston area, both of which Marshall conducted his criminal activity. It was found that Marshall had two Bank of America accounts, one in Tucson and the other in Boston. The Bank of America account in Boston (Account # ███████3213) was found to have a balance of $20,548.00. The Bank of America account in

Tucson (Account # ████1455) was found to have a balance of $14,399.00. I found that Marshall had an account (Account # 61000016743) with Sovereign Bank (Headquarters are in Boston) that has a balance of $35,637.00. I found that Marshall had a trust set up (Dion Family Trust) with Citizens Bank (Checking account # ████6336 and savings account # ████0164). At the time this Affidavit was prepared, the exact balance of the Citizen's bank accounts is unknown. The last known account Marshall holds is with Pima Federal Credit Union (Unknown account #) and it has a balance of around $400.00. Further investigation reveals that Marshall makes deposits to these accounts on a daily or every other day basis. The majority of these deposits are in the amount of $990.00.

Based on my training and experience, I am familiar that drug and currency smugglers often deal in cash. I am aware that the cash derived from these types of criminal activity are sometimes spread around to several different banks in several different geographical locations (As in this case). This is in an attempt to pass their cash holdings off as being legitimate/legal earnings and to make it more difficult for law enforcement to find if they are ever caught. Based on the fact that Marshall admitted his only source of legal income was social security that was less than $690.00 per month, I believe all of his known cash holdings were derived from smuggling contraband. I respectfully request a seizure warrant for all of the above listed accounts.

FURTHER AFFIANT SAITH NAUGHT.

_____
Affiant

Subscribed and sworn to before me this 21st day of June 2013.

_____
Notary Public

NOTARY PUBLIC - State of Kansas
JEFFERY S. CHILDS
My Appt. Exp. 3-16-2016

Page 9 of 9

USAO-000727

## SEIZURE WARRANT

Junction City Police Department,
    Plaintiff

vs.                                                                                          13-CV-

Bank of America, Acct #: ▓▓▓▓3213,
belonging to Marshall Herbert Dion
DOB: ▓▓1935
    Defendant

COMES NOW, THE STATE OF KANSAS, to the Sheriff of Geary County, Kansas, or any law enforcement officer therein:

WHEREAS, a verified affidavit and/or affidavits or other evidence has been filed with the undersigned judge at Junction City, Geary County, Kansas, and the undersigned Judge finds probable cause to believe that the above listed property is subject to civil forfeiture pursuant to K.S.A. 60-4104 and K.S.A. 60-4105.

WHEREUPON, the undersigned judge ORDERS the seizure of the above listed bank account and their contents as described within the above caption.

YOU are, therefore, commanded to seize and retain control of:

Bank of America, Acct #: ▓▓▓▓3213,
belonging to Marshall Herbert Dion
DOB: ▓▓1935

FURTHERMORE, the undersigned judge ORDERS that the Junction City Police Department retain temporary custody of the seized property until the matter is properly addressed in the civil forfeiture case.

WITNESS my hand in Junction City, Geary County, Kansas, this 21st day of June, 2013.

                                                        _[signature]_
                                             Judge of the District Court

USAO-000728

## SEIZURE WARRANT

Junction City Police Department,
    Plaintiff

vs.                                                             13-CV-

Bank of America, Acct #: 004652931455,
belonging to Marshall Herbert Dion
DOB: 8-1-1935
    Defendant

COMES NOW, THE STATE OF KANSAS, to the Sheriff of Geary County, Kansas, or any law enforcement officer therein:

WHEREAS, a verified affidavit and/or affidavits or other evidence has been filed with the undersigned judge at Junction City, Geary County, Kansas, and the undersigned Judge finds probable cause to believe that the above listed property is subject to civil forfeiture pursuant to K.S.A. 60-4104 and K.S.A. 60-4105.

WHEREUPON, the undersigned judge ORDERS the seizure of the above listed bank account and their contents as described within the above caption.

YOU are, therefore, commanded to seize and retain control of:

Bank of America, Acct #: ▮▮▮▮▮1455,
belonging to Marshall Herbert Dion
DOB: ▮▮▮1935

FURTHERMORE, the undersigned judge ORDERS that the Junction City Police Department retain temporary custody of the seized property until the matter is properly addressed in the civil forfeiture case.

WITNESS my hand in Junction City, Geary County, Kansas, this 21st day of June, 2013.

_____
Judge of the District Court

USAO-000729

SEIZURE WARRANT
Junction City Police Department,
    Plaintiff

vs.                                          13-CV-

All accounts at Pima Federal Credit Union
belonging to Marshall Herbert Dion/Dion Family Trust
DOB: ▒ 1935
    Defendant

    COMES NOW, THE STATE OF KANSAS, to the Sheriff of Geary County, Kansas, or any law enforcement officer therein:

    WHEREAS, a verified affidavit and/or affidavits or other evidence has been filed with the undersigned judge at Junction City, Geary County, Kansas, and the undersigned Judge finds probable cause to believe that the above listed property is subject to civil forfeiture pursuant to K.S.A. 60-4104 and K.S.A. 60-4105.

    WHEREUPON, the undersigned judge ORDERS the seizure of the above listed bank accounts and their contents as described within the above caption.

    YOU are, therefore, commanded to seize and retain control of:

All accounts at Pima Federal Credit Union
belonging to Marshall Herbert Dion/Dion Family Trust
DOB: 8-1-1935

    FURTHERMORE, the undersigned judge ORDERS that the Junction City Police Department retain temporary custody of the seized property until the matter is properly addressed in the civil forfeiture case.

    WITNESS my hand in Junction City, Geary County, Kansas, this 21st day of June, 2013.

                                                    _____
                                                   Judge of the District Court

SEIZURE WARRANT
Junction City Police Department,
    Plaintiff

vs.                                                             13-CV-

Sovereign Bank, Acct #: ▓▓▓▓ 6743,
belonging to Marshall Herbert Dion
DOB: ▓▓▓ 1935
    Defendant

   COMES NOW, THE STATE OF KANSAS, to the Sheriff of Geary County, Kansas, or any law enforcement officer therein:

   WHEREAS, a verified affidavit and/or affidavits or other evidence has been filed with the undersigned judge at Junction City, Geary County, Kansas, and the undersigned Judge finds probable cause to believe that the above listed property is subject to civil forfeiture pursuant to K.S.A. 60-4104 and K.S.A. 60-4105.

   WHEREUPON, the undersigned judge ORDERS the seizure of the above listed bank account and their contents as described within the above caption.

   YOU are, therefore, commanded to seize and retain control of:

Sovereign Bank, Acct #: ▓▓▓▓ 6743,
belonging to Marshall Herbert Dion
DOB: ▓▓▓ 1935

   FURTHERMORE, the undersigned judge ORDERS that the Junction City Police Department retain temporary custody of the seized property until the matter is properly addressed in the civil forfeiture case.

   WITNESS my hand in Junction City, Geary County, Kansas, this 21st day of June, 2013.

                                                    _____
                                                    Judge of the District Court

USAO-000731

SEIZURE WARRANT
Junction City Police Department,
    Plaintiff

        vs.                                                 13-CV-

Citizens Bank, Acct #: ▮▮▮▮▮6336 and acct #: ▮▮▮▮0164,
belonging to Marshall Herbert Dion/Dion Family Trust
    DOB: ▮▮1935
        Defendant

COMES NOW, THE STATE OF KANSAS, to the Sheriff of Geary County, Kansas, or any law enforcement officer therein:

WHEREAS, a verified affidavit and/or affidavits or other evidence has been filed with the undersigned judge at Junction City, Geary County, Kansas, and the undersigned Judge finds probable cause to believe that the above listed property is subject to civil forfeiture pursuant to K.S.A.60-4104 and K.S.A. 60-4105.

WHEREUPON, the undersigned judge ORDERS the seizure of the above listed bank accounts and their contents as described within the above caption.

YOU are, therefore, commanded to seize and retain control of:

Citizens Bank, Acct #: ▮▮▮▮▮6336 and acct #: ▮▮▮▮0164,
belonging to Marshall Herbert Dion/Dion Family Trust
DOB: ▮▮1935

FURTHERMORE, the undersigned judge ORDERS that the Junction City Police Department retain temporary custody of the seized property until the matter is properly addressed in the civil forfeiture case.

WITNESS my hand in Junction City, Geary County, Kansas, this 21st day of June, 2013.

                                    _____
                                    Judge of the District Court

SEIZURE WARRANT

Junction City Police Department,
    Plaintiff

vs.                                                                 13-CV-

Any and all accounts at Citizens Bank
belonging to Marshall Herbert Dion and/or Dion Family Trust
DOB ▒▒-1935
    Defendant

COMES NOW, THE STATE OF KANSAS, to the Sheriff of Geary County, Kansas, or any law enforcement officer therein:

WHEREAS, a verified affidavit and/or affidavits or other evidence has been filed with the undersigned judge at Junction City, Geary County, Kansas, and the undersigned Judge finds probable cause to believe that the above listed property is subject to civil forfeiture pursuant to K.S.A. 60-4104 and K.S.A. 60-4105.

WHEREUPON, the undersigned judge ORDERS the seizure of the above listed bank account(s) and their contents as described within the above caption.

YOU are, therefore, commanded to seize and retain control of:

Any and all accounts at Citizens Bank
belonging to Marshall Herbert Dion and/or Dion Family Trust
DOB ▒▒ 1935

FURTHERMORE, the undersigned judge ORDERS that the Junction City Police Department retain temporary custody of the seized property until the matter is properly addressed in the civil forfeiture case.

WITNESS my hand in Junction City, Geary County, Kansas, this 21st day of June, 2013.

_____
Judge of the District Court