# EXHIBIT D

| SEARCH WARRANT | TRIAL COURT OF MASSACHUSETTS |
|---|---|
| G.L.c. 276, §§ 1-7 | ~~District~~  Trial  COURT DEPARTMENT |
| NAME OF APPLICANT<br>Patrick M. Burke | Woburn                DIVISION |
| POSITION OF APPLICANT<br><br>Trooper | SEARCH WARRANT DOCKET NUMBER<br>1353 SW 0053 |

TO THE SHERIFFS OF OUR SEVERAL COUNTIES OR THEIR DEPUTIES, ANY STATE POLICE OFFICER, OR ANY CONSTABLE OR POLICE OFFICER OF ANY CITY OR TOWN, WITHIN OUR COMMONWEALTH:

Proof by affidavit, which is hereby incorporated by reference, has been made this day and I find that there is PROBABLE CAUSE to believe that the property described below

☐ has been stolen, embezzled, or obtained by false pretenses
☒ is intended for use or has been used as a means of committing a crime.
☒ has been concealed to prevent a crime from being discovered.
☒ is unlawfully possessed or concealed for an unlawful purpose.
☒ is evidence of a crime or is evidence of criminal activity.
☐ other (specify)

YOU ARE THEREFORE COMMANDED within a reasonable time and in no event later than seven days from the issuance of this search warrant to search for the following property:

See Addendum A attached hereto and incorporated herein

☒ at : (A)         Storage Unit 220, at The Town & Country Self Storage Facility, 130 Main Street, North Reading, Massachusetts as more particularly described as a storage unit located at the "Town & Country Self Storage Facility" at 130 Main Street in the town of North Reading. There is a black chain link fence encloses the front of this storage facility. The main office is a one-story wood frame structure with white siding and black shutters. Above the front windows there is a large red sign with white lettering which reads "Town & Country Self Storage 978-664-4044". On the right side of the front of the building the numbers "140" are clearly visible in black numbering. Access to storage unit "220" is obtained through a brown, corrugated metal garage door. This door opens and closes horizontally. The number "220" is affixed in black numbering directly above the center of the brown, corrugated metal garage door. There is one padlock on the right side of the garage door and which secures access to the storage unit.

which is occupied by and/or in the possession of:   MARSHALL DION (DOB 08/01/1935)

☐ on the person or in the possession of :

You ☒ are ☒ are not  also authorized to conduct the search at any time during the night.

You ☐ are ☒ are not  also authorized to enter the premises without announcement.

You ☐ are ☒ are not  also commanded to search any person present who may be found to have such property in his or her possession or under his or her control or to whom such property may have been delivered.

YOU ARE FURTHER COMMANDED if you find such property or any part thereof, to bring it, and when appropriate, the persons in whose possession it is found before the
**Woburn** Division of the **District** Court Department.

| DATE ISSUED<br>07/02/2013 | SIGNATURE OF JUSTICE, CLERK-MAGISTRATE OR ASSISTANT CLERK<br>x  Marianne Kiklis |
|---|---|
| FIRST OR ADMINISTRATIVE JUSTICE<br>WITNESS: Marianne C Hinkle | PRINTED NAME OF JUSTICE, CLERK-MAGISTRATE OR ASSISTANT CLERK<br>Marianne Kiklis |

## Addendum A

### (Items to be search for)

I.     Books, papers, documents, ledgers, records, accounts, whether in physical (paper) or electronic form (including digital storage devices such as thumb drives, DVDs, computers, blackberry or similar digital devices) evidencing the possession and/or distribution of heroin, cocaine, marijuana, and/or methamphetamine including, but not limited to records and other papers reflecting 1) the purchase or acquisition of the aforementioned controlled substance(s) 2) the identities of the source of the aforementioned controlled substance(s), 3) the storage of the aforementioned controlled substance(s), 4) the distribution of the aforementioned controlled substance(s), 5) the identities of persons to whom the aforementioned controlled substance(s) was/were distributed;

II.    Books, papers, documents, ledgers, records, accounts whether in physical (paper) or electronic form (including digital storage devices) evidencing the sources of money or other property used to purchase or acquire the aforementioned controlled substance(s) and/or the manner in which the financial proceeds of the distribution of the aforementioned controlled substance(s) are stored, invested or spent, including, but not limited to, 1) amounts of money paid, collected or owed on account of the purchase or sale of the aforementioned controlled substance(s), 2) bank records, 3) investment account records, 4) safe deposit box rental agreement or keys, 5) property deeds, 6) bill of sale, 7) tax returns, 8) vehicle titles;

III.   United States currency or coins used to purchase or sell the aforementioned controlled substance(s), or traceable to the purchase or sale of the aforementioned controlled substance(s);

IV.    Papers and possessions identifying the person(s) having custody and control over the premises being searched, and its contents;

V.      Scales, packaging materials, and paraphernalia used in the possession or distribution of the aforementioned controlled substance(s);

VI.     The aforementioned controlled substance, 1) heroin a Class "A" Controlled Substance, 2) cocaine a Class "B" Controlled Substance, 3) marijuana a Class "D" Controlled Substance, and 4) methamphetamine a Class "B" controlled substance.

VII.    Any and all records maintained at the storage facility evidencing access and control of the storage facility.

VIII.   Any cellular telephones, blackberries, or similar digital communications devices.

I also seek permission to photograph the interior of the unit in order to create a record of the condition of the residence and the location of evidence recovered during the search.

COMMONWEALTH OF MASSACHUSETTS

WOBURN, SS.

DISTRICT COURT

## AFFIDAVIT OF TROOPER PATRICK M. BURKE
## IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Patrick M. Burke, being duly sworn, depose and state under the pains and penalties of perjury that the following is true to the best of my knowledge and belief:

I.   Introduction

I submit this affidavit in support of an application for warrants to search:

(A)   **Storage Unit 220, at The Town & Country Self Storage Facility, 130 Main Street, North Reading, Massachusetts** as more particularly described below;

for heroin a Class "A" Controlled Substance, cocaine a Class "B" Controlled Substance, marijuana a Class "D" Controlled Substance, and methamphetamine a Class "B" controlled substance, drug distribution paraphernalia, and written documents, writings, notes, and other records in whatever form, including digital, relating to the distribution of controlled substances, as more fully described in Addendum A, below.

USAO-000069

## II.    Credentials of Affiant

1)    I, Trooper Burke, am a Massachusetts State Police Officer assigned to the PACT Unit of the Middlesex County District Attorney's Office.  I have been employed as a State Police Officer since April 2005.  I have been assigned to a number of duty stations throughout the Commonwealth as a uniformed patrol officer, including the Holden and Milton State Police Barracks.  For approximately two years before becoming a State Police Officer, I was a sworn law enforcement officer with the Stoughton Police Department.  During my time as a State Police Officer, I have initiated and/or participated in numerous investigations which have resulted in the arrest and conviction of individuals for various forms of criminal activity including, but not limited to, narcotics-related offenses.  Many of these investigations resulted in the seizure of controlled substances, weapons, stolen property, and other evidence of criminal activity.  More specifically, I have made dozens of arrests for violations of the Controlled Substances Act, and I have testified in both Superior and District Court throughout the Commonwealth.

2)    I have attended and graduated from both the Massachusetts State Police Academy as well as the Municipal Police Academy.  I hold a Master of Arts degree in Criminal Justice from the University of Massachusetts in Lowell.   I have received specialized training in the investigation, identification and illegal distribution of controlled substances.  This training included the recognition of various controlled substances.  Additionally, I have also received training and

2

USAO-000070

attended numerous seminars instructed by members of various local, state, and federal law enforcement agencies. This instruction has included, but is not limited to, interview and interrogation courses, surveillance courses, courtroom testimony courses, hidden vehicle compartment recognition courses, a money laundering course, as well as instruction and training in the weapons, methods and operations utilized by drug traffickers and other organized criminal enterprises. I have also attended and completed the Drug Enforcement Administration's eighty-hour Basic Narcotics School. I have participated in four prolonged narcotics investigations utilizing the authorized electronic interception of conversations and communications of narcotic traffickers. These cases resulted in the arrests of dozens of narcotics distributors, several of whom are currently serving lengthy prison sentences. These cases also resulted in the seizure of narcotics including cocaine, heroin and marijuana, property, vehicles, and over one million dollars in United States currency. My responsibilities during these wiretap investigations have included acting as a surveillance officer and monitoring officer in the wire monitoring room. I have applied for and received several search warrants authorizing the covert recording of conversations (so-called <u>Blood</u> Warrants). I have acted in an undercover capacity, making purchases of narcotics on several occasions. Additionally, I have received informal training from experienced narcotics investigators while engaged in cooperative investigations with federal, state and municipal law enforcement agencies.

## III.    The Structure and Methods of Drug Organizations

3)      Since my assignment to the District Attorney's Office, I have become familiar with, and have utilized many of the so-called "normal investigative procedures" used by law enforcement

USAO-000071

officers to identify, apprehend, and successfully prosecute persons involved in the distribution of controlled substances. These "normal investigative procedures" include, but are not limited to: physical surveillance, telephone analysis, public records analysis, interviews, gathering information from informants, "controlled purchases" of drugs, utilizing undercover law enforcement personnel to infiltrate drug distribution organizations, trash analysis, executing search warrants and grand jury investigations. I have also become familiar with the practical limitations of these techniques in penetrating organized drug distribution operations and bringing about the successful prosecution of all participants in such conspiracies. Additionally, I have participated in two investigations utilizing the authorized electronic interception of conversations and communications of such participants.

4)      Based on my training and experience, I am familiar with the terminology used by illegal narcotic users and distributers and am familiar with the manner in which these persons disguise the subject of their conversations and operations by speaking in a cryptic fashion. I have become acquainted with a full range of methods, practices, and techniques by which member of organized criminal enterprises illegally transport and distribute controlled substances. It is my opinion, as well as the collective opinion of other law enforcement officers experienced in investigating violations of the Controlled Substance Act, that persons involved in the distribution of controlled substances necessarily conspire with others, and that the distributors of controlled substances are part of an organized drug distribution network. It is also my experience that there are similarities between drug distribution networks.

USAO-000072

5) As a result of my training, experience, and conversations with other law enforcement personnel, both state and federal, involved in the investigation of organizations trafficking in controlled substances, I know that typically, a drug distribution network involves numerous persons who agree with one another (conspire) in and between the several levels of the network or organization. Most often, the structure of a drug distribution network can be compared to the structure of a pyramid.

6) I know that at the lowest (or first) level of the network are the consumers or users of controlled substances who most often purchase controlled substances in relatively small quantities for their own personal consumption.

7) At the next higher (or second) level of the conspiracy are the persons who sell controlled substances to the consumers. These persons may be referred to as "street dealers." Typically, "street dealers" maintain relatively small inventories of controlled substances for retail sale, and sell controlled substances to consumers in relatively small quantities. "Street dealers" often confine their sales activities to small, defined geographical areas.

8) The next higher (or third) level of the conspiracy is made up of persons who supply the controlled substances to the "street dealers." These people, who can be compared to merchandise wholesalers, may be referred to as "local dealers." Typically, "local dealers" sell controlled substances in larger quantities than "street dealers," and may operate in larger

5

geographical areas. A "local dealer" may distribute controlled substances to a number of "street dealers," and may also sell controlled substances to consumers.

9)      A number of higher levels of drug distribution networks and conspiracies can exist. At the highest levels of the organization are those relatively few persons who manufacture, produce or cultivate controlled substances. These persons introduce the controlled substances into the distribution chain, and the controlled substances are then distributed down through the many, many levels of the chain until they ultimately end up in the hands of the consumers.

12)     Distributors of controlled substances, from the so-called "street dealers" to those at the highest levels of the distribution chain, most often conduct their activities in such a manner as to minimize the likelihood of detection and apprehension by law enforcement officers. The techniques employed by these persons to avoid detection and apprehension often make it difficult, if not impossible, for law enforcement officers utilizing "normal investigative procedures" to successfully penetrate the higher levels of these distribution conspiracies. Techniques often employed by drug dealers to prevent detection and apprehension by law enforcement officers include, but are not limited to, the following:

       a.       To prevent apprehension through physical surveillance, drug dealers often employ counter-surveillance techniques that are designed to detect the presence of surveillance officers and/or to "lose" surveillance officers. For example, when driving vehicles, drug dealers will often drive at erratic speeds, circle blocks, make sudden U-turns, change direction without

6

signaling, etc. Drug dealers may also exit their vehicles and walk through crowded areas or enter and exit buildings.

        b.      Communication between persons involved in the purchase and sale of controlled substances often involve the use of telephones. This has the effect of limiting the effectiveness of physical surveillance.

        c.      To avoid detection through electronic surveillance, drug dealers, particularly at the "local dealer" level and higher levels, often use cryptic and coded language during conversations over their telephones, and often change telephones when conducting business related to the distribution of drugs. By using different telephones, drug dealers limit the likelihood of law enforcement being able to establish a pattern of telephone usage sufficient to obtain an electronic surveillance warrant. This in turn thwarts efforts to obtain evidence through telephone toll analysis.

        d.      Drug dealers often use cellular or mobile telephones. These telephones, and other telephones used by them on a regular basis, are often listed under other persons' names to provide further security. Cellular/mobile telephones provide mobility to drug dealers, allowing them to conduct their activities at any time and place, and when used by them in conjunction with counter-surveillance techniques, the effectiveness of physical surveillance is minimized. This mobility also thwarts law enforcement efforts to utilize electronic surveillance at fixed locations or on non-mobile phones.

        e.      Drug dealers, particularly at the "local dealer" and higher levels, frequently store their supply of controlled substances in "safe" or "stash" houses (in addition to their own residences), which are often times leased or owned under different or fictitious names.

7

USAO-000075

Frequently, drug dealers will store or transport narcotics, money or records pertaining to narcotics in motor vehicles.

    f.  Similarly, drug dealers at the "local dealer" and higher levels often will not use their own vehicles to store or transport controlled substances. Rather, they will often rent vehicles using different names, fictitious or otherwise, or use other persons' vehicles. This is done to avoid the likelihood of their own vehicles being seized and forfeited, to make physical surveillance by law enforcement more difficult, and to make it difficult to determine the dealer's true identity through a records check on the vehicle he/she is driving.

    g.  Drug dealers, particularly at the "local dealer" and higher levels, often minimize their direct contact with controlled substances by employing persons often referred to as "runners" and "mules." While the dealer may handle the negotiations and arrangements for the sale of controlled substances, he will minimize his risk of apprehension by utilizing a "runner" to make the actual pick-up and delivery of the controlled substance. The "runner" may also retrieve the money from the purchaser after making the sale and deliver it to the dealer.

13)  I also know from my training and experience that a business involved in the purchase and sales of controlled substances operates at all hours of the day and night. "Street dealers" often sell controlled substances to consumers during the nighttime, and dealers at all levels of the distribution chain negotiate, purchase and sell controlled substances at any time.

8

USAO-000076

14)     In my training and experience, I have also learned the following about the financial and logistical aspects of illegal narcotics distribution:

     a.     Drug distribution is sometimes conducted as a cash and carry business, and at other times drugs are bought and sold on credit. In either event, the distribution of drugs is a cash business, and distributors of drugs often deal in large sums of money. This necessitates that the distributor be in possession of, or has ready access to, large amounts of money and drugs.

     b.     Because drugs are often bought and sold on credit, drug dealers frequently maintain written records of the drugs bought and sold, the identities of the persons who have purchased or sold the drugs, and the moneys due to, or owed by, them.

     c.     Drug dealers often maintain books, records, receipts, invoices, notes, ledgers, money orders, bank records and other papers relating to their transportation, ordering, sale and distribution of controlled substances. These records may be maintained in long hand or in electronic format within a computer, blackberry device or cellular phone or in other forms of electronic digital storage such as a flashdrive.

     d.     Drug dealers often conceal their distribution records, controlled substances and money either on their person, in their residences and/or in their cars but also frequently utilize other physical locations such as storage facilities when dealing with large quantities.

     e.     Drug dealers utilize various paraphernalia, such as scales, cutting agents (dilutents) and packaging material, to prepare and package these controlled substances for further distribution. Such paraphernalia are often stored in close proximity to where the controlled substances are stored, such as in the cars and residences of dealers, and on their persons.

9

USAO-000077

IV.     Electronic Communications

15)     Persons involved in the trafficking of controlled substances communicate with many individuals and organizations in order to facilitate the distribution of controlled substances as well as the proceeds of the sales of those controlled substances.  Through my training and experience I know that these communications have been historically conducted telephonically but are increasingly being conducted electronically by e-mail and text messaging via cellular/mobile phones.  Based on my training and experience, I am aware that the type of information contained on cellular telephone call histories, voicemails, photographs and text messages can be useful in determining the facts and circumstances surrounding illegal narcotic activity and identifying co-conspirators.  Virtually all cellular telephones contain a "call-history" function that will display the identities (phone numbers and often names or nicknames) of parties who called the phone and parties who were called from the phone, as well as the time and sequence of such telephone calls.

18)     I know from my training and experience that drug dealers will often receive phone calls on their cellular phone for orders of drugs via phone calls, text messages and voice mail messages.  I also know that cell phones are commonly used to arrange and coordinate specific meet locations in order to distribute controlled substances, including during this particular investigation.

10

USAO-000078

## V.   Investigation

19)   This affidavit does not include every fact known to me or other law enforcement officials about this investigation, but only those facts I believe are necessary to establish probable cause for the requested search warrant.

According to Officer Nicholas Blake of the Junction City, Kansas Police Department's Arrest Report for Marshall Dion (DOB: 08/01/1935; SSN: 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):

20)   On June 18, 2013, Marshall Dion, Date of Birth (DOB) 8/1/35, was stopped for speeding by the Junction City Police Department (JCPD) in Kansas, while driving a 2002 GMC Sierra pickup with Colorado registration plates.

21)   During the JCPD roadside interview, Dion presented the interviewing officer with a valid Arizona driver's license, and explained that he was coming from Pennsylvania en route to his home in Tucson, Arizona. Dion stated that he had residences in Massachusetts and Arizona.

22)   Dion further explained that he had traveled from Tucson, Arizona, to Yardley, Pennsylvania to meet with his CPA. He stated that he had stayed in Pennsylvania for three days, and was headed home to Tucson, Arizona. Dion claimed that he traveled to Pennsylvania to meet with his CPA because she "gives him a break" on the charges.

23)   The interviewing officer detected signs of deception throughout the interview, including a travel itinerary that didn't seem to make sense. Dion continued to talk to the interviewing officer

11