after he had been issued a written citation for speeding. At one point, the officer asked for, and was granted, consent to search Dion's truck.

24)     Upon opening the rear of the truck, the officer observed several items that appeared to be random junk, and a refrigerator. When the officer asked Dion where these items came from, Dion told the officer that he picked them up in Boston. This was the first time that Dion had mentioned being in Boston.

25)     The interviewing officer, who was also a K9 officer, conducted an exterior sniff of Dion's vehicle. The K9 alerted to the area of the front driver side wheel well and in the area of the front bed on the passenger side. The officer asked Dion if he had any cocaine, heroin, ecstasy, or marijuana. Dion confidently answered no to each question. When the officer asked Dion if he had any large amounts of US currency with him, he first answered no, and then said that he had approximately $6,000 worth of cash with him to be deposited into the bank.

26)     The officer then continued the search of the vehicle and located two FedEx boxes in front of the refrigerator that contained a large amount of US currency. A second officer, who was assisting the search, located two additional boxes beside the refrigerator, which also contained a large amount of US currency. Three of these boxes had permanent marker writing on them that read "24 100s." The fourth box had "9 100s" written on it. It was later found that these boxes contained nothing but 100 dollar bills in $10,000 stacks and wrapped with a little stack band that indicate the same total. Several other bundles of cash were located within the truck. The amount inside the FedEx boxes was found to be $810,900, and the other cash was found to be $17,320. In my training and experience, this amount of cash and the manner in which it was concealed,

USAO-000080

packaged, and transported is typical of bulk cash smuggling methods used to move cash in the organized drug trade.

27)     Dion was arrested and given his Miranda rights, which he said he understood. Dion initially claimed that he had done nothing wrong and that he was "Just driving down the road." When Dion was told that he was driving with a large amount of cash, he responded, "I didn't even know that." Dion further stated, "I don't even know who loaded my truck." When the interviewing officer proposed to Dion that he might assist the police by making a controlled delivery of the money that could result arrests of persons involved in the drug trade, Dion quickly stated that he doesn't "bother with dope anymore." Dion then went to describe himself as a "mule", which your affiant understands to be a person who simply drives a package for an organization. That package is typically drugs or money, but can be almost anything. Dion explained to the interviewing officer that he takes the money and "drops it when he gets to his destination" and he doesn't know "where it goes or anything else." Dion was asked if the money was his and he responded, "I can't even tell you that." Dion admitted that the money, "Would probably go across the border." When he was asked if he would take it across the border Dion replied, "You're damn right I wouldn't, I don't go across the border." Dion was speaking of the US-Mexico border, and your affiant believes that Dion would not cross into Mexico for fear of the high level of violence in Mexico related to the illegal narcotics trade.

28)     Dion claimed that when he is in Boston, someone would load his truck "probably in the Boston area." Dion claimed that he just parked the truck in a parking garage in Boston and rented a vehicle to drive while the unidentified individuals allegedly loaded the truck with cash. Dion stated that he had no pension and his only source of legal income is social security, which pays him less than $690 per month. However, during the search of Dion's truck, the JCPD

13

located checks that were made out to a trust account and appeared to be ready for deposit. The JCPD subsequently investigated this account and found that it was a trust account in Dion's name and that it contained approximately $1.9 million in cash. The JCPD seized this account and the funds on deposit for forfeiture. Dion is currently charged with transporting drug proceeds. Although no drugs were found in the vehicle, the K9 alert suggests that the money found may have been stored with drugs or that the vehicle had earlier been used to transport drugs and that the odor remained.

29)   The JCPD seized various other items from Dion's truck, including a Garmin GPS unit. The JCPD searched the Garmin GPS and found that Dion had arrived in Boston at 4 Longfellow Place, on June 2, 2013, at approximately 10:08pm. The following day, June 3, 2013, at approximately 6:29am, the GPS showed that Dion traveled to 30 Main Street, North Reading, Massachusetts, and remained there for approximately 30 minutes. This is the address of a Town and Country Self Storage. The GPS showed that Dion went to the Town and Country Self Storage a second time on June 6, 2013, this time for approximately 90 minutes.

30)   Since his arrest, Dion has made several recorded calls from jail. On June 28, 2013, Dion called an individual and asked him to bring money to his brother-in-law to pay for his attorney in Kansas. When this individual attempted to ask questions of Dion, Dion stated, "This is not a secure phone so I can't talk with you."

31)   Dion also called a second individual on June 28, 2013, and told him to take a box that belonged to him (Dion) to Dion's brother-in-law. Earlier in the day, Dion had told his brother-in-law that these two individuals (whom Dion named in the calls) would come through with money for Dion's attorneys.

14

USAO-000082

32)     As a result of this information, On July 2, 2013 the FBI, Massachusetts State Police, and

North Reading Police, went to the Town and Country Self Storage, located at 130 Main Street,

North Reading, Massachusetts. The owners were given a subpoena for information related to

any units owned by Marshall Dion. Records located by Town and Country ownership indicate

that Marshall Dion rents unit #220. In his application, dated August 30, 1999, Dion indicated his

home address to be 4 Longfellow Place, Unit 3802, Boston, Massachusetts. In the description of

items to be stored in the unit, Dion wrote "documents/office furniture" and indicated that his

legal occupation was "Legal Investigation." Payment records indicate that Dion has paid his rent

on the storage unit through August 30, 2013.

33)     On July 2, 2013, at approximately 1:00 PM, Tpr. Christopher Coscia and his K-9 partner

"Dante" arrived on scene at the Town and Country Self Storage, located at 130 Main Street,

North Reading, Massachusetts . Tpr. Coscia deployed "Dante" and an exterior scan of the

storage lockers 215 through 225 was conducted. "Dante" reacted positive for narcotic odor on

the exterior of the locker #220. The dog scratched at the unit door; Tpr. Coscia explained that

this is a positive alert the presence of narcotic odor.  The locker was subsequently secured by

investigators pending a search warrant. Trooper Coscia has been employed with the

Massachusetts State Police for the last fourteen years and has been assigned to the K-9 unit for

the last eight years. Trooper Coscia and K-9 Dante have attended and successfully completed

courses in narcotic odor detection, specifically marijuana, cocaine, heroin and

methamphetamine. Trooper Coscia has been working with "Dante" since he was certified in

patrol school in 2005, and is Dante's sole custodian. Trooper Coscia and K-9 Dante received

accreditation for narcotic odor detection through the New England State Police Administrator

Conference in the past and were most recently re-certified on June 5, 2013. Trooper Coscia

15

informed me that Dante has given numerous successful alerts resulting in seizures from automobiles, aircraft, and building structures. Trooper Coscia and Dante also engage in proficiency training on a monthly basis. Trooper Coscia advised that Dante is a well trained and reliable canine.

## VI.   Storage Facilities

34)   It is my experience, as well as the collective experience of law enforcement officers involved in this investigation, that storage facilities are often used to store controlled substances, ledgers, scales, paraphernalia, and other items listed in Addendum A. I am personally aware that in 2007, Trooper Timothy Babbin executed a search warrant for a residence, which yielded a large amount of green vegetable matter, believed to be marijuana, a large amount of currency, in excess of $80,000.00, and documents and records consistent with the distribution of marijuana. Among those records were account statements for several storage facilities located throughout the commonwealth. Following a positive alert from Massachusetts State Police K-9, Trooper Babbin applied for and was issued search warrants for all three facilities. Upon execution of the search warrant, bails of marijuana were recovered from the facilities, totaling in excess of 100 pounds. The present situation presents similar circumstances that suggest narcotics will be found within the storage facility rented by Dante.

## V.   Conclusion

Therefore, I respectfully request the Court issue a warrant authorizing the search of:

USAO-000084

(A)     **Storage Unit 220, at The Town & Country Self Storage Facility, 130 Main Street, North Reading, Massachusetts** as more particularly described as a storage unit located at the "Town & Country Self Storage Facility" at 130 Main Street in the town of North Reading. The a black chain link fence encloses the front of this storage facility.  The main office is a one-story wood frame structure with white siding and black shutters.  Above the front windows there is a large red sign with white lettering which reads "Town & Country Self Storage 978-664-4044".  On the right side of the front of the building the numbers "140" are clearly visible in black numbering.  Access to storage unit "220" is obtained through a brown, corrugated metal garage door. This door opens and closes horizontally. The number "220" is affixed in black numbering directly above the center of the brown, corrugated metal garage door.  There is one padlock on the right side of the garage door and which secures access to the storage unit.

Based on the facts and circumstances contained in this report, as well as the collective training and experience of investigators involved in this investigation, this officer has probable cause to believe that the items listed below will be located at **Storage Unit 220, at The Town & Country Self Storage Facility, 130 Main Street, North Reading, Massachusetts.**

As such, I request authority to search said premises for evidence of the crime of narcotics possession and trafficking, such evidence to include the following:

I.      Books, papers, documents, ledgers, records, accounts, whether in physical (paper) or electronic form (including digital storage devices such as thumb drives, DVDs, computers, blackberry or similar digital devices) evidencing the possession and/or distribution of heroin, cocaine, marijuana, and/or methamphetamine including, but not limited to records and other

17

USAO-000085

papers reflecting 1) the purchase or acquisition of the aforementioned controlled substance(s) 2) the identities of the source of the aforementioned controlled substance(s), 3) the storage of the aforementioned controlled substance(s), 4) the distribution of the aforementioned controlled substance(s), 5) the identities of persons to whom the aforementioned controlled substance(s) was/were distributed;

II.     Books, papers, documents, ledgers, records, accounts whether in physical (paper) or electronic form (including digital storage devices) evidencing the sources of money or other property used to purchase or acquire the aforementioned controlled substance(s) and/or the manner in which the financial proceeds of the distribution of the aforementioned controlled substance(s) are stored, invested or spent, including, but not limited to, 1) amounts of money paid, collected or owed on account of the purchase or sale of the aforementioned controlled substance(s), 2) bank records, 3) investment account records, 4) safe deposit box rental agreement or keys, 5) property deeds, 6) bill of sale, 7) tax returns, 8) vehicle titles;

III.    United States currency or coins used to purchase or sell the aforementioned controlled substance(s), or traceable to the purchase or sale of the aforementioned controlled substance(s);

IV.     Papers and possessions identifying the person(s) having custody and control over the premises being searched, and its contents;

USAO-000086

V.      Scales, packaging materials, and paraphernalia used in the possession or distribution of the aforementioned controlled substance(s);

VI.     The aforementioned controlled substance, 1) heroin a Class "A" Controlled Substance, 2) cocaine a Class "B" Controlled Substance, 3) marijuana a Class "D" Controlled Substance, and 4) methamphetamine a Class "B" controlled substance.

VII.    Any and all records maintained at the storage facility evidencing access and control of the storage facility.

VIII.   Any cellular telephones, blackberries, or similar digital communications devices.

Signed under the pains and penalties of perjury this 2nd day of July, 2013.

_____
Trooper Patrick M. Burke,
Massachusetts State Police

Then personally appeared the above named Patrick M. Burke and made oath that the foregoing affidavit by him subscribed is true.

19

USAO-000087

Before me this 2nd day of July, 2013

_____

Associate Justice, Superior Court

**Addendum A**

(Items to be search for)

I.       Books, papers, documents, ledgers, records, accounts, whether in physical (paper) or

electronic form (including digital storage devices such as thumb drives, DVDs, computers,

blackberry or similar digital devices) evidencing the possession and/or distribution of heroin,

20

USAO-000088

cocaine, marijuana, and/or methamphetamine including, but not limited to records and other papers reflecting 1) the purchase or acquisition of the aforementioned controlled substance(s) 2) the identities of the source of the aforementioned controlled substance(s), 3) the storage of the aforementioned controlled substance(s), 4) the distribution of the aforementioned controlled substance(s), 5) the identities of persons to whom the aforementioned controlled substance(s) was/were distributed;

II.     Books, papers, documents, ledgers, records, accounts whether in physical (paper) or electronic form (including digital storage devices) evidencing the sources of money or other property used to purchase or acquire the aforementioned controlled substance(s) and/or the manner in which the financial proceeds of the distribution of the aforementioned controlled substance(s) are stored, invested or spent, including, but not limited to, 1) amounts of money paid, collected or owed on account of the purchase or sale of the aforementioned controlled substance(s), 2) bank records, 3) investment account records, 4) safe deposit box rental agreement or keys, 5) property deeds, 6) bill of sale, 7) tax returns, 8) vehicle titles;

III.    United States currency or coins used to purchase or sell the aforementioned controlled substance(s), or traceable to the purchase or sale of the aforementioned controlled substance(s);

IV.     Papers and possessions identifying the person(s) having custody and control over the premises being searched, and its contents;

21

USAO-000089

V.      Scales, packaging materials, and paraphernalia used in the possession or distribution of

the aforementioned controlled substance(s);


VI.     The aforementioned controlled substance, 1) heroin a Class "A" Controlled Substance, 2)

cocaine a Class "B" Controlled Substance, 3) marijuana a Class "D" Controlled Substance, and

4) methamphetamine a Class "B" controlled substance.


IX.     Any and all records maintained at the storage facility evidencing access and control of the

storage facility.

X.      Any cellular telephones, blackberries, or similar digital communications devices.


I also seek permission to photograph the interior of the unit in order to create a record of the

condition of the residence and the location of evidence recovered during the search.

USAO-000090

## APPLICATION FOR USE AND/OR OCCUPANCY
THE APPLICANT IS INVITED TO FURNISH THE FOLLOWING INFORMATION. PLEASE PRINT CLEARLY.

IF NOW MOVING ENTER NEW ADDRESS

WHEN MOVING?

DATE OF APPLICATION X 8.30.99    AGE

☐ M  ☐ F   HAVE YOU RENTED HERE BEFORE?  ☐ YES ☐ NO  IF YES, WHEN?

HOME PHONE NUMBER  617·523·4455

APPLICANT'S NAME  X MARSHALL DION    SPOUSE'S NAME  X N/A

STREET ADDRESS  X 4 LONGFELLOW PL-Su 3802    POST OFFICE  X BOSTON    X ZIP 02114

TYPE OF GOODS TO BE STORED (REFER TO RESTRICTIONS)  X Documents/Office Furniture

YOUR SOCIAL SECURITY NUMBER  ·4580

OCCUPATION OR BUSINESS X Legal Investigation    EMPLOYED BY OR BUSINESS NAME X do/bo Felgodus & Ditelberg    HOW LONG? X 19 yrs

STREET ADDRESS X 4 Longfellow Pl - Ste 3802

CITY, STATE & ZIP X Boston MA 02114    EMPLOYER'S PHONE NO. X 617.523.4455

IF IN MILITARY SERVICE, PLEASE GIVE THE FOLLOWING INFORMATION:
BRANCH          LOCATION          SERIAL NUMBER          TOUR OF DUTY ENDS

DO YOU NOW ①OWN ②RENT ③APT. ④HOUSE ⑤COND. ⑥MOBILE ⑦MOVING
OR IS THIS A ⑧GOVERNMENT ⑨COMMERCIAL ⑩INDUSTRIAL ACCOUNT?
HOW DID YOU FIRST LEARN ABOUT THIS FACILITY?
⑪TV ⑫Radio ⑬Newspaper ⑭Yellow Pages ⑮Drive By ⑯Hear Say ⑰Rented Before
HOW FAR DO YOU LIVE FROM THIS PROJECT? ⑱Within 1 mile ⑲1-3 miles ⑳3-5 miles ㉑5-8 miles ㉒over 8 miles

A  CAR MAKE, TYPE & COLOR

B  CAR LICENSE No. & STATE

NOTICE! PLEASE READ YOUR OCCUPANCY AGREEMENT CAREFULLY.

C  DRIVER'S LICENSE NO. & STATE  X 445803/ ME

PERSON WHO CAN BE REACHED IF APPLICANT IS UNAVAILABLE

NAME X Dennis Ditelberg    RELATIONSHIP X legal counsel

STREET X 4 Longfellow Pl    PHONE X (617) 523-4455

POST OFFICE X Boston    ZIP X 02114

D  DATE OF BIRTH

E  LICENSE EXPIRES

PRINT NAME OF OTHERS AUTHORIZED FOR ACCESS.  X NO    X    X

AUTHORIZED PERSON MUST SIGN HERE → X Marshall Dion (SIGNATURE)    X (SIGNATURE)    X (SIGNATURE)

I (WE) GIVE THIS INFORMATION KNOWING IT WILL BE USED IN ESTABLISHING THIS ACCOUNT. I (WE) HAVE NO OBJECTION TO INQUIRIES BEING MADE TO VERIFY THESE STATEMENTS. SHOULD I (WE) CHANGE MY (OUR) ADDRESS OR EMPLOYER DURING THE PERIOD OF OCCUPANCY OF THE RENTAL UNIT/SPACE, I (WE) WILL NOTIFY YOU OF SUCH A CHANGE ALONG WITH THE NEW PHONE NUMBER(S). I (WE) UNDERSTAND THIS APPLICATION IS SUBJECT TO THE APPROVAL OF THE HOME OFFICE.

X Marshall Dion (SIGNATURE OF APPLICANT(S))

FOR RECREATION VEHICLES
☐ Motor Home
  ☐ Mobile Home
☐ Camper ☐ Tow ☐ Pick-Up
☐ Boat ☐ Power ☐ Sail
☐ Tractor ☐ Trailer
☐ Airplane ☐ Other(describe)

| CREDIT CARDS: NAME | ACCOUNT NUMBER | EXPIRATION DATE |
|---|---|---|
| 1. | | |
| 2. | | |

MAKE          YEAR

BANK

☐ CHECKING  ☐ SAVINGS

LICENSE NO.          STATE

REMARKS:

LENGTH          WIDTH

HEIGHT

REORDER FORM OLC SYSTEM 3
NATIONWIDE 800-523-5753

COPYRIGHT 1980
GARLITS INDUSTRIES, INC.

Printed in United States of America

USAO-000091

| BUSINESS PHONE | | | | HOME | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|

NAME Marshall Dion
STREET PO Box 507
CITY Revere, MA 02151-0005

CAUTION! DO NOT TYPE OR WRITE OUTSIDE SCREENED AREA WHEN USING CARBON TABS

CHECK TRANSIT NUMBER

SIZE 10x20
DO YOU WANT INSURANCE? □ YES ■ NO  210
INITIAL
□ 1 MONTH □ 2 MONTHS □ 3 MONTHS □ YEAR
KEY NO.

Unit No. 220  Dion Marshall

HOW LONG AT THIS ADDRESS? YRS  PREVIOUS ADDRESS
AGREEMENT DATE 8-30-99  AGREEMENT NUMBER 5477  VACATE NOTICE RECEIVED ON
DEPOSIT AMT. $  REFUND AMT. $  DATE  CHECK No.  DUE DATE 30

| | UNIT No. | DATE PAID | RECEIVED FROM | RECEIPT | TOTAL | C or √ | RENT | LATE CHG | TAX | OTHER | | BAL. DUE | RENT PAID TO |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 220 | 8-30-99 | Marshall Dion | | 540 | ✓ | 525 | | 15-1F | | | | 10-29-99 |
| 2 | 220 | 11-18-99 | " | " | 185 | ✓ | 525 | | | | | | 2-29-00 |
| 3 | 220 | 3-11-00 | " | " | 525 1050 | ✓ | 1050 | | | | | | 8-29-00 |
| 4 | 220 | 9-21-00 | " | " | 1050 | ✓ | 1050 | | | | | | 2-29-00 |
| 5 | 220 | | " | " | | | | | | | | | |
| 6 | 220 | 2-26-01 | " | " | 1050 | ✓ | 1050 | | | | | | 8-29-01 |
| 7 | | | | | | | | | | | | | |
| 8 | 220 | 1-30-01 | " | " | 1170 | ✓ | 1170 | | | | | | 8-29-01 |
| 9 | 220 | 8-13-02 | " | " | 1260 | ✓ | 1260 | | | | | | 2-28-03 |
| 10 | 220 | 1-29-03 | " | " | 1260 | ✓ | 1260 | | | | | | 8-28-03 |
| 11 | 220 | 8-9-03 | " | " | 1260 | ✓ | 1260 | | | | | | 2-29-03 |
| 12 | 220 | 2-24-04 | " | " | 1250 | ✓ | 1250 | | | | | | 8-29-04 |
| 13 | 220 | 8-24-04 | " | " | 1260 | ✓ | 1260 | | | | | | 2-29-05 |
| 14 | 220 | 2-22-05 | " | " | 1260 | ✓ | 1260 | | | | | | 8-29-05 |
| 15 | 220 | 8-25-05 | " | " | 1260 | ✓ | 1260 | | | | | | 2-29-06 |
| 16 | 220 | 2-14-06 | " | " | 1260 | ✓ | 1260 | | | | | | 8-29-06 |
| 17 | 220 | 8-11-06 | " | " | 1260 | ✓ | 1260 | | | | | | 2-28-07 |
| 18 | 220 | 2-22-07 | " | " | 1260 | ✓ | 1260 | | | | | | 8-28-07 |
| 19 | 220 | 8-17-07 | " | " | 1260 | ✓ | 1260 | | | | | | 2-28-08 |
| 20 | 220 | 10-2-07 | " | " | 1260 | ✓ | 1260 | | | | | | 8-28-08 |
| 21 | 220 | 8-19-08 | " | " | 1260 | ✓ | 1260 | | | | | | 2-28-09 |
| 22 | 220 | 3-9-09 | " | " | 1260 | ✓ | 1260 | | | | | | 8-28-09 |

TOTAL PAID THIS CARD ⟶  CARD No.

COPYRIGHT 1980, BY GARLITS INDUSTRIES, INC. MORRISVILLE, PA 19067-1110 NATIONWIDE 800 523-5753 IN PA 800-792-1500  OCCUPANT LEDGER CARD (OLC) SYSTEM 3  REV. 1/86  Garlit

USAO-000092

OUT

UNIT No. *Dion Marshall 220*

| BUSINESS PHONE | | HOME PHONE | | | | SIZE *10X20* | |
|---|---|---|---|---|---|---|---|
| NAME *Marshall Dion* | | | CAUTION! DO NOT TYPE OR WRITE OUTSIDE SCREENED AREA WHEN USING CARBON TABS | | DO YOU WANT INSURANCE? ☐ YES ☐ NO INITIAL *210* | | |
| NAME *10 Box 507* | | | | | | | |
| STREET | | | | | | | |
| CITY *Revere, MA* | ZIP *02151-1* | | CHECK TRANSIT NUMBER | ☐ 1 MONTH ☐ 2 MONTHS ☐ 3 MONTHS ☐ YEAR | | | |
| HOW LONG AT THIS ADDRESS? | YRS | PREVIOUS ADDRESS | | | | KEY NO. | |

| AGREEMENT DATE *8-30-99* | AGREEMENT NUMBER *5477* | VACATE NOTICE RECEIVED ON | DEPOSIT AMT. $ | REFUND AMT. $ | DATE | CHECK No. | DUE DATE *30* |
|---|---|---|---|---|---|---|---|

| | UNIT No. | DATE PAID | RECEIVED FROM | RECEIPT | TOTAL | C or ✓ | RENT | LATE CHG | TAX | OTHER | CODE | BAL. DUE | RENT PAID TO |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 220 | 8-17-09 | M. Dion | | 1260 | ✓ | 1260 | | | | | | 2-30-10 |
| 2 | 220 | 1-30-10 | " " | | 1260 | ✓ | 1260 | | | | | | 8-30-10 |
| 3 | 220 | 8-16-10 | " " | | 1260 | ✓ | 1260 | | | | | | 2-30-10 |
| 4 | 220 | 1-31-11 | " " | | 1260 | ✓ | 1260 | | | | | | 8-30-11 |
| 5 | 220 | 8-16-11 | " " | | 1260 | ✓ | 1260 | | | | | | 2-30-11 |
| 6 | 220 | 2/27/12 | | | 1260 | ✓ | 1260 | | | | | | 8-30-12 |
| 7 | 220 | 8-7-12 | | | 1260 | ✓ | 1260 | | | | | | 2-28-13 |
| 8 | | 2-26-13 | | | 1260 | ✓ | 1260 | | | | | | 8-30-13 |
| 9 | | | | | | | | | | | | | |
| 10 | | | | | | | | | | | | | |
| 11 | | | | | | | | | | | | | |
| 12 | | | | | | | | | | | | | |
| 13 | | | | | | | | | | | | | |
| 14 | | | | | | | | | | | | | |
| 15 | | | | | | | | | | | | | |
| 16 | | | | | | | | | | | | | |
| 17 | | | | | | | | | | | | | |
| 18 | | | | | | | | | | | | | |
| 19 | | | | | | | | | | | | | |
| 20 | | | | | | | | | | | | | |
| 21 | | | | | | | | | | | | | |
| 22 | | | | | | | | | | | | | |

TOTAL PAID THIS CARD ➤

CARD No.

COPYRIGHT 1980, BY GARLITS INDUSTRIES, INC. MORRISVILLE, PA 19067-1110 NATIONWIDE 800 523-5753 IN PA 800-792-1600    OCCUPANT LEDGER CARD (OLC) SYSTEM 3    REV. 1/86

USAO-000093

*330*

# SELF SERVICE STORAGE LEASE ADDENDUM

### TENANTS STORE GOODS AT THEIR OWN RISK

1. I understand that the lessor is a landlord renting space for the tenants' self service use and is not a bailor or warehouseman in the business of storing goods for hire.

2. I hereby acknowledge that I have received a copy of the completed rental agreement and that I understand the provision that states the lessor is not responsible for loss or damage to property in my storage space.

### INSURANCE IS TENANTS' RESPONSIBILITY

3. I understand that the lessor does not provide insurance coverage on any personal property in my storage space.

4. I have been given a brochure which explains the optional Customer Storage Insurance that is available.

This is an addendum to, and made part of, a rental contract dated X _8·30·99_

X _Marshall Dion_                    X _8·30·99_
TENANT                                      DATE

USAO-000094

# TOWN&COUNTRY
## Town & Country Self Storage Inc.
140 Main St. (P.O. Box 175) N. Reading 01864
(978) 664-4044

98   5477

### MASSACHUSETTS RENTAL AGREEMENT

This Lease Agreement is made between TOWN & COUNTRY SELF STORAGE INC. (hereinafter known as "Lessor), with a principal place of business at 140 Main St. (P.O. Box 175), N. Reading, MA 01864 (hereinafter known as "Premises"), and _Marshall Dion_ an address of _Longfellow Pl. SU-3802 Boston, MA 02114_ ("Lessee"). Lessee shall lease Space No. _220_ (hereinafter referred to as the "Space") containing approximately _500_ of sq. ft., from Lessor, in the building located at above stated premises.

1. **TERM.** To have and to hold for a term commencing on _8-30_ 19 _99_ and continuing month to month thereafter (hereinafter refered to as the "Term"), unless sooner terminated as hereinafter provided.

2. **RENT.** Lessee shall pay on the _30th_ day of each calendar month in advance, rent for the space at the rate of $ _75_ per month.

The first monthly payment shall be made on _8-30_ 19 _99_. All payments due hereunder shall be made to the Lessor at the above address, or at such other place as Lessor shall from time to time in writing designate.
A one time administration fee of $ _15_ is to be paid initially.

3. **LATE CHARGE.** If any payment of rent due hereunder is not paid within ten (10) days of the date the same was due, Lessee shall pay to Lessor a late charge of 10% or a minimum of five ($5.00) dollars on rent not paid within ten (10) days of due date.

4. **TERMINATION.** Either party shall have the right to terminate this agreement by ten (10) days prior written notice given to the other party before the end of the term stated in paragraph #1, and this agreement shall thereupon terminate at the end of said Term.

5. **HOLDING OVER.** There will be no partial month rentals. If Lessee vacates the space five (5) days after the end of the term stated in Paragraph Number 1 above, the Lessee shall pay one full month's rent. If Lessee vacates the space after the end of the above stated term, but before five (5) days after the end of the above stated term, the Lessor will pro rate the rent fee on a daily basis. The provisions of this Paragraph 5 shall not operate as a waiver by Lessor of any rights provided to Lessor under Paragraph 11 of this agreement.

6. **USE AND COMPLIANCE WITH LAW.** The space shall be used for storage of personal property and for no other purpose. It is expressly agreed that Lessor is under no duty to maintain any records of the property so stored in the space. Lessee hereby acknowledges and agrees that Lessor is not a warehouseman as defined in Massachusetts General Laws Chapter 105 or Article 7 of the Uniform Commercial Code. No property shall be stored in the space unless Lessee has the right to have that property in his possession. Lessee shall not use the space for residential purposes or for any other unlawful purpose. Items which are volatile, flammable or explosive, or which are hazardous when exposed to moisture, or which burn with extreme rapidity, or which when burning or subjected to heat produces toxic fumes or gases in quantities and under conditions dangerous to safety or health of any person, may not be stored, used or kept in the space. These items include, but are not limited to, the following:

A. **COMBUSTIBLE DUST.** Fine particles or matter liable to spontaneous ignition or explosion or constituting a dust hazard such as lint, shavings, sawdust, flour, starch, sulphur, metal powders and powdered plastics.

B. **EXPLOSIVE GASES.** Acetylene, ether, ethyl chloride, ethylene, hydrogen illumination gas, petroleum gases, methyl chloride gas, oxygen.

C. **FLAMMABLE AND COMBUSTIBLE SOLIDS.** Pyroxylin products, nitrocellulose, asphalt, coal tar, pitch, waste paper and rags, feathers, straw, hemp, excelsior, kapok, oil, greases and fats.

D. **FLAMMABLE LIQUIDS.** Ether, carbon, bisulfide, gasoline, collodion, acetone, alcohol, acelate, toluol, kerosene, turpentine, and flammable paint and varnish.

E. **POISONOUS, CORROSIVE OR FUME HAZARD SUBSTANCE.** Hydrochloric, nitric, sulphuric, hydrofluoric, perchloric, and other corrosive acids, corrosive, toxic, or noxious alkalis, cyanides, ammonia, chlorine, phosgene, sulphur dioxide, and similar substances providing like hazards.

F. Live animals, contraband, hazardous waste or any other item prohibited by law or ordinance.

Lessee shall not store in the space any items which shall be in violation of any order or requirement imposed by the Board of Health, Sanitary or Police Departments or other appropriate governmental body or do any act or cause to be done any act which creates or may create a nuisance in or upon or connected with the space during the term of this agreement or any renewal or extension thereof.

The space shall not be employed or used by Lessee for on-premises exhibition or sales of property of any type or kind in or about the space or any other place in the Lessor's lands or premises. No repairs, maintenance or work of any type shall be done or caused to be done by the Lessee in or about the space or any other place in the Lessor's lands or premises.

7. **CONDITION OF THE PREMISES.** Lessee covenants and agrees to keep the space in as good order, repair and condition as the same is in at the commencement of the term, or may be put in thereafter. The Lessee agrees to peaceably surrender the space to Lessor at the termination of this agreement and in broom clean condition and otherwise in the same order, repair and condition as described above in this Paragraph 7. Any dirt, debris, sawdust, shavings, garbage, refuse, and like matter shall not be accumulated or stored but shall be deposited in containers provided by Lessor.

8. **NON-LIABILITY OF THE LESSOR AND INSURANCE OBLIGATIONS OF LESSEE.** ALL OF THE PROPERTY STORED BY LESSEE IN THE SPACE SHALL BE AT THE SOLE RISK AND HAZARD OF LESSEE. THE PROPERTY STORED IN THE SPACE IS NOT INSURED BY LESSOR AGAINST LOSS OR DAMAGE, AND THEREFORE, LESSEE MUST OBTAIN ANY INSURANCE DESIRED AT HIS EXPENSE. THE LESSOR STRONGLY RECOMMENDS THAT THE LESSEE SECURE HIS OWN INSURANCE TO PROTECT HIMSELF AND HIS PROPERTY AGAINST ALL PERILS. LESSEE HEREBY ACKNOWLEDGES THAT THE LESSOR HAS ADVISED THE LESSEE OF THE AVAILABILITY OF INSURANCE FOR THE FOREGOING, WITHOUT REPRESENTATION OF THE COVERAGE AFFORDED THEREBY. IF LESSEE PURCHASES SAME, THE INSURANCE COVERAGE IS AS SET FORTH IN THE CONTRACT OF INSURANCE BETWEEN THE INSURANCE COMPANY AND THE LESSEE, AND WITHOUT LIABILITY OR RESPONSIBLITY THEREFORE ON THE PART OF THE LESSOR. THE LESSOR SHALL NOT BE LIABLE FOR PERSONAL INJURY OR PROPERTY DAMAGE, OR LOSS FROM THEFT, VANDALISM, FIRE, WATER, HURRICANE, RAIN, EXPLOSION, BURSTING PIPES, ELECTRICITY CAUSED FIRE OR ANY OTHER CAUSE WHATSOEVER, UNLESS THE SAME IS DUE TO THE NEGLIGENCE OF THE LESSOR, ITS AGENTS, SERVANTS OR EMPLOYEES. THE LESSOR SHALL NOT BE LIABLE FOR LOSS OR DAMAGE RESULTING FROM THE FAILURE, INTERRUPTION OR MALFUNCTION OF ANY UTILITIES, APPLIANCES, OR FIXTURES PROVIDED TO THE LESSEE UNDER THE TERMS OF THIS AGREEMENT.

Lessee shall indemnify Lessor and hold Lessor harmless from and against any liability for injury, loss, accident or damage to any person or property, and from any claims, actions, proceedings and expenses and costs in connection therewith (including, without limitation, attorney fees), (i) arising from (a) the omission, fault, willful act, negligence or other misconduct of Lessee or (b) from any use made or thing done or occurring in the space not due to the omission, fault, willful act, negligence or other misconduct of Lessor, or (ii) resulting from the failure of Lessee to perform and discharge its covenants and obligations under this agreement.

THE LESSEE SHALL TAKE WHATEVER STEPS ARE NECESSARY TO SAFEGUARD WHAT IS ON OR IN THE SPACE WHICH IS THE SUBJECT OF THIS AGREEMENT. THE LESSEE MUST PROVIDE HIS OWN LOCK THE SAME DAY HE ENTERS INTO A LEASE AGREEMENT WITH THE LESSOR. IT IS THE LESSEE'S SOLE RESPONSIBILITY FOR WHO HAS POSSESSION OF LESSEE'S LOCK KEYS. LESSOR WILL NOT KEEP A DUPLICATE KEY TO LESSEE'S SPACE. LESSEE ACKNOWLEDGES THAT NO ELECTRICITY, WATER, HEATING OR AIR COOLING IS FURNISHED OR AVAILABLE IN THIS SPACE.

Should any of the Lessor's employees perform any services for Lessee at Lessee's request, such employees shall be deemed to be the agents of the Lessee regardless of whether payment for such services is made or not, and the Lessee agrees to indemnify and save the Lessor harmless from all liability in connection with services performed by Lessor's employees, together with attorney's fees and costs of suit.

9. **ALTERATIONS, SIGNS AND WASTE.** The Lessee shall not make nor suffer any alterations of the space nor post any signs without the express written consent of the Lessor. The Lessee shall not commit nor permit any waste on the space or the Lessor's property.

"CONTINUED ON REVERSE SIDE"

---

Initial | IMPORTANT
--- | ---

_MD_ A. All rent due on the _30th_ day of each month. (See paragraph #2)

_MD_ B. A late fee is charged after 10 days of continuous non-payment. Cash or money order is needed to eliminate double locking. (See paragraph #3)

_MD_ C. Checkouts 5 days after the first day of rental period pay full month's fee. (See paragraph #6) You must notify manager 10 days in advance of vacating. (See paragraph #4)

_MD_ D. Report any change in address in writing to the Lessor at above address. (See paragraph #20)

_MD_ E. It is Lessee's responsibility to carry insurance. Lessor assumes no liability for same. (See paragraph #8)

_MD_ F. Lessor has lien on all goods for payment of fees due and may sell or otherwise dispose of same with proper notice. (See paragraph #11)

_MD_ G. Lessee must supply a lock to secure his/her leased space. If a lock is not on unit the date of the transaction above Lessor has a right to put a lock on, charge the tenant for the lock, and mail the lock keys to the Lessee certified mail, return receipt requested. Also Lessor reserves the right to remove any lock if the Lessee's unit has two locks on it for the purposes of double locking the unit due to delinquency. (See paragraph #8)

_MD_ H. Lessee agrees to pay a $15.00 fee in addition to any late fees accrued for any returned check.

_MD_ I. Space subject to inspection by Town of North Reading Fire Department.

"Continued from reverse side"

USAO-000095

The first monthly payment shall be made on _____ 19__. All payments due hereunder shall be made to the Lessor at the above address, or at such other place as Lessor shall from time to time in writing designate.

A one time administration fee of $ _____ is to be paid initially.

3. LATE CHARGE. If any payment of rent due hereunder is not paid within ten (10) days of the date the same was due, Lessee shall pay to Lessor a late charge of 10% or a minimum of five ($5.00) dollars on rent not paid within ten (10) days of due date.

4. TERMINATION. Either party shall have the right to terminate this agreement by ten (10) days prior written notice given to the other party before the end of the term stated in paragraph #1, and this agreement shall thereupon terminate at the end of said Term.

5. HOLDING OVER. There will be no partial month rentals. If Lessee vacates the space five (5) days after the end of the term stated in Paragraph Number 1 above, the Lessee shall pay one full month's rent. If Lessee vacates the space after the end of the above stated term, but before five (5) days after the end of the above stated term, the Lessor will pro rate the rent fee on a daily basis. The provisions of this Paragraph 5 shall not operate as a waiver by Lessor of any rights provided to Lessor under Paragraph 11 of this agreement

6. USE AND COMPLIANCE WITH LAW. The space shall be used for storage of personal property and for no other purpose. It is expressly agreed that Lessor is under no duty to maintain any records of the property so stored in the space. Lessee hereby acknowledges and agrees that Lessor is not a warehouseman as defined in Massachusetts General Laws Chapter 105 or Article 7 of the Uniform Commercial Code. No property shall be stored in the space unless Lessee has the right to have that property in his possession. Lessee shall not use the space for residential purposes or for any other unlawful purpose. Items which are volatile, flammable or explosive, or which are hazardous when exposed to moisture, or which burn with extreme rapidity, or which when burning or subjected to heat produces toxic fumes or gases in quantities and under conditions dangerous to safety or health of any person, may not be stored, used or kept in the space. These items include, but are not limited to, the following:

A. COMBUSTIBLE DUST. Fine particles or matter liable to spontaneous ignition or explosion or constituting a dust hazard such as lint, shavings, sawdust, flour, starch, sulphur, metal powders and powdered plastics.

B. EXPLOSIVE GASES. Acetylene, ether, ethyl chloride, ethylene, hydrogen illumination gas, petroleum gases, methyl chloride gas, oxygen.

C. FLAMMABLE AND COMBUSTIBLE SOLIDS. Pyroxylin products, nitrocellulose, asphalt, coal tar, pitch, waste paper and rags, feathers, straw, hemp, excelsior, kapok, oil, greases and fats.

D. FLAMMABLE LIQUIDS. Ether, carbon, bisulfide, gasoline, collodion, acetone, alcohol, acetate, toluol, kerosene, turpentine, and flammable paint and varnish.

E. POISONOUS, CORROSIVE OR FUME HAZARD SUBSTANCE. Hydrochloric, nitric, sulphuric, hydrofluoric, perchloric, and other corrosive acids, corrosive, toxic, or noxious alkalis, cyanides, ammonia, chlorine, phosgene, sulphur dioxide, and similar substances providing like hazards.

F. Live animals, contraband, hazardous waste or any other item prohibited by law or ordinance.

type or kind in or about the space or any other place in the Lessor's lands or premises. No repairs, maintenance or work of any type shall be done or caused to be done by the Lessee in or about the space or any other place in the Lessor's lands or premises.

7. CONDITION OF THE PREMISES. Lessee covenants and agrees to keep the space in as good order, repair and condition as the same is in at the commencement of the term, or may be put in thereafter. The Lessee agrees to peaceably surrender the space to Lessor at the termination of this agreement empty and in broom clean condition and otherwise in the same order, repair and condition as described above in this Paragraph 7. Any dirt, debris, sawdust, shavings, garbage, refuse, and like matter shall not be accumulated or stored but shall be deposited in containers provided by Lessor.

8. NON-LIABILITY OF THE LESSOR AND INSURANCE OBLIGATIONS OF LESSEE. ALL OF THE PROPERTY STORED BY LESSEE IN THE SPACE SHALL BE AT THE SOLE RISK AND HAZARD OF LESSEE. THE PROPERTY STORED IN THE SPACE IS NOT INSURED BY LESSOR AGAINST LOSS OR DAMAGE, AND THEREFORE, LESSEE MUST OBTAIN ANY INSURANCE DESIRED AT HIS EXPENSE. THE LESSOR STRONGLY RECOMMENDS THAT THE LESSEE SECURE HIS OWN INSURANCE TO PROTECT HIMSELF AND HIS PROPERTY AGAINST ALL PERILS. LESSEE HEREBY ACKNOWLEDGES THAT THE LESSOR HAS ADVISED THE LESSEE OF THE AVAILABILITY OF INSURANCE FOR THE FOREGOING, WITHOUT REPRESENTATION OF THE COVERAGE AFFORDED THEREBY. IF LESSEE PURCHASES SAME, THE INSURANCE COVERAGE IS AS SET FORTH IN THE CONTRACT OF INSURANCE BETWEEN THE INSURANCE COMPANY AND THE LESSEE, AND WITHOUT LIABILITY OR RESPONSIBILITY THEREFORE ON THE PART OF THE LESSOR. THE LESSOR SHALL NOT BE LIABLE FOR PERSONAL INJURY OR PROPERTY DAMAGE, OR LOSS FROM THEFT, VANDALISM, FIRE, WATER, HURRICANE, RAIN, EXPLOSION, BURSTING PIPES, ELECTRICITY CAUSED FIRE OR ANY OTHER CAUSE WHATSOEVER, UNLESS THE SAME IS DUE TO THE NEGLIGENCE OF THE LESSOR, ITS AGENTS, SERVANTS OR EMPLOYEES. THE LESSOR SHALL NOT BE LIABLE FOR LOSS OR DAMAGE RESULTING FROM THE FAILURE, INTERRUPTION OR MALFUNCTION OF ANY UTILITIES, APPLIANCES, OR FIXTURES PROVIDED TO THE LESSEE UNDER THE TERMS OF THIS AGREEMENT.

Lessee shall indemnify Lessor and hold Lessor harmless from and against any liability for injury, loss, accident or damage to any person or property, and from any claims, actions, proceedings and expenses and costs in connection therewith (including, without limitation, attorney fees), (i) arising from (a) the omission, fault, willful act, negligence or other misconduct of Lessee or (b) from any use made of thing done or occurring in the space not due to the omission, fault, willful act, negligence or other misconduct of Lessor, or (ii) resulting from the failure of Lessee to perform and discharge its covenants and obligations under this agreement.

THE LESSEE SHALL TAKE WHATEVER STEPS ARE NECESSARY TO SAFEGUARD WHAT IS ON OR IN THE SPACE WHICH IS THE SUBJECT OF THIS AGREEMENT. THE LESSEE MUST PROVIDE HIS OWN LOCK THE SAME DAY HE ENTERS INTO A LEASE AGREEMENT WITH THE LESSOR. IT IS THE LESSEE'S SOLE RESPONSIBILITY FOR WHO HAS POSSESSION OF LESSEE'S LOCK KEYS. LESSOR WILL NOT KEEP A DUPLICATE KEY TO LESSEE'S SPACE. LESSEE ACKNOWLEDGES THAT NO ELECTRICITY, WATER, HEATING OR AIR COOLING IS FURNISHED OR AVAILABLE IN THIS SPACE.

Should any of the Lessor's employees perform any services for Lessee at Lessee's request, such employees shall be deemed to be the agents of the Lessee regardless of whether payment for such services is made or not, and the Lessee agrees to indemnify and save the Lessor harmless from all liability in connection with services performed by Lessor's employees, together with attorney's fees and costs of suit.

9. ALTERATIONS, SIGNS AND WASTE. The Lessee shall not make nor suffer any alterations of the space nor post any signs without the express written consent of the Lessor. The Lessee shall not commit nor permit any waste on the space or the Lessor's property.

"CONTINUED ON REVERSE SIDE"

---

| Initial | | IMPORTANT | |
|---|---|---|---|
| A. All rent due on the _____ day of each month. (See paragraph #2) | | F. Lessor has lien on all goods for payment of fees due and may sell or otherwise dispose of same with proper notice. (See paragraph #11) | |
| B. A late fee is charged after 10 days of continuous non-payment. Cash or money order is needed to eliminate double locking. (See paragraph #3) | | G. Lessee must supply a lock to secure his/her leased space. If a lock is not on unit the date of the transaction above Lessor has a right to put a lock on, charge the tenant for the lock, and mail the lock keys to the Lessee certified mail, return receipt requested. Also Lessor reserves the right to remove any lock if the Lessee's unit has two locks on it for the purposes of double locking the unit due to delinquency. (See paragraph #8) | |
| C. Checkouts 5 days after the first day of rental period pay full month's fee. (See paragraph #5) You must notify manager 10 days in advance of vacating. (See paragraph #4) | | | |
| D. Report any change in address in writing to the Lessor at above address. (See paragraph #20) | | H. Lessee agrees to pay a $15.00 fee in addition to any late fees accrued for any returned check. | |
| E. It is Lessee's responsibility to carry insurance. Lessor assumes no liability for same. (See paragraph #8) | | I. Space subject to inspection by Town of North Reading Fire Department. | |

"Continued from reverse side"

30. NOTICE TO LESSEE. DO NOT SIGN THIS AGREEMENT BEFORE YOU READ IT AND FULLY UNDERSTAND THE COVENANTS AND CONDITIONS CONTAINED HEREIN. YOU ARE ENTITLED TO A COPY OF THE AGREEMENT YOU SIGN. KEEP THIS AGREEMENT TO PROTECT YOUR LEGAL RIGHTS.

IN TESTIMONY WHEREOF, the Lessor has caused this instrument to be executed in duplicate and Lessee has hereunto affixed his signature on the date and year first above written. Lessee acknowledges receipt of a fully executed copy of the Agreement.

LESSEE: _____

LESSOR:
TOWN & COUNTRY SELF STORAGE, INC.
BY _____
AUTHORIZED REPRESENTATIVE

Lessee Name: Marshall _____

Address: _____

Driver's License No: _____   Address _____

Telephone (Home) 617-___-____   (Business) _____

State _____

Initial Rental Term: _____ Day _____ Month 19__
_____ Day _____ Month 19__

Number of Months _____

Monthly Rate _____

Total Rent                $ 175
Administrative Fee          15
TOTAL AMOUNT DUE           190

USAO-000096

```
MOVE-IN RECEIPT       Unit #0220
08-30-1999                11:45:05
Receipt #60671
=================================
TOWN AND COUNTRY SELF STORAGE
=================================
RENT................    $525.00
Admin. Fee..........    $15.00
                      -----------
TOTAL                   $540.00

PAID BY:
  Check:    $540.00
  Check #: 917

Paid to Date: 11-30-1999
Balance due:       $0.00
----------------------------------
Marshall Dion
Longfellow Pl.
Su-3802
Boston, MA    02114
617-523-4455
=================================
We value your business!
```

USAO-000097

February 17, 2006

Please change my billling/mailing address from:

                                              Marshall Dion
                                              PO Bos 1017
                                              Allston, MA 02134

To, New Address:   Marshall Dion
                   PO Box 507
                   Revere, MA 02151-0005

My unit number is **0220**.

USAO-000098



USAO-000099