# EXHIBIT E

| SEARCH WARRANT | TRIAL COURT OF MASSACHUSETTS | |
|---|---|---|
| G.L.c. 276, §§ 1-7 | District | COURT DEPARTMENT |
| NAME OF APPLICANT<br>Patrick M. Burke | Lynn | DIVISION |
| POSITION OF APPLICANT<br>Trooper | SEARCH WARRANT DOCKET NUMBER | |

TO THE SHERIFFS OF OUR SEVERAL COUNTIES OR THEIR DEPUTIES, ANY STATE POLICE OFFICER, OR ANY CONSTABLE OR POLICE OFFICER OF ANY CITY OR TOWN, WITHIN OUR COMMONWEALTH:

Proof by affidavit, which is hereby incorporated by reference, has been made this day and I find that there is PROBABLE CAUSE to believe that the property described below

☐ has been stolen, embezzled, or obtained by false pretenses
☒ is intended for use or has been used as a means of committing a crime.
☒ has been concealed to prevent a crime from being discovered.
☒ is unlawfully possessed or concealed for an unlawful purpose.
☒ is evidence of a crime or is evidence of criminal activity.
☐ other (specify)

YOU ARE THEREFORE COMMANDED within a reasonable time and in no event later than seven days from the issuance of this search warrant to search for the following property:

See Addendum A attached hereto and incorporated herein

☒ at : (A)   Storage Unit B14, at Comeau's Mini Storage Facility, 20 Walden Pond Avenue, Saugus, Massachusetts as more particularly described as a storage unit located at the "Comeau's Mini Storage Facility" at 20 Walden Pond Avenue in the town of Saugus. Comeau's Mini Storage Facility is located down a long paved driveway. Just to the left of this driveway is a small green sign with "Comeau's Mini Storage" in gold colored lettering. The main office is located at the end of the driveway and is a one-story metal framed structure with grey siding. On the front door the word "Office" is clearly visible. Above the front door the letter "B" is clearly visible designating that section of the storage facility as the "B" section. Access to storage unit "14," in building "B" is obtained through a black, corrugated metal garage door. This door opens and closes horizontally. The number "14" is affixed in black numbering directly to the left of the black, corrugated metal garage door. There is one padlock on the right side of the garage door and which secures access to the storage unit.

which is occupied by and/or in the possession of:

☐ on the person or in the possession of :

You ☒ are ☐ are not  also authorized to conduct the search at any time during the night.

You ☐ are ☒ are not  also authorized to enter the premises without announcement.

You ☐ are ☒ are not  also commanded to search any person present who may be found to have such property in his or her possession or under his or her control or to whom such property may have been delivered.

YOU ARE FURTHER COMMANDED if you find such property or any part thereof, to bring it, and when appropriate, the persons in whose possession it is found before the
Saugus Division of the District Court Department.

| DATE ISSUED<br>07/03/2013 | SIGNATURE OF JUSTICE, CLERK-MAGISTRATE OR ASSISTANT CLERK<br>X *John M Fleming* |
|---|---|
| FIRST OR ADMINISTRATIVE JUSTICE<br>WITNESS: ALBERT CONLON | PRINTED NAME OF JUSTICE, CLERK-MAGISTRATE OR ASSISTANT CLERK<br>JOHN M FLEMING |

# Addendum A

(Items to be search for)

I.  Books, papers, documents, ledgers, records, accounts, whether in physical (paper) or electronic form (including digital storage devices such as thumb drives, computers, blackberry or similar digital devices) evidencing the possession and/or distribution of marijuana including, but not limited to records and other papers reflecting 1) the purchase or acquisition of the aforementioned controlled substance(s) 2) the identities of the source of the aforementioned controlled substance(s), 3) the storage of the aforementioned controlled substance(s), 4) the distribution of the aforementioned controlled substance(s), 5) the identities of persons to whom the aforementioned controlled substance(s) was/were distributed;

II. Books, papers, documents, ledgers, records, accounts whether in physical (paper) or electronic form (including digital storage devices) evidencing the sources of money or other property used to purchase or acquire the aforementioned controlled substance(s) and/or the manner in which the financial proceeds of the distribution of the aforementioned controlled substance(s) are stored, invested or spent, including, but not limited to, 1) amounts of money paid, collected or owed on account of the purchase or sale of the aforementioned controlled substance(s), 2) bank records, 3) investment account records, 4) safe deposit box rental agreement or keys, 5) property deeds, 6) bill of sale, 7) tax returns, 8) vehicle titles;

III. United States currency or coins used to purchase or sell the aforementioned controlled substance(s), or traceable to the purchase or sale of the aforementioned controlled substance(s);

IV. Papers and possessions identifying the person(s) having custody and control over the premises being searched, and its contents;

V. Scales, packaging materials, and paraphernalia used in the possession or distribution of the aforementioned controlled substance(s);

VII. Any and all records maintained at the storage facility evidencing access and control of the storage facility.

VIII. Any cellular telephones, blackberries, or similar digital communications devices.

I also seek permission to photograph the interior of the unit in order to create a record of the condition of the residence and the location of evidence recovered during the search.

COMMONWEALTH OF MASSACHUSETTS

LYNN, SS.                                                                                                  DISTRICT COURT

# AFFIDAVIT OF TROOPER PATRICK M. BURKE
# IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Patrick M. Burke, being duly sworn, depose and state under the pains and penalties of perjury that the following is true to the best of my knowledge and belief:

## I.   Introduction

I submit this affidavit in support of an application for warrants to search:

(A)   **Storage Unit B14, at The Comeau's Mini Storage Facility, 20 Walden Pond Avenue, Saugus, Massachusetts** as more particularly described below;

for United States currency or coins used to purchase or sell marijuana, or traceable to the purchase or sale of the aforementioned controlled substance; drug distribution paraphernalia, and written documents, writings, notes, and other records in whatever form, including digital, relating to the distribution of marijuana, as more fully described in Addendum A, below.

USAO-000100

## II. Credentials of Affiant

1) I, Trooper Burke, am a Massachusetts State Police Officer assigned to the PACT Unit of the Middlesex County District Attorney's Office. I have been employed as a State Police Officer since April 2005. I have been assigned to a number of duty stations throughout the Commonwealth as a uniformed patrol officer, including the Holden and Milton State Police Barracks. For approximately two years before becoming a State Police Officer, I was a sworn law enforcement officer with the Stoughton Police Department. During my time as a State Police Officer, I have initiated and/or participated in numerous investigations which have resulted in the arrest and conviction of individuals for various forms of criminal activity including, but not limited to, narcotics-related offenses. Many of these investigations resulted in the seizure of controlled substances, weapons, stolen property, US Currency, and other evidence of criminal activity. More specifically, I have made dozens of arrests for violations of the Controlled Substances Act, and I have testified in both Superior and District Court throughout the Commonwealth.

2) I have attended and graduated from both the Massachusetts State Police Academy as well as the Municipal Police Academy. I hold a Master of Arts degree in Criminal Justice from the University of Massachusetts in Lowell. I have received specialized training in the investigation, identification and illegal distribution of controlled substances. This training included the recognition of various controlled substances. Additionally, I have also received training and attended numerous seminars instructed by members of various local, state, and federal law

USAO-000101

enforcement agencies. This instruction has included, but is not limited to, interview and interrogation courses, surveillance courses, courtroom testimony courses, hidden vehicle compartment recognition courses, a money laundering course, as well as instruction and training in the weapons, methods and operations utilized by drug traffickers and other organized criminal enterprises. I have also attended and completed the Drug Enforcement Administration's eighty-hour Basic Narcotics School. I have participated in four prolonged narcotics investigations utilizing the authorized electronic interception of conversations and communications of narcotic traffickers. These cases resulted in the arrests of dozens of narcotics distributors, several of whom are currently serving lengthy prison sentences. These cases also resulted in the seizure of narcotics including cocaine, heroin and marijuana, property, vehicles, and over one million dollars in United States currency. My responsibilities during these wiretap investigations have included acting as a surveillance officer and monitoring officer in the wire monitoring room. I have applied for and received several search warrants authorizing the covert recording of conversations (so-called <u>Blood</u> Warrants). I have acted in an undercover capacity, making purchases of narcotics on several occasions. Additionally, I have received informal training from experienced narcotics investigators while engaged in cooperative investigations with federal, state and municipal law enforcement agencies.

### III. The Structure and Methods of Drug Organizations

3) Since my assignment to the District Attorney's Office, I have become familiar with, and have utilized many of the so-called "normal investigative procedures" used by law enforcement officers to identify, apprehend, and successfully prosecute persons involved in the distribution of

USAO-000102

controlled substances. These "normal investigative procedures" include, but are not limited to: physical surveillance, telephone analysis, public records analysis, interviews, gathering information from informants, "controlled purchases" of drugs, utilizing undercover law enforcement personnel to infiltrate drug distribution organizations, trash analysis, executing search warrants and grand jury investigations. I have also become familiar with the practical limitations of these techniques in penetrating organized drug distribution operations and bringing about the successful prosecution of all participants in such conspiracies. Additionally, I have participated in two investigations utilizing the authorized electronic interception of conversations and communications of such participants.

4) Based on my training and experience, I am familiar with the terminology used by illegal narcotic users and distributers and am familiar with the manner in which these persons disguise the subject of their conversations and operations by speaking in a cryptic fashion. I have become acquainted with a full range of methods, practices, and techniques by which member of organized criminal enterprises illegally transport and distribute controlled substances. It is my opinion, as well as the collective opinion of other law enforcement officers experienced in investigating violations of the Controlled Substance Act, that persons involved in the distribution of controlled substances necessarily conspire with others, and that the distributors of controlled substances are part of an organized drug distribution network. It is also my experience that there are similarities between drug distribution networks.

USAO-000103

5) As a result of my training, experience, and conversations with other law enforcement personnel, both state and federal, involved in the investigation of organizations trafficking in controlled substances, I know that typically, a drug distribution network involves numerous persons who agree with one another (conspire) in and between the several levels of the network or organization. Most often, the structure of a drug distribution network can be compared to the structure of a pyramid.

6) I know that at the lowest (or first) level of the network are the consumers or users of controlled substances who most often purchase controlled substances in relatively small quantities for their own personal consumption.

7) At the next higher (or second) level of the conspiracy are the persons who sell controlled substances to the consumers. These persons may be referred to as "street dealers." Typically, "street dealers" maintain relatively small inventories of controlled substances for retail sale, and sell controlled substances to consumers in relatively small quantities. "Street dealers" often confine their sales activities to small, defined geographical areas.

8) The next higher (or third) level of the conspiracy is made up of persons who supply the controlled substances to the "street dealers." These people, who can be compared to merchandise wholesalers, may be referred to as "local dealers." Typically, "local dealers" sell controlled substances in larger quantities than "street dealers," and may operate in larger

USAO-000104

geographical areas. A "local dealer" may distribute controlled substances to a number of "street dealers," and may also sell controlled substances to consumers.

9) A number of higher levels of drug distribution networks and conspiracies can exist. At the highest levels of the organization are those relatively few persons who manufacture, produce or cultivate controlled substances. These persons introduce the controlled substances into the distribution chain, and the controlled substances are then distributed down through the many, many levels of the chain until they ultimately end up in the hands of the consumers.

12) Distributors of controlled substances, from the so-called "street dealers" to those at the highest levels of the distribution chain, most often conduct their activities in such a manner as to minimize the likelihood of detection and apprehension by law enforcement officers. The techniques employed by these persons to avoid detection and apprehension often make it difficult, if not impossible, for law enforcement officers utilizing "normal investigative procedures" to successfully penetrate the higher levels of these distribution conspiracies. Techniques often employed by drug dealers to prevent detection and apprehension by law enforcement officers include, but are not limited to, the following:

    a. To prevent apprehension through physical surveillance, drug dealers often employ counter-surveillance techniques that are designed to detect the presence of surveillance officers and/or to "lose" surveillance officers. For example, when driving vehicles, drug dealers will often drive at erratic speeds, circle blocks, make sudden U-turns, change direction without

USAO-000105