signaling, etc. Drug dealers may also exit their vehicles and walk through crowded areas or enter and exit buildings.

      b.      Communication between persons involved in the purchase and sale of controlled substances often involve the use of telephones. This has the effect of limiting the effectiveness of physical surveillance.

      c.      To avoid detection through electronic surveillance, drug dealers, particularly at the "local dealer" level and higher levels, often use cryptic and coded language during conversations over their telephones, and often change telephones when conducting business related to the distribution of drugs. By using different telephones, drug dealers limit the likelihood of law enforcement being able to establish a pattern of telephone usage sufficient to obtain an electronic surveillance warrant. This in turn thwarts efforts to obtain evidence through telephone toll analysis.

      d.      Drug dealers often use cellular or mobile telephones. These telephones, and other telephones used by them on a regular basis, are often listed under other persons' names to provide further security. Cellular/mobile telephones provide mobility to drug dealers, allowing them to conduct their activities at any time and place, and when used by them in conjunction with counter-surveillance techniques, the effectiveness of physical surveillance is minimized. This mobility also thwarts law enforcement efforts to utilize electronic surveillance at fixed locations or on non-mobile phones.

      e.      Drug dealers, particularly at the "local dealer" and higher levels, frequently store their supply of controlled substances in "safe" or "stash" houses (in addition to their own residences), which are often times leased or owned under different or fictitious names.

7

USAO-000106

Frequently, drug dealers will store or transport narcotics, money or records pertaining to narcotics in motor vehicles.

       f.     Similarly, drug dealers at the "local dealer" and higher levels often will not use their own vehicles to store or transport controlled substances. Rather, they will often rent vehicles using different names, fictitious or otherwise, or use other persons' vehicles. This is done to avoid the likelihood of their own vehicles being seized and forfeited, to make physical surveillance by law enforcement more difficult, and to make it difficult to determine the dealer's true identity through a records check on the vehicle he/she is driving.

       g.     Drug dealers, particularly at the "local dealer" and higher levels, often minimize their direct contact with controlled substances by employing persons often referred to as "runners" and "mules." While the dealer may handle the negotiations and arrangements for the sale of controlled substances, he will minimize his risk of apprehension by utilizing a "runner" to make the actual pick-up and delivery of the controlled substance. The "runner" may also retrieve the money from the purchaser after making the sale and deliver it to the dealer.

13)    I also know from my training and experience that a business involved in the purchase and sales of controlled substances operates at all hours of the day and night. "Street dealers" often sell controlled substances to consumers during the nighttime, and dealers at all levels of the distribution chain negotiate, purchase and sell controlled substances at any time.

USAO-000107

14)      In my training and experience, I have also learned the following about the financial and logistical aspects of illegal narcotics distribution:

      a.      Drug distribution is sometimes conducted as a cash and carry business, and at other times drugs are bought and sold on credit.  In either event, the distribution of drugs is a cash business, and distributors of drugs often deal in large sums of money.  This necessitates that the distributor be in possession of, or has ready access to, large amounts of money and drugs.

      b.      Because drugs are often bought and sold on credit, drug dealers frequently maintain written records of the drugs bought and sold, the identities of the persons who have purchased or sold the drugs, and the moneys due to, or owed by, them.

      c.      Drug dealers often maintain books, records, receipts, invoices, notes, ledgers, money orders, bank records and other papers relating to their transportation, ordering, sale and distribution of controlled substances.  These records may be maintained in long hand or in electronic format within a computer, blackberry device or cellular phone or in other forms of electronic digital storage such as a flashdrive.

      d.      Drug dealers often conceal their distribution records, controlled substances and money either on their person, in their residences and/or in their cars but also frequently utilize other physical locations such as storage facilities when dealing with large quantities of narcotics and cash.

      e.      Drug dealers utilize various paraphernalia, such as scales, cutting agents (dilutents) and packaging material, to prepare and package these controlled substances for further

USAO-000108

distribution. Such paraphernalia are often stored in close proximity to where the controlled substances are stored, such as in the cars and residences of dealers, and on their persons.

## IV.    Electronic Communications

15)    Persons involved in the trafficking of controlled substances communicate with many individuals and organizations in order to facilitate the distribution of controlled substances as well as the proceeds of the sales of those controlled substances. Through my training and experience I know that these communications have been historically conducted telephonically but are increasingly being conducted electronically by e-mail and text messaging via cellular/mobile phones. Based on my training and experience, I am aware that the type of information contained on cellular telephone call histories, voicemails, photographs and text messages can be useful in determining the facts and circumstances surrounding illegal narcotic activity and identifying co-conspirators. Virtually all cellular telephones contain a "call-history" function that will display the identities (phone numbers and often names or nicknames) of parties who called the phone and parties who were called from the phone, as well as the time and sequence of such telephone calls.

18)    I know from my training and experience that drug dealers will often receive phone calls on their cellular phone for orders of drugs via phone calls, text messages and voice mail messages. I also know that cell phones are commonly used to arrange and coordinate specific

10

meet locations in order to distribute controlled substances, including during this particular investigation.

## V.   Investigation

19)   This affidavit does not include every fact known to me or other law enforcement officials about this investigation, but only those facts I believe are necessary to establish probable cause for the requested search warrant.

According to Officer Nicholas Blake of the Junction City, Kansas Police Department's Arrest Report for Marshall Dion (DOB: 08/01/1935; SSN: 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):

20)   On June 18, 2013, Marshall Dion, Date of Birth (DOB) 8/1/35, was stopped for speeding by the Junction City Police Department (JCPD) in Kansas, while driving a 2002 GMC Sierra pickup with Colorado registration plates.

21)   During the JCPD roadside interview, Dion presented the interviewing officer with a valid Arizona driver's license, and explained that he was coming from Pennsylvania en route to his home in Tucson, Arizona. Dion stated that he had residences in Massachusetts and Arizona.

22)   Dion further explained that he had traveled from Tucson, Arizona, to Yardley, Pennsylvania to meet with his CPA. He stated that he had stayed in Pennsylvania for three days, and was headed home to Tucson, Arizona. Dion claimed that he traveled to Pennsylvania to meet with his CPA because she "gives him a break" on the charges.

USAO-000110

23)     The interviewing officer detected signs of deception throughout the interview, including a travel itinerary that didn't seem to make sense. Dion continued to talk to the interviewing officer after he had been issued a written citation for speeding. At one point, the officer asked for, and was granted, consent to search Dion's truck.

24)     Upon opening the rear of the truck, the officer observed several items that appeared to be random junk, and a refrigerator. When the officer asked Dion where these items came from, Dion told the officer that he picked them up in Boston. This was the first time that Dion had mentioned being in Boston.

25)     The interviewing officer, who was also a K9 officer, conducted an exterior sniff of Dion's vehicle. The K9 alerted to the area of the front driver side wheel well and in the area of the front bed on the passenger side. The officer asked Dion if he had any cocaine, heroin, ecstasy, or marijuana. Dion confidently answered "no" to each question. When the officer asked Dion if he had any large amounts of US currency with him, he first answered "no," and then said that he had approximately $6,000 worth of cash with him to be deposited into the bank.

26)     The officer then continued the search of the vehicle and located two FedEx boxes in front of the refrigerator that contained a large amount of US currency. A second officer, who was assisting the search, located two additional boxes beside the refrigerator, which also contained a large amount of US currency. Three of these boxes had permanent marker writing on them that read "24 100s." The fourth box had "9 100s" written on it. It was later found that these boxes contained nothing but 100 dollar bills in $10,000 stacks and wrapped with a little stack band that indicate the same total. Several other bundles of cash were located within the truck. The amount inside the FedEx boxes was found to be $810,900, and the other cash was found to be $17,320.

12

USAO-000111

In my training and experience, this amount of cash and the manner in which it was concealed, packaged, and transported is typical of bulk cash smuggling methods used to move cash in the organized drug trade.

27)    Dion was arrested and given his Miranda rights, which he said he understood.  Dion initially claimed that he had done nothing wrong and that he was "Just driving down the road." When Dion was told that he was driving with a large amount of cash, he responded, "I didn't even know that."  Dion further stated, "I don't even know who loaded my truck."  When the interviewing officer proposed to Dion that he might assist the police by making a controlled delivery of the money that could result arrests of persons involved in the drug trade, Dion quickly stated that he doesn't "bother with dope anymore."  Dion then went to describe himself as a "mule", which your affiant understands to be a person who simply drives a package for an organization.  That package is typically drugs or money, but can be almost anything.  Dion explained to the interviewing officer that he takes the money and "drops it when he gets to his destination" and he doesn't know "where it goes or anything else."  Dion was asked if the money was his and he responded, "I can't even tell you that."  Dion admitted that the money, "Would probably  go across the border."  When he was asked if he would take it across the border Dion replied, "You're damn right I wouldn't, I don't go across the border."  Dion was speaking of the US-Mexico border, and your affiant believes that Dion would not cross into Mexico for fear of the high level of violence in Mexico related to the illegal narcotics trade.

28)    Dion claimed that when he is in Boston, someone would load his truck "probably in the Boston area."  Dion claimed that he just parked the truck in a parking garage in Boston and rented a vehicle to drive while the unidentified individuals allegedly loaded the truck with cash. Dion stated that he had no pension and his only source of legal income is social security, which

13

pays him less than $690 per month. However, during the search of Dion's truck, the JCPD located checks that were made out to a trust account and appeared to be ready for deposit. The JCPD subsequently investigated this account and found that it was a trust account in Dion's name and that it contained approximately $1.9 million in cash. The JCPD seized this account and the funds on deposit for forfeiture. Dion is currently charged with transporting drug proceeds. Although no drugs were found in the vehicle, the K9 alert suggests that the money found may have been stored with drugs or that the vehicle had earlier been used to transport drugs and that the odor remained.

29)     The JCPD seized various other items from Dion's truck, including a Garmin GPS unit. The JCPD searched the Garmin GPS and found that Dion had arrived in Boston at 4 Longfellow Place, on June 2, 2013, at approximately 10:08pm. The following day, June 3, 2013, at approximately 6:29am, the GPS showed that Dion traveled to 130 Main Street, North Reading, Massachusetts, and remained there for approximately 30 minutes. This is the address of a Town and Country Self Storage. The GPS showed that Dion went to the Town and Country Self Storage a second time on June 6, 2013, this time for approximately 90 minutes.

30)     Since his arrest, Dion has made several recorded calls from jail. On June 28, 2013, Dion called an individual and asked him to bring money to his brother-in-law to pay for his attorney in Kansas. When this individual attempted to ask questions of Dion, Dion stated, "This is not a secure phone so I can't talk with you."

31)     Dion also called a second individual on June 28, 2013, and told him to take a box that belonged to him (Dion) to Dion's brother-in-law. Earlier in the day, Dion had told his brother-

14

in-law that these two individuals (whom Dion named in the calls) would come through with money for Dion's attorneys.

32)    As a result of this information, On July 2, 2013 the FBI, Massachusetts State Police, and North Reading Police, went to the Town and Country Self Storage, located at 130 Main Street, North Reading, Massachusetts. The owners were given a subpoena for information related to any units owned by Marshall Dion. Records located by Town and Country ownership indicate that Marshall Dion rents unit #220. In his application, dated August 30, 1999, Dion indicated his home address to be 4 Longfellow Place, Unit 3802, Boston, Massachusetts. In the description of items to be stored in the unit, Dion wrote "documents/office furniture" and indicated that his legal occupation was "Legal Investigation." Payment records indicate that Dion has paid his rent on the storage unit through August 30, 2013.

33)    On July 2, 2013, at approximately 1:00 PM, Tpr. Christopher Coscia and his K-9 partner "Dante" arrived on scene at the Town and Country Self Storage, located at 130 Main Street, North Reading, Massachusetts . Tpr. Coscia deployed "Dante" and an exterior scan of the storage lockers 215 through 225 was conducted. "Dante" reacted positive for narcotic odor on the exterior of the locker #220. The dog scratched at the unit door: Tpr. Coscia explained that this is a positive alert the presence of narcotic odor. The locker was subsequently secured by investigators pending a search warrant. Trooper Coscia has been employed with the Massachusetts State Police for the last fourteen years and has been assigned to the K-9 unit for the last eight years. Trooper Coscia and K-9 Dante have attended and successfully completed courses in narcotic odor detection, specifically marijuana, cocaine, heroin and methamphetamine. Trooper Coscia has been working with "Dante" since he was certified in patrol school in 2005, and is Dante's sole custodian. Trooper Coscia and K-9 Dante received

15

accreditation for narcotic odor detection through the New England State Police Administrator

Conference in the past and were most recently re-certified on June 5, 2013. Trooper Coscia

informed me that Dante has given numerous successful alerts resulting in seizures from

automobiles, aircraft, and building structures. Trooper Coscia and Dante also engage in

proficiency training on a monthly basis. Trooper Coscia advised that Dante is a well trained and

reliable canine.

34)    As a result of the above information, I, Trooper Burke, applied for and was granted a

warrant to search Storage Unit 220, at The Town & Country Self Storage Facility, 130 Main

Street, North Reading, Massachusetts by Assistant Clerk Magistrate Marianne Kiklis of Woburn

District Court. On July 2, 2013 at approximately 5:45 PM, members of the FBI, Massachusetts

State Police, and North Reading Police executed the above mentioned search warrant. Found

within the storage unit was a large amount of miscellaneous personal items and neatly stacked

within the unit was a large amount of US Currency and a green, leafy substance that based on

investigating officers training and experience is consistent with marijuana. At this time it is

believed that in excess of ten million dollars in US Currency was seized. This is based on the

manner of packaging and handwritten notes found on the packaging that contained the currency.

Additionally, investigating officers believe at this time the amount of suspect marijuana seized is

in excess of fifty pounds. Various other documents in the name of Marshall Dion were also

seized within the storage unit.

35)    In addition to the above mentioned items, a used checkbook was also discovered within

the storage unit during the search. This checkbook contained handwritten notations that detailed

numerous payments for yearly rent to Comeau's Mini Storage dating back to 1996. Investigating

officers subsequently contacted Comeau's Mini Storage Facility, 20 Walden Pond Avenue,

16

Saugus, Massachusetts and spoke with the owner, Herb Comeau. Herb Comeau informed

investigating officers that he is familiar with Dion Marshall and that Dion Marshall currently

rents Storage Unit B14, at Comeau's Mini Storage Facility, 20 Walden Pond Avenue, Saugus,

Massachusetts. Herb Comeau provided investigating officers with a "Tenant Ledger" that he

keeps which documents Dion Marshalls rental of Unit "B14". Herb Comeau also stated that he

remembered Dion and that Dion always arrived at the storage facility in the early morning,

specifically before 7am and is consistently observed driving different vehicles. Herb Comeau

further reported that Dion told him that he (Dion) said that he always dealt in cash and owned

several properties in Arizona and Massachusetts. Herb Comeau noted to investigators that when

Dion was at the storage facility and Comeau would approach him, Dion would walk away from

the unit and intercept Comeau prior to him getting to the actual unit. Comeau believed that Dion

was preventing him from seeing what Dion was doing in the unit.

## V.    Conclusion

Therefore, I respectfully request the Court issue a warrant authorizing the search of:

    (A)    **Storage Unit B14, at Comeau's Mini Storage Facility, 20 Walden Pond**

**Avenue, Saugus, Massachusetts** as more particularly described as a storage unit located at the

"Comeau's Mini Storage Facility" at 20 Walden Pond Avenue in the town of Saugus. Comeau's

Mini Storage Facility is located down a long paved driveway. Just to the left of this driveway is

a small green sign with "Comeau's Mini Storage" in gold colored lettering. The main office is

located at the end of the driveway and is a one-story metal framed structure with grey siding. On

the front door the word "Office" is clearly visible. Above the front door the letter "B" is clearly

visible designating that section of the storage facility as the "B" section. Access to storage unit

17

USAO-000116

"14," in building "B" is obtained through a black, corrugated metal garage door. This door opens and closes horizontally. The number "14" is affixed in black numbering directly to the left of the black, corrugated metal garage door. There is one padlock on the right side of the garage door and which secures access to the storage unit.

Based on the facts and circumstances contained in this report, as well as the collective training and experience of investigators involved in this investigation, this officer has probable cause to believe that the items listed below will be located at **Storage Unit B14, at Comeau's Mini Storage Facility, 20 Walden Pond Avenue, Saugus, Massachusetts.**

As such, I request authority to search said premises for evidence of the crime of narcotics possession and trafficking, such evidence to include the following:

I.       Books, papers, documents, ledgers, records, accounts, whether in physical (paper) or electronic form (including digital storage devices such as thumb drives, computers, blackberry or similar digital devices) evidencing the possession and/or distribution of marijuana including, but not limited to records and other papers reflecting 1) the purchase or acquisition of the aforementioned controlled substance(s) 2) the identities of the source of the aforementioned controlled substance(s), 3) the storage of the aforementioned controlled substance(s), 4) the distribution of the aforementioned controlled substance(s), 5) the identities of persons to whom the aforementioned controlled substance(s) was/were distributed;

II.       Books, papers, documents, ledgers, records, accounts whether in physical (paper) or electronic form (including digital storage devices) evidencing the sources of money or other property used to purchase or acquire the aforementioned controlled substance(s) and/or the

18

USAO-000117

manner in which the financial proceeds of the distribution of the aforementioned controlled substance(s) are stored, invested or spent, including, but not limited to, 1) amounts of money paid, collected or owed on account of the purchase or sale of the aforementioned controlled substance(s), 2) bank records, 3) investment account records, 4) safe deposit box rental agreement or keys, 5) property deeds, 6) bill of sale, 7) tax returns, 8) vehicle titles;

III.     United States currency or coins used to purchase or sell the aforementioned controlled substance(s), or traceable to the purchase or sale of the aforementioned controlled substance(s);

IV.     Papers and possessions identifying the person(s) having custody and control over the premises being searched, and its contents;

V.     Scales, packaging materials, and paraphernalia used in the possession or distribution of the aforementioned controlled substance(s);

VI.     Any and all records maintained at the storage facility evidencing access and control of the storage facility.

VII.     Any cellular telephones, blackberries, or similar digital communications devices.

Signed under the pains and penalties of perjury this 2nd day of July, 2013.

19

_____

Trooper Patrick M. Burke,

Massachusetts State Police

Then personally appeared the above named Patrick M. Burke and made oath that the foregoing

affidavit by him subscribed is true.

Before me this 2nd day of July, 2013

_____

Associate Justice, Superior Court

20

USAO-000119

**Addendum A**

(Items to be search for)

I.      Books, papers, documents, ledgers, records, accounts, whether in physical (paper) or electronic form (including digital storage devices such as thumb drives, computers, blackberry or similar digital devices) evidencing the possession and/or distribution of marijuana including, but not limited to records and other papers reflecting 1) the purchase or acquisition of the aforementioned controlled substance(s) 2) the identities of the source of the aforementioned controlled substance(s), 3) the storage of the aforementioned controlled substance(s), 4) the distribution of the aforementioned controlled substance(s), 5) the identities of persons to whom the aforementioned controlled substance(s) was/were distributed;

II.     Books, papers, documents, ledgers, records, accounts whether in physical (paper) or electronic form (including digital storage devices) evidencing the sources of money or other property used to purchase or acquire the aforementioned controlled substance(s) and/or the manner in which the financial proceeds of the distribution of the aforementioned controlled substance(s) are stored, invested or spent, including, but not limited to, 1) amounts of money paid, collected or owed on account of the purchase or sale of the aforementioned controlled

21

USAO-000120

substance(s), 2) bank records, 3) investment account records, 4) safe deposit box rental agreement or keys, 5) property deeds, 6) bill of sale, 7) tax returns, 8) vehicle titles;

III.     United States currency or coins used to purchase or sell the aforementioned controlled substance(s), or traceable to the purchase or sale of the aforementioned controlled substance(s);

IV.     Papers and possessions identifying the person(s) having custody and control over the premises being searched, and its contents;

V.     Scales, packaging materials, and paraphernalia used in the possession or distribution of the aforementioned controlled substance(s);

VI.     Any and all records maintained at the storage facility evidencing access and control of the storage facility.

VII.     Any cellular telephones, blackberries, or similar digital communications devices.

I also seek permission to photograph the interior of the unit in order to create a record of the condition of the residence and the location of evidence recovered during the search.

22

USAO-000121

23

USAO-000122

# TENANT LEDGER

MARSHALL, DICK

PO BOX 587
REVERE, MA

| NAME | DESCRIPTION | AMOUNT RECEIVED | CHECK NO | | | | | | | | | | CHECK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BH | Marshall Dick | $340 | 1135 | $390.00 | | | 3 | 14 | 9 | 18 | 6 | | B.C |
| BH | Marshall Dick | $390 | 1143 | $390.00 | | | 3 | 1 | 9 | 19 | 6 | | B.C |
| BH | Marshall Dick | $390 | 1858 | $390.00 | | | 3 | 1 | 9 | 19 | 6 | | B.C |
| BH | Marshall Dick | $390 | 1843 | $390.00 | | | 3 | 1 | 9 | 19 | 6 | | B.C |
| BH | Marshall Dick | $730 | 1620 | $390.00 | | | 3 | 1 | 7 | 18 | 6 | | B.C |
| BH | Marshall Dick | $130 | 1340 | $260.00 | | | 3 | 1 | 9 | 18 | 6 | | B.C |
| BH | Marshall Dick | $390 | 1173 | $390.00 | | | 3 | 1 | 9 | 18 | 6 | | B.C |
| BH | Marshall Dick | $390 | 1293 | $390.00 | | | 3 | 1 | 9 | 16 | 6 | | B.C |
| BH | Marshall Dick | $390 | 1293 | $390.00 | | | 3 | 1 | 9 | 16 | 6 | | B.C |
| BH | Marshall Dick | $390 | 123 | $390.00 | | | 3 | 1 | 3 | 19 | 6 | | B.C |
| BH | Marshall Dick | $390 | 301 | $390.00 | | | 3 | 1 | 9 | 15 | 6 | | B.C |
| BH | Marshall Dick | $390 | 316 | $390.00 | | | 3 | 1 | 3 | 14 | 6 | | B.C |
| BH | Marshall Dick | $390 | 165 | $390.00 | | | 3 | 1 | 9 | 10 | 6 | | B.C |
| BH | Marshall Dick | $390 | 350 | $390.00 | | | 3 | 1 | 3 | 14 | 6 | | B.C |
| BH | Marshall Dick | $390 | 301 | $390.00 | | | 3 | 1 | 3 | 14 | 6 | | B.C |
| BH | Marshall Dick | $390 | 353 | $390.00 | | | | | | | | | B.C |

USAO-000123