and authorized to exercise the powers of enforcement personnel set forth in section 878
Title 21 U.S.C. I am deputized pursuant to Title 28, Federal Code of Regulations,
sections 0.112 &0.19A, and am charged with the duty of investigating violations of the
laws of the United States as stated in Title 28, Federal Code of regulations by order of the
Attorney General of the United States.

3.      As part of my Police Academy training conducted by the Boston Police
Academy and sponsored by the Massachusetts Criminal Justice Training Council, I was
instructed in drug recognition and investigative techniques. I have also acquired in
excess of five hundred hours of specialized training relating to narcotics' enforcement at
both the Federal and State level. I have completed the Drug Enforcement Administration
(DEA) 80-hour Narcotics School. I am certified by the Federal Law Enforcement
Training Center in Narcotics Investigations and Surveillance Techniques. I am certified
in the use of Narcotics Field Testing kits. I have received numerous hours of training in
Confidential Informant Recruiting and Development, Search Warrant Applications and
Procedures, Raid Preparation and Procedures, Drug Recognition, Clandestine Drug Labs,
Undercover Operations, Domestic Drug Interdiction, Firearms Investigations, Drug
Conspiracy Investigations, Hidden Compartments in Motor Vehicles, Patrol Interdiction
and Current Drug Trends. I hold a Bachelors Degree in Criminal Justice. I have
executed and participated in numerous search warrants and the recovery of evidence.

4.      During my career as a Police Officer, I have participated in a number of
arrests and investigations for violations of Massachusetts Controlled Substance Laws and
federal criminal law. I have been the affiant on over 30 search warrants and participated
in the execution of over 100 search warrants. As the result of my training and

experience, I am familiar with the methods, routines and practices of individuals involved in the sale and trafficking of narcotics. I am also familiar with the various paraphernalia used to manufacture, compound, process, deliver and dispense heroin, cocaine, marijuana and other controlled substances. I have provided testimony in numerous District and Superior Courts in the Commonwealth of Massachusetts as well as in the United States Federal Courts

5.      I make each of the following statements based upon my own personal knowledge, belief, and information and the knowledge, belief and information of other Police Officers involved in this investigation.

6.      This affidavit is made in support of an application for a search warrant for Storage Unit 574 at the Town & Country Self Storage Facility, 140 Main Street, North Reading, Massachusetts (the "Target Location"). A full description of the location to be searched is attached hereto as Attachment A, and is incorporated herein by reference.

7.      This affidavit does not contain each and every fact I know about this investigation. This affidavit only sets forth sufficient facts to demonstrate probable cause for a search warrant.

B.      Summary of Investigation

8.      On June 18, 2013, Marshall Dion, Date of Birth (DOB) 8/1/35, was stopped for speeding by the Junction City Police Department (JCPD) in Kansas, while driving a 2002 GMC Sierra pickup with Colorado registration plates. During the JCPD roadside interview, Dion presented the interviewing officer with a valid Arizona driver's license, and explained that he was traveling from Pennsylvania en route to his home in Tucson, Arizona. Dion stated that he had residences in Massachusetts and Arizona.

9.      Dion further explained that he had traveled from Tucson, Arizona, to Yardley, Pennsylvania to meet with his CPA. He stated that he had stayed in Pennsylvania for three days, and was headed home to Tucson, Arizona. Dion claimed that he traveled to Pennsylvania to meet with his CPA because she "gives him a break" on the charges.

10.     The interviewing officer detected signs of deception throughout the interview, including a travel itinerary that didn't seem to make sense. Dion continued to talk to the interviewing officer after he had been issued a written citation for speeding. At one point, the officer asked for, and was granted, consent to search Dion's truck.

11.     Upon opening the rear of the truck, the officer observed several items that appeared to be random junk, and a refrigerator. When the officer asked Dion where these items came from, Dion told the officer that he picked them up in Boston. This was the first time that Dion had mentioned being in Boston.

12.     The interviewing officer, who was also a K9 officer, conducted an exterior sniff of Dion's vehicle with his K9. The K9 alerted to the area of the front driver side wheel well and in the area of the front bed on the passenger side. The officer asked Dion if he had any cocaine, heroin, ecstasy, or marijuana. Dion confidently answered no to each question. When the officer asked Dion if he had any large amounts of US currency with him, he first answered no, and then said that he had approximately $6,000 worth of cash with him to be deposited into the bank.

13.     The officer then continued the search of the vehicle and located two FedEx boxes in front of the refrigerator that contained a large amount of US currency. A second officer, who was assisting the search, located two additional boxes beside the

refrigerator, which also contained a large amount of US currency. Three of these boxes had permanent marker writing on them that read "24 100s." The fourth box had "9 100s" written on it. It was later found that these boxes contained nothing but 100-dollar bills in $10,000 stacks and wrapped with a stack band that indicated the same total. Several other bundles of cash were also located within the truck. The total amount of cash inside the FedEx boxes was found to be $810,900, and the other cash was found to be $17,320.

14.     Dion was arrested and read his *Miranda* rights, which he said he understood. Dion initially claimed that he had done nothing wrong and that he was "just driving down the road." When Dion was told that he was driving with a large amount of cash, he responded, "I didn't even know that." Dion further stated, "I don't even know who loaded my truck." When the interviewing officer described a situation to Dion where drugs were found by the police and then subsequently delivered, in the hopes of conducting a controlled delivery of the money, Dion quickly stated that he doesn't "bother with dope anymore." Dion then went on to describe himself as a "mule", which your affiant understands to be a person who simply drives a package for an organization. That package is typically drugs or money, but can be almost anything. Dion explained to the interviewing officer that he takes the money and "drops it when he gets to his destination" and he doesn't know "where it goes or anything else." Dion was asked if the money was his and he responded, "I can't even tell you that." Dion admitted that the money "would probably go across the border." When he was asked if he would take it across the border Dion replied, "You're damn right I wouldn't, I don't go across the border." Dion was speaking of the US-Mexico border, and your affiant believes that Dion would not cross into Mexico for fear of the high level of violence in Mexico related

to the illegal narcotics trade.

15.     Dion claimed that when in Boston someone would load his truck "probably in the Boston area." Dion claimed that he just parked the truck in a parking garage in Boston and rented a vehicle to drive while the unidentified individuals allegedly loaded the truck with cash.

16.     Dion stated that he has no pension and his only source of legal income is social security, which pays him less than $690 per month. However, during the search of Dion's truck, the JCPD located checks that were made out to a trust account and appeared to be ready for deposit. The JCPD investigated this account and found that it was a trust account in Dion's name, and that it contained approximately $1.9 million in cash. The JCPD seized this account and the funds on deposit for forfeiture.

17.     The JCPD seized various other items from Dion's truck, including a Garmin GPS unit. The JCPD searched the Garmin GPS and found that Dion had arrived in Boston at 4 Longfellow Place, on June 2, 2013, at approximately 10:08pm. The GPS showed that following day, June 3, 2013, at approximately 6:29am, Dion traveled to the Town and Country Self Storage, 140 Main Street, North Reading, Massachusetts, and remained there for approximately 30 minutes. The GPS showed that Dion went to the Town and Country Self Storage a second time on June 6, 2013, this time for approximately 90 minutes.

18.     Since his arrest, Dion has made several recorded calls from jail. On June 28, 2013, Dion called an individual and asked him to bring money to his brother-in-law to pay for his attorney in Kansas. Dion's brother-in-law was subsequently identified as Dennis Ditelberg, an attorney in the Boston area. When this individual attempted to ask

questions of Dion, Dion stated, "This is not a secure phone so I can't talk with you."

19.     Also on June 28, 2013, Dion placed a recorded jail call to (978) 500-5234 and spoke with an individual whom he addressed as "Billy." Dion asked Billy, "Did Dennis talk to you?" Your affiant believes that Dion was referring to Dennis Ditelberg, his brother-in-law. Billy responded, "Yes" and Dion asked, "Can you hear me?" When Billy responded by saying, "I said yes", Dion said, "Ok, can you, can you get that thing to Dennis for me?" After a short pause Billy responded, "I'll take care of everything." There was no confusion in Billy's response and was clear that he understood the content of the coded conversation. Dion responded, "Ok, I appreciate it, thank you very much." Dion said that Ditelberg would fill Billy in and that he would talk to Billy at a later time. Based on this conversation, your affiant believes that Dion was speaking in code to avoid law enforcement detection, and that Attorney Ditelberg had already told Billy what the item was that Dion wanted Billy to give him (Ditelberg). At this point in the conversation, Billy asked Dion if he was ok, and Dion responded by saying, "Yep, yep, oh no, I'm ok, but, but, I'm uh, you know, I'm in the, you know right now I'm in the locked up, and that thing that, that thing that uh, er, uh, that box that you have of mine I want you to give that to Dennis. Ok?" Billy responded, "I understand, I understand, I understand." The call then came to an end with Dion and Billy exchanging well wishes. Your affiant believes that Dion was using coded language to direct Landolfi to bring an item of contraband, possibly incriminating evidence, to Attorney Ditelberg in order to prevent law enforcement from obtaining that item and using it in their case against him.

20.     After listening to this call, which was supplied to the FBI by the Junction City Police Deparmtent, your affiant reviewed a copy of Dion's cell phone contact list.

That list contained an entry for telephone number (978) 500-5234 under the name William "Billy" Landolfi, with an address of 21 Shady Hill Drive, North Reading, Massachusetts. A public database check revealed that William Landolfi, Date of Birth (DOB) ████████████, Social Security Account Number (SSAN) ████████████, previously resided at 21 Shady Hill Drive, North Reading, and currently resides at 230 Haverhill Street, North Reading, Massachusetts. Your affiant notes that this residence is located approximately 2.7 miles from the Town and Country Self Storage business on Main Street in North Reading.

21.    On Monday, July 1, 2013, the FBI interviewed Landolfi on the front steps of his residence in North Reading, MA. Landolfi acknowledged that he knew Dion and was aware that he had "got in trouble" in Kansas City because he had been told by an attorney, but could not recall the name of the attorney. Landolfi was asked when he had last spoken with Dion, Landolfi responded, "A long time ago." When Landolfi was confronted with the fact that he had talked to Dion in a recorded jail call only three days earlier, Landolfi admitted that he did talk to him (Dion).

22.    Landolfi was asked if he had any property belonging to Dion and Landolfi stated that he did not. Landolfi was asked what the box was that Dion referred to in the recorded jail call. Landolfi stated that he didn't know what Dion was talking about during the call. Landolfi was reminded that he had responded, "I'll take care of everything" and "I understand, I understand, I understand." The FBI explained to Landolfi that based on these responses it was reasonable to believe that he (Landolfi) clearly understood what Dion was talking about. Landolfi claimed that he had no idea what Dion was talking about during the call. Landolfi was asked if he had given any

USAO-000157

property or money to any attorney and he stated that he had not.

23.     Landolfi was asked if anyone had contacted him about Dion's arrest, and he replied that an attorney had called to ask if he could help Dion, but Landolfi said that he had no way to help and could not recall the name of the attorney who had called. Landofli was asked when he had last spoken to "Marc", referring to Attorney Marc Cantor (Cantor works in the same law firm as Ditelberg) without using his last name. Landofli stated that he had spoken with Cantor when he called to talk with Attorney Ditelberg, despite the fact that Landolfi had claimed that Attorney Ditelberg had actually called him earlier in the interview. Landolfi was then able to remember that Ditelberg was the name of the attorney, whom he could not recall in the beginning of the interview. Landolfi was then asked if he had taken any money or property to any attorney for Dion and he stated that he had not.

24.     Landolfi was then asked if he had a storage unit at Town and Country Self Storage on Main Street in North Reading, to which he replied that he did not. Landolfi was asked if he had ever been to Town and Country Self Storage and he replied that he had not. Landfoli was informed that the storage location is equipped with video cameras and was asked if the FBI reviewed the video footage for the location, would he be seen on the video at the location, and he stated that he would not.

25.     Shortly after this line of questioning, Landolfi asked if he could go to the bathroom and went inside his residence to use the restroom. Landolfi returned several minutes later talking on his cell phone. Landolfi spoke for another minute or two in the presence of the FBI Agents and then hung up. Landolfi then informed the Agents that he had spoken to an attorney, and stated that although the attorney with whom Landolfi had

been speaking was a defense attorney, he was not specifically Landolfi's attorney. Landolfi told the Agents that the attorney had told him to continue to be truthful and to answer the FBI's questions if they had something new to ask, but not to offer them (the FBI) anything outside of what was asked and that if he was uncomfortable to tell the FBI that he didn't want to answer any more questions.

26.    Landolfi was then questioned again about having any property belonging to Dion, and he again responded that he didn't have any of Dion's property and never had any of his property. Landolfi also repeated that he was confused by Dion's jail call and didn't know what he was talking about. At this point in the interview, Landolfi indicated that he no longer wished to answer any questions, but remained on the front steps of his residence. Landolfi was asked specifically if he wanted to clarify any prior misstatements that he had made to the FBI during the interview, and he repeated that he no longer wanted to answer questions. The FBI encouraged Landolfi to contact his attorney and ask for advice as to whether he should clarify or correct any prior misstatements he had made to the FBI, as your affiant believes Landolfi lied to the FBI several times during his interview. Landolfi again declined to answer any questions, or to correct any prior statements.

27.    On Tuesday, July 2, 2013, the FBI served a subpoena on Town and Country Self Storage for, among other things, a list of all current renters of storage units at the facility. A review of the list provided by Town and Country Self Storage revealed that Dion (#220) and Landofli (#574) both currently rent units at Town and Country Self Storage. According to Town and Country Self Storage records, Dion has rented a unit since 1999, and Landofi has rented a unit since 2008.

28.    The Massachusetts State Police called one of their K9 units to Town and Country Self Storage in order to conduct an exterior sniff of the area around the two units. The K9 is trained and certified in narcotics detection and his handler confirms that he is reliable. As a result of a positive alert on Dion's unit by the K9, a state search warrant was obtained and executed at Dion's unit. This search warrant resulted in the seizure of approximately $11 million[1] in US Currency, 160 pounds of high-grade marijuana, and ledgers and records related to Dion's drug distribution operation. Among the records discovered was a check book ledger from 1996-1998 with several entries detailing yearly rental payments to several storage facilities, including Comeau's Mini Storage in Saugus, Massachusetts. I contacted the owner of Comeau's Mini Storage, and he confirmed that Marshal Dion was a longtime customer and currently had a storage unit at the facility. A state search warrant for Dion's unit at Comeau's Mini Storage was obtained, the execution of which in the seizure of an additional estimated $120,000 and an additional 160 pounds of high-grade marijuana.

29.    Based on the information developed during the execution of these search warrants, the Drug Enforcement Administration (DEA) in Tucson, Arizona, sought and obtained federal search warrants for 2 residences and 3 storage units belonging to Dion in Tucson, Arizona. As a result of the execution of those search warrants, the DEA seized $888,432 in US currency.

30.    A review of the records obtained from Dion's storage unit in North

---

[1] All amounts and weight quoted as a result of the execution of search warrants in this affidavit are estimated because the large amount of cash precluded a hand count and at the time of writing this affidavit the funds had not yet been transferred to Brinks Inc. to be counted. The stated amount is based on notations made on the packages that contain a large amount of US currency.

Reading indicate that Dion has been trafficking in large amounts of marijuana since at least 1992. Dion kept detailed records of customers, amounts of marijuana, and balances, as well as airline, bank, and rental car records, pieces of mail addressed to Dion at Attorney Ditelberg's office, and other items inside the storage unit. Among the customers identified in Dion's records is an individual who is referred to as "Billy L". Your affiant believes that "Billy L" is a reference to William "Billy" Landolfi. A complete review of these records is not complete; however, (as an example) Dion made notations regarding Landolfi that indicated the following:

1. 12/24/2003 Balance owed of $159,865, payment of $179,820, which resulted in a credit balance of $19,955.
2. 10/20/2003 Balance owed of $205,954, payment of $80,000, which resulted in a balance owed of $125,954.
3. 9/23/2003 Balance owed of $439,341, payment of $420,070, which resulted in a balance owed of $19,271.

31. Based on a review of these records, and the items seized at Dion's storage units, your affiant believes that Landolfi is a long time, large-scale, marijuana distributor who obtains large amounts of marijuana from Dion.

32. On Wednesday, July 3, 2013, after consulting with the United States Attorney's Office, the FBI secured Landolfi's storage unit with a lock purchased by the government. In addition, the FBI informed the owners of the property that storage unit #574 was frozen in anticipation of obtaining a federal search warrant for the unit. North Reading Police remain on scene to prevent anyone from accessing the unit prior to the issuance of a search warrant.

33. It is my experience, as well as the experience of other agents with whom I have worked and spoken, that storage facilities are often used by narcotics traffickers to store controlled substances, ledgers, scales, paraphernalia, and other items listed in Appendix

A, as evidence by the search warrant executed at Dion's units in North Reading and

Saugus, Massachusetts.

34.    In addition, based upon my training and experience, and the training and

experience of other agents with whom I have worked and spoken, I know that:

a.    narcotics traffickers must maintain, on hand, large amounts of U.S. Currency in order to maintain and finance their on-going narcotics business;

b.    it is common for narcotics traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments and or the transfer of funds, and other papers relating to the transportation, ordering, sale and distribution of controlled substances.

c.    it is common for drug dealers to secrete contraband, proceeds of drug sales and records of drug transactions in secure locations which they maintain dominion and control over, for ready access and to conceal these items from law enforcement authorities;

d.    narcotics traffickers often purchase and/or title their assets in fictitious names, aliases, or the names of relatives, associates or business entities to avoid detection of these assets by government agencies;

e.    even though these assets are in the names of others, the narcotics traffickers actually own and continue to use these assets, and exercise dominion and control over them;

f.    it is common for persons involved in narcotics trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and or expenditure of narcotics proceeds, such as: currency, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashiers checks, bank checks, safe deposit box keys and money wrappers. These items are maintained by the narcotics traffickers within their residences, businesses or other locations, including storage units, which they maintain dominion and control over;

g.    narcotics traffickers often utilize electronic equipment such as computers, cellular telephones, tablet computers (IPads, IPods), currency counting machines and telephone answering machines to generate, transfer, count, record and or store the information described above.  I have also encountered cellular telephones, billing records pertaining to cellular telephone accounts, telephones, and ledgers containing code numbers, customers and stash locations, all of which facilitate drug distribution;

h.    when drug traffickers amass significant proceeds from the sale of drugs, they attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize, among other mechanisms, domestic and international banks and their attendant

B hereto, which items constitute evidence of violations of Title 21, United States Code, Sections 841(a)(1), Possession with Intent to Distribute and Distribution of Controlled Substances, Title 21, United States Code, Section 846, Conspiracy to do the same, and Title 18, United States Code, Sections 1956 and 1957, violations involving the laundering of monetary instruments.

I declare that the foregoing is true and correct to the best of my knowledge and belief.

Task Force Officer Brian Cohoon

Subscribed and sworn to before me this 5th day of July, 2013.

HONORABLE DAVID H. HENNESSY
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS

# ATTACHMENT A

## LOCATION TO BE SEARCHED

Storage Unit 574 at the Town & Country Self Storage Facility, 140 Main Street, North Reading, Massachusetts, as more particularly described as a storage unit located at the "Town & Country Self Storage Facility" at 140 Main Street in the town of North Reading. A black chain link fence encloses the storage facility. The main office is a one story wood framed structure with white siding and black shutters. Above the front windows there is a large red sign with white lettering, which reads, "Town & Country Self Storage 978-664-4044." On the right side of the front of the building the numbers "140" are clearly visible in black numbering. Access to storage unit "574" is obtained through a brown, corrugated metal garage door. This door opens and closes horizontally. The number "574" is clearly marked directly above the center of the brown, corrugated metal garage door.



## ATTACHMENT B

### ITEMS TO BE SEIZED

The following is a list of the evidence, fruits and instrumentalities of violations of 21 U.S.C. §841(a) (1) (possession of a controlled substance with intent to distribute), 21 U.S.C. §841(a) (1) (distribution of a controlled substance), 21 U.S.C. §846 (conspiracy), and 18 U.S.C. §§ 1956 and 1957 (laundering of monetary instruments), to be seized:

1.      Controlled substances, including but not limited to marijuana, and controlled substances paraphernalia, including but not limited to scales, baggies, bindles, sifters, razor blades, spoons, syringes, glass pipes, plastic, tin foil, cellophane, jars, surgical gloves, and aromatic substances including, but not limited to, soap, dryer sheets, wood shavings, heat sealers and plastic wrap, and cutting agents, including, but not limited to, lactose, inositol, and Mannitol.

2.      Documents evidencing narcotics possession, use, or trafficking, including but not limited to books, records, accounting records, narcotics distribution or customer lists, narcotics supplier lists, correspondence, notations, logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when narcotics were purchased, possessed, transferred, distributed, sold or concealed, records of narcotics sales and records listing persons who owe money and who are owed money, receipts, purchase orders, notes, ledgers, and any other paper relating to the transportation, ordering, purchase, manufacturing and distribution of controlled substances, in particular, methamphetamine.

3.      Bank account records, wire transfer records, bank statements, safety deposit keys and records, money wrappers, money containers, income tax returns, books, records, receipts, bank statements and records, money drafts, letters of credit, money order and cashier's check receipts, passbooks, bank checks, and other items evidencing the obtaining, secreting, transfer, and/or concealment of assets and the obtaining, secreting, transfer, concealment and/or expenditure of money relating to the distribution of controlled substances, in particular, methamphetamine.

4.      Photographs, including but not limited to photographs of co-conspirators, assets and/or controlled substances.

5.      Articles tending to establish sales of marijuana including, but not limited to, ledgers, police radio scanners, buyer and seller lists, pagers, video cameras, monitors, firearms, and any and all items which relate to the possession, maintenance and use of firearms, including but not limited to ammunition, magazine clips, holsters, photographs, receipts of the purchase or repair of firearms, firearms containers, carrying cases and firearm boxes.

6.      Articles of personal property tending to establish the identity of person in control of the premises searched, including but not limited to personal identification papers, utility and rent receipts, mail, photographs and keys.

7.      Computers, cellular telephones, tablet computers (IPads, IPods), currency counting machines and telephone answering machines used to generate, transfer, count, record, or store the information or items described above, and all mobile phones, car phones, and other communication devices which evidence or facilitate participation in a conspiracy to distribute controlled substances. It is specifically requested that the searching agents or officers be authorized to answer and record all telephone calls (residential and/or cellular) received at the location to be searched during the execution of the search warrant, to seize any and all answering machines, pagers and cellular phones, of and to record and return incoming any pages received at the location to be searched during the execution of this search warrant.

8.      Items showing unexplained wealth or evidencing the proceeds derived from illicit drug or trafficking, including but not limited to large sums of currency, vehicles, financial instruments, precious metals, jewelry, and real estate, documents evidencing the procuring or leasing of these items, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashiers checks, bank checks, safe deposit box keys and money wrappers.



9.      Items tending to identify other co-conspirators, including but not limited to telephone records, personal telephone books, personal address books and listings, letters, cables, telegrams, telephone bills, mail, pictures, ledgers, receipts and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in drug trafficking activities.

10.     United States and foreign currency linked to drug trafficking and/or the proceeds of drug trafficking.

11.     Records, items, and documents reflecting travel, including airline tickets, credit card receipts, travel vouchers, hotel and restaurant receipts, canceled checks, maps and written directions to location.

12.     Handguns, shotguns, rifles, ammunition and other firearms possessed in relation to drug trafficking or discovered in the possession of a prohibited person.

13.     All names, words, telephone numbers, email addresses, time/date information, messages or other electronic data in the memory of any mobile telephone and described as the mobile telephone's:

    a.      Incoming call history;
    b.      Outgoing call history;
    c.      Missed call history;

    d.      Outgoing text messages;

    e.      Incoming text messages;

    f.      Draft text messages;

    g.      Telephone book;

    h.      Data screen or file identifying the telephone number associated with the mobile telephone searched;

    i.      Data screen, file, or writing containing serial numbers or other information to identify the mobile telephone searched;

    j.      Voicemail;

    k.      User-entered messages (such as to-do lists);

    l.      Photographs; and

    m.      Any passwords used to access the electronic data described above.

14.      Any and all electronically stored data regarding the evidence sought in categories 1-13 hereof, including any and all electronic devices, media, and/or computer hardware equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data, including but not limited to, any data-processing devices (such as laptops, central processing units, memory typewriters, internal and peripheral storage devices (such as thumb drives, fixed disks, external hard drives, hard and floppy disk drives, tape drives and tapes, optical storage devices, and other memory storage devices)); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); and related communications devices (such as modems, cables and connections, recording equipment, RAM or ROM units, acoustic couplers, automatic electronic tone-generating devices); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks); computer software consisting of digital information which can be interpreted by computer and any of its related components to direct the way they work including, but not limited to, software stored in electronic, magnetic, optical, or other digital form, which commonly includes programs to run operating systems, applications (like word-processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communications programs; computer-related documentation consisting of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, software, or other related items; computer passwords and other data security devices designed to restrict access to or hide computer software, documentation, or data consisting of (but is not limited to) hardware, software or other programming code, encryption devices, chips, and circuit boards.



# FEDERAL BUREAU OF INVESTIGATION

Date of entry     07/10/2013

On July 10, 2013, Magistrate Judge David H. Hennessy, District of Massachusetts, authorized a search warrant for 261 Rice Avenue, Revere, Massachusetts (MA). The following individuals executed the search warrant: Supervisory Special Agent (SSA) William R. McDermott, FBI, Special Agent (SA) SA Tucker J. Heap, FBI, SA Lise N.Baillargeon, FBI, Task Force Officer (TFO) Brian Cohoon, FBI, TFO John Bartolomucci, FBI, TFO John Oliveira, FBI, TFO Daniel McIntyre, FBI, TFO Ryan Impemba, FBI, TFO Jason Sutherland, Drug Enforcement Administration (DEA), TFO David Spirito, DEA, TFO Matthew Woodman, DEA, SA Matthew Langille, Homeland Security Investigations (HSI), SA Matthew McCarthy, HSI, Seargent (Sgt.) Paul Bulman, Massachusetts State Police (MSP), Trooper (Tpr.) Andrew Graham, MSP, Tpr. Jeffrey Boutwell, MSP, Tpr. R.B. Porter, MSP, Lieutenant (Lt.) John Goodman, Revere Police Department (RPD), and Detective (Det.) Jim Bulman, Scituate Police Department. The following is a report of the search:

All times are approximate.

**Search began**: July 10, 2013, at 6:30 PM

| Exhibit | Location | Agent/Officer | Item(s) seized |
|---------|----------|---------------|----------------|
| 1 | Room A | Graham | One (1) HP Pavilion G6 laptop |
| 2 | Room K | Sutherland | $2,400.00 cash in white envelope |
| 3 | Room A | Graham | One (1) iPad (16GB), S/N: CQ24608AA90 |
| 4 | Room K | Sutherland | One (1) Toshiba laptop, S/N: XA109147W, One (1) hardrive, S/N: SGK85HYE |
| 5 | Room F | Langille | Papers with telephone numbers |
| 6 | Room B | Bartolomucci | One (1) Revere City building permit, dated: July 27, 2002, in name of DENNIS DITELBERG |

Investigation on   07/10/2013   at   Revere, Massachusetts, United States (In Person)

File #   245C-BS-2495557-Reports                                    Date drafted   07/10/2013

by   Tucker J. Heap

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

USAO-000169

245C-BS-2495557-Reports

| Exhibit | Location | Agent/Officer | Item(s) seized |
|---------|----------|---------------|----------------|
| 7 | Room H | Boutwell | Papers containing telephone numbers |
| 8 | Room E | McIntyre | Five (5) U-Haul storage locker keys: "301, 302, 328,1038, 1106" |
| 9 | Room B | Oliveira | One (1) shipping packaged addressed to "MARSHALL H DION" at "4 LONGFELLOW PL STE 3802" |
| 10 | Room B | Oliveira | Nine (9) USPS priority mail envelopes |
| 11 | Room B | Baillargeion | One (1) check from DION Family Trust, papers with numbers |

**Search ended:** 8:25 PM

At the conclusion of the search, SA Heap Heap took custody of Exhibits 1-11. Before departing the location, SA Heap and TFO Cohoon met with WARREN MERRILL, date of birth (DOB) January 31, 1955, and provided him with a receipt of property list (FD-597) of items seized at 261 Rice Avenue, Revere, MA. MERRILL reviewed the list then signed it. SA Heap then signed the FD-597 in MERRILL's presence and provided him with a copy.

At 9:00 PM, SA Heap and SSA McDermott placed Exhibits 1-11 in secure storage at the Organized Crime Drug Enforcement (OCDETF) Strikeforce Offices, 617 Arsenal Street, 2nd Floor, Watertown, MA.

Administrative

The photographs, evidence logs and notes regarding the search of 261 Rice Avenue, Revere, MA, were sent to the 1A section of the captioned investigation.