"he owes me." DION told Ditelberg to call Landolfi and tell him that DION "authorized" him to call. DION told Ditelberg that Landolfi had "funds" that belonged to DION and that either "Billy or Glenn have funds that will cover the lawyer."

44. After listening to this call, the FBI reviewed a copy of Exhibit 4, which contained Landolfi's telephone number and address. Based on the recorded call, agents set up surveillance around Landolfi's home on July 1, 2013, in an effort to intercept Landolfi as he delivered the "box" to Ditelberg's office. After watching Landolfi's residence for several hours and observing no criminal activity, Task Force Agent Brian Cohoon and I knocked on Landolfi's door and interviewed him from the front steps of his residence.

45. Landolfi acknowledged that an attorney had told him that DION "got in trouble" in Kansas, but he could not recall the name of the attorney who told him. Landolfi was asked when he had last spoken with DION, Landolfi responded, "A long time ago." When Landolfi was confronted with the fact that he had talked to DION in a recorded jail call only three days earlier, Landolfi admitted that he had spoken with DION.

46. Landolfi was asked if he had any property belonging to DION and Landolfi stated that he did not. Landolfi was asked about the "box" that DION referred to in the recorded jail call. Landolfi stated that he did not know what DION was talking about during the call. Landolfi was reminded that he had responded, "I'll take care of everything" and "I understand, I understand, I understand." Nevertheless, Landolfi maintained that he had no idea what DION was talking about during the call. Landolfi was asked if he had given any property or money to any attorney, and he stated that he had not. Landolfi was asked if anyone had contacted him about DION's arrest.

47. Landolfi told investigators that an attorney had called him to ask if he could help

17

DION, but Landolfi said that he had no way to help. Landolfi said he could not recall the name of the attorney who had called. When asked when he had last spoken to "Marc" (Cantor), Landolfi stated that he had spoken with Cantor when he called to talk with Ditelberg. (This contradicted Landolfi's previous statement that that Ditelberg had actually called him.) Landolfi was then able to recall that Ditelberg was the person who had called him about DION. Landolfi was then asked if he had taken any money or property to any attorney for DION and he stated that he had not.

48. On July 10, 2013, DION placed another recorded jail call to Ditelberg. Ditelberg told DION, "Your friend will help out. We can make the retainer." DION asked if one of his "friends" had contacted Ditelberg. Ditelberg replied, "I heard from two. Our tattooed friend." I know that Glenn Freeman has a number or tattoos and based on the above detailed calls, I believe Ditelberg told DION that Freeman either had or was planning to give Ditelberg the money needed for DION to retain a criminal attorney.

49. On July 16, 2013, Ditelberg submitted to a proffer interview with the FBI. Ditelberg was represented by counsel during the proffer. Ditelberg told agents that he had met with Freeman outside of 4 Longfellow Place the week prior to the proffer. Ditelberg denied that Freeman gave him any money during this meeting. Ditelberg appeared surprised when I informed him that all of the calls DION placed from jail were recorded and that we had reviewed all of the calls. When asked why he told DION he would "stall" the FBI, Ditelberg had no explanation.

### DION used the Target Location and the Target Computer when he was in Massachusetts.

50. On June 28, 2013, FBI Special Agent Tucker Heap and I interviewed Dennis Ditelberg at his office, located at 4 Longfellow Place, Boston. During that interview, Ditelberg

18

told agents that he did not know what DION did for work or how DION made money, except that he may have been involved in "sales." Ditelberg told agents DION visited him at 4 Longfellow Place approximately once a month. Ditelberg told agents he would allow DION to "use the office" and would "give him the key every now and then." Ditelberg also told officers that DION would use a computer inside 4 Longfellow Place to conduct "business." Ditelberg denied ever giving DION money. He stated he was shocked to learn about DION's arrest and told agents he would cooperate in their investigation.

51. As indicated above, subsequent to this interview, DION and Ditelberg had an extensive conversation about Ditelberg's FBI interview and Ditelberg expressed concern that the FBI knew how often DION had been in and out of 4 Longfellow Place. Exhibit 4 in fact details that many, if not most, of DION's trips between Boston and Tucson started from the Target Location and that DION went straight to the Target Location when he arrived in Boston from Tucson.

52. Accordingly, I believe the Target Location, Target Telephone, Target Computers, Target GPS Device and Target Storage Devices likely contain evidence in the form of audio, video, and photographic images as well as text communications that can help establish the full nature of the defendants' relationships and the frequency with which they communicated as well as direct evidence of the charged crimes.

53. In addition, based upon my training, experience, and the training and experience of other agents with whom I have worked and spoken, I know that:

   a. narcotics traffickers must maintain, on hand, large amounts of U.S. Currency in order to maintain and finance their on going narcotics business;

   b. it is common for narcotics traffickers to maintain paper and electronic books,

19

records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments and or the transfer of funds, and other papers relating to the transportation, ordering, sale and distribution of controlled substances. That the aforementioned paper and electronic books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them;

c. it is common for drug dealers to secrete contraband, proceeds of drug sales and records of drug transactions in secure locations within their cell phones, computers, cameras, residences, businesses, and/or other locations and devices over which they maintain dominion and control, for ready access and to conceal these items from law enforcement authorities;

d. narcotics traffickers often purchase and/or title their assets in fictitious names, aliases, or the names of relatives, associates or business entities to avoid detection of these assets by government agencies;

e. even though these assets are in the names of others, the narcotics traffickers actually own and continue to use these assets, and exercise dominion and control over them;

f. it is common for persons involved in narcotics trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of narcotics proceeds, such as: currency, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashiers checks, bank checks, safe deposit box keys and money wrappers. These items are maintained by the narcotics traffickers within their residences,

businesses or other locations which they maintain dominion and control over;

g.     narcotics traffickers often utilize electronic equipment such as computers, telex machines, facsimile machines, currency counting machines and telephone answering machines to generate, transfer, count, record, and/or store the information described above. I have also encountered beepers, cell phones, smart phones, billing records pertaining to beeper accounts, telephones, and ledgers containing beeper code numbers, customers and stash locations, all of which facilitate drug distribution;

h.     when drug traffickers amass significant proceeds from the sale of drugs, they attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize, among other mechanisms, domestic and international banks and their attendant accounts, casinos, real estate, shell corporations and business fronts, and otherwise legitimate businesses which generate large quantities of currency. Traffickers often commingle narcotics proceeds with money generated by legitimate businesses;

i.     narcotics traffickers at times become fearful that their extravagant spending habits will bring them under scrutiny by the Internal Revenue Service or other federal, state, or local agencies. In order to legitimize their spending, these traffickers file tax returns reporting income commensurate with the amount of money they have spent during the year which they feel can be traced and documented by the government. The source of their income reported on these returns is usually falsely stated, misleading or generic in terms. Retained copies of these returns are commonly kept by the traffickers in their residences, businesses, and other storage locations;

j.     traffickers commonly maintain electronic and paper books or documents which

reflect names, addresses, and/or telephone numbers of their associates in the trafficking organization; and

k.   traffickers keep photographs of themselves, their associates, and their property and usually maintain these photographs in their possession.

54.   Based on this training and experience, the investigation in this case, my analysis of recorded calls, and physical surveillance conducted up until today, I believe that evidence of the Target Offenses will be found in the Target Telephone, Target Computers, Target GPS Devices and Target Storage Devices.

## SEIZURE OF COMPUTER EQUIPMENT AND DATA

55.   Based on my knowledge and training and the experience of other agents with whom I have spoken, I know that in order to completely and accurately retrieve data maintained in computer hardware, computer software or storage media, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that computer equipment, software, peripherals, and related documentation be seized and subsequently processed by a qualified computer specialist in a laboratory setting. This is true because of the following:

56.   <u>The volume of evidence.</u>   Computer storage devices (such as hard disks, flash drives, magnetic and optical disks) can store the equivalent of thousands or, in some instances, millions of pages of information. Additionally, a user may seek to conceal evidence by storing it in random order or with deceptive file names. Searching authorities may need to examine all the stored data to determine which particular files are evidence or instrumentalities of criminal activity. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this analysis on-site.

57. <u>Technical requirements.</u> Analyzing computer systems for criminal evidence is a highly technical process requiring expertise and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications. Thus, it is difficult to know, before the search, which expert possesses sufficient specialized skill to best analyze the system and its data. Furthermore, data analysis protocols are exacting procedures, designed to protect the integrity of the evidence and to recover even "hidden," deleted, compressed, password-protected, or encrypted files. Many commercial computer software programs also save data in unique formats that are not conducive to standard data searches. Additionally, computer evidence is extremely vulnerable to tampering or destruction (both from external sources and destructive code imbedded in the system as a "booby trap").

58. In light of the volume of data at issue and these technical requirements, it is generally necessary that data, hardware, software, and storage media, be seized and subsequently processed by a qualified computer specialist in a laboratory setting rather than in the location where it is seized. It is also generally necessary for agents to seize most or all of a computer system's input/output peripheral devices, software, and computer-related documentation, in order for a qualified computer expert to accurately retrieve the system's data in a laboratory or other controlled environment.

59. Attachments B, C and D to the proposed warrant, which contain sections relating to the search and seizure of computer equipment and data, are appended to my Affidavit and incorporated by reference.

## CONCLUSION

60. Based on all of the foregoing, I believe that on and in the property described above as the Target Telephone, Target Laptop Computer, Target Computer, Target GPS Device and Target Storage Devices, more fully described in Attachment A, there is probable cause to believe that the items set forth in Attachment C will be found.

Respectfully submitted,

*Stephen Kelleher SA/FBI*
Special Agent Stephen Kelleher
Federal Bureau of Investigation

Subscribed and sworn to before me
on 25th day of October, 2013

*Marianne B. Bowler, USMJ*
HONORABLE MARIANNE B. BOWLER
U.S. MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS