<pre>
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
 2

 3     _____

 4     UNITED STATES OF AMERICA,

 5                       Plaintiff,        Criminal Action
                                           No. 13-10258-DJC
 6     v.
                                           November 18, 2014
 7     MARSHALL HERBERT DION,
       WILLIAM LANDOLFI and
 8     GLENN FREEMAN,                      10:00 a.m.

 9                       Defendants.

10     _____

11

12

13            TRANSCRIPT OF MOTION TO SUPPRESS DAY 1

14          BEFORE THE HONORABLE DENISE J. CASPER

15             UNITED STATES DISTRICT COURT

16          JOHN J. MOAKLEY U.S. COURTHOUSE

17                 1 COURTHOUSE WAY

18              BOSTON, MA  02210

19

20

21              DEBRA M. JOYCE, RMR, CRR
22              Official Court Reporter
              John J. Moakley U.S. Courthouse
23            1 Courthouse Way, Room 5204
                 Boston, MA  02210
24              joycedebra@gmail.com

25
</pre>

```
 1   APPEARANCES:

 2   FOR THE GOVERNMENT:

 3   LEAH B. FOLEY, ESQ.
     United States Attorney's Office
 4   John J. Moakley U.S. Courthouse
     Suite 9200
 5   One Courthouse Way
     Boston, MA 02210
 6   617-748-3144

 7   FOR THE DEFENDANT MARSHALL HERBERT DION:

 8   HENRY B. BRENNAN, ESQ.
     Brennan & Associates
 9   20 Park Plaza
     Suite
10   Boston, MA 02116
     617-720-1200
11
     FOR THE DEFENDANT WILLIAM LANDOLFI:
12
     ROBERT M. GOLDSTEIN, ESQ.
13   20 Park Plaza, Suite 1000
     Boston, MA 02116
14   617-742-9015

15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

(The following proceedings were held in open court before the Honorable Denise J. Casper, United States District Judge, United States District Court, District of Massachusetts, at the John J. Moakley United States Courthouse, 1 Courthouse Way, Boston, Massachusetts, on November 18, 2014.

The defendants, Marshall Herbert Dion and William Landolfi, are present with counsel.  The Assistant U.S. Attorney is present.)

THE CLERK:  Criminal action 13-10258, <u>United States v. Marshall Dion and William Landolfi</u>.

Would counsel please state your name for the record.

MS. FOLEY:  Good morning, your Honor.  Leah Foley for the United States.

Your Honor, with the Court's permission, I ask that Special Agent Steve Kelleher, who is the case agent of this case, be allowed to sit at counsel table through the motions.

I just want to alert the Court also that he will be testifying later in the motions' hearing.

THE COURT:  Okay.

Good morning.

MR. BRENNAN:  Good morning, your Honor.  Hank Brennan for Marshall Dion.

THE COURT:  Good morning, counsel.

Good morning, sir.

1          MR. GOLDSTEIN:  Good morning, your Honor.  Robert

2     Goldstein on behalf of William Landolfi, who is with me at

3     counsel table.

4          THE COURT:  Good morning.

5          Good morning, sir.

6          MR. LANDOLFI:  Good morning.

7          THE COURT:  Counsel, I know that we're here on the two

8     motions to suppress.  I've also recently received Docket 125,

9     which was the supplement to the motion to suppress.  I also

10:01 10   received an affidavit, Mr. Brennan, on Mr. Dion's behalf, which

11    was also filed recently, Docket 126.

12         Counsel, are we ready to proceed today?

13         Ms. Foley?

14         MS. FOLEY:  Yes, your Honor.

15         THE COURT:  Do you have witnesses today?

16         MS. FOLEY:  I do, your Honor.  The government will be

17    calling to start Officer Nicholas Blake.

18         And just sort of to alert the Court, we will be

19    playing a video of the car stop, which is loaded in the

10:02 20   government's computer.  I know I already produced a copy to the

21    Court.

22         THE COURT:  I attempted to play it, there seemed to be

23    various videos on here, some of which I did not believe related

24    to this case, but --

25         MS. FOLEY:  Your Honor, there's a folder that has the

1   car stop, and then there's a folder that has multiple parts of

2   the interview that was -- that took place after the defendant

3   was arrested.

4           THE COURT:  Okay.

5           I think -- well, part of the video -- part of the

6   video was perhaps the officer taking the dog around the police

7   station.  Okay.

8           MS. FOLEY:  And so -- yes, that was at the very end,

9   after the defendant's arrest.  Because the dog had alerted or

10:03 10  indicated on the car before -- or during the traffic stop, they

11  took the money that was found inside the defendant's truck and

12  put it in a clean office and ran the dog in there to see if the

13  dog would alert again, and that was just documenting the fact

14  that the dog did alert again.

15          THE COURT:  So Officer Blake is the officer that does

16  the stop?

17          MS. FOLEY:  Yes, your Honor.

18          THE COURT:  And that's of Mr. Dion?

19          MS. FOLEY:  Yes, your Honor.

10:03 20        THE COURT:  And do you have other witnesses in regards

21  to Mr. Dion's motion?

22          MS. FOLEY:  Yes, your Honor.  The government will be

23  calling Agent Kelleher, and the government also may be calling

24  after Agent Kelleher, depending on how things stand at that

25  point, Massachusetts State Trooper Pat Burke.

1          THE COURT:  Okay.

2          MS. FOLEY:  And one other preliminary matter, your

3   Honor.  Mr. Brennan and I discussed this morning the scope of

4   the examination of Officer Blake and what is being contested,

5   and I was informed that the defendant is not going to be

6   contesting the dog sniff at either the Kansas roadside stop or

7   at the storage unit in Massachusetts, the storage unit rented

8   by Mr. Dion which was the Town and Country Self Storage unit in

9   North Reading.  So the Court will not being hearing any

10:04 10  testimony on those probable cause-based sniffs based on the

11  defendant's conceding that point or withdrawing that argument.

12          THE COURT:  Any other witnesses in regards to

13  Mr. Dion's motion?

14          MS. FOLEY:  No, your Honor.

15          THE COURT:  And what about Mr. Landolfi's motion?

16          MS. FOLEY:  Your Honor, I was prepared to have Agent

17  Kelleher testify with regard to Mr. Landolfi's motion, but I

18  believe that -- it's the government's position that the Court

19  can rule on the papers on Mr. Landolfi's motion.

10:05 20          There was a supplemental motion filed yesterday, which

21  challenged whether there was a material factual omission from

22  the affidavit, which would allow for a Frank's hearing on

23  the -- his motion.  And it was based on the fact that the

24  government had obtained a video surveillance of the Town &

25  Country Self Storage, and that that fact was not made known to

1    Magistrate Judge Hennessey when applying for the search

2    warrant.  And the government can proffer to the Court, and it

3    has informed the defense, there was no reason for them to have

4    known this ahead of time, but the video that was obtained by

5    the FBI on July 2, 2013 only captured the five previous days of

6    ins and outs from that storage facility.  And the government's

7    evidence and the probable cause was based on things that happen

8    at that storage facility in June of 2013, specifically, prior

9    to June 17, 2013.  So, therefore, there's no basis to claim

10:06 10   that that was a material omission when the fact that the

11   defendant had not been to a storage unit within five days,

12   which was outside the scope of the criminal conduct that the

13   government believed and alleged in that motion are in the

14   affidavit, occurred.

15        THE COURT:  So the government's position is I can

16   decide this motion on the papers?

17        MS. FOLEY:  Yes, your Honor.

18        THE COURT:  Counsel, do you want to be heard on that?

19        MR. GOLDSTEIN:  I do, your Honor.

10:07 20        I would respectfully disagree with Ms. Foley's

21   recitation regarding the relevance of the video footage.

22        They obtained the video footage on July 2nd.  They've

23   now conceded they looked at the video footage before applying

24   for the warrant to search my client's storage unit.

25        Ms. Foley refers the Court back to earlier June, but

1    in terms of my client, your Honor, the government has alleged

2    that they spoke with Mr. Dion on June 28th of 2013.  And so if

3    they had footage from five days prior of July 2nd, it would

4    have been material for the magistrate to have known whether

5    after receiving a call from Mr. Dion that Mr. Landolfi had or

6    had not gone to the particular storage unit facility that they

7    claim to have had probable cause to search.

8         So I think it is a highly material fact that

9    Magistrate Judge Hennessey should have known that they had five

10:08 10   days' worth of video footage and they did not include that in

11   the affidavit in support of the search warrant.  So I do

12   believe it would amount to a material omission.

13        Now, if the government is willing to stipulate that

14   they had video footage going back five days and that they had

15   the opportunity to review it, that they did review it and that

16   they omitted that information from the search warrant affidavit

17   and that they, further, cannot testify to the Court whether or

18   not Mr. Landolfi appeared in that video, then perhaps, based on

19   that, the Court might be able to make findings in terms of

10:09 20   whether or not there was a material omission from the

21   affidavit.  But given that Agent Kelleher is going to testify,

22   I don't think it's going to impose too much time on the Court

23   for me to ask maybe five or ten minutes of questions regarding

24   this limited subject matter.

25        THE COURT:  Ms. Foley, what do you say in response to

1   that?

2          MS. FOLEY:  Your Honor, the government doesn't -- if

3   the cross-examination is going to be limited to that very

4   topic, then the government doesn't -- is not going to oppose

5   his cross-examining Agent Kelleher for five or ten minutes.

6          What the government did not want to do is open up the

7   other arguments that were raised in the motion, which are

8   clearly legal issues, and not factual.

9          THE COURT:  On the nexus, on the staleness, counsel?

10:10 10        MS. FOLEY:  I'm sorry, your Honor?

11         THE COURT:  In regards to the staleness and nexus,

12  counsel?

13         MS. FOLEY:  Your Honor, I don't believe that the

14  defense is contesting the information that the government put

15  into its affidavit or its motion to suppress, which is the

16  evidence that the government states in the affidavit and in the

17  motion to suppress was in the possession of the defense.  I

18  don't believe that there is any contesting that that label was

19  found in Mr. Landolfi's storage unit, that information records

10:10 20  were found at his house, that phone calls recorded between the

21  defendant and Mr. Landolfi were reviewed by the FBI, that the

22  FBI also had calls between Dion and other co-conspirators

23  directing them to call Billy because Billy owed them.

24         So to the extent those facts are not being disputed,

25  the government does not believe a hearing -- and the government

1   can provide to the Court all of those calls.

2           And if the Court is inclined to hear that information

3   and to hear the calls in Court during this hearing, then the

4   government's prepared to move forward on all of those -- to

5   prove up those factual bases.

6           THE COURT:  Okay.

7           MR. GOLDSTEIN:  Your Honor, it's clearly a

8   four-corners argument we're making.  It's the government that's

9   injecting other facts.  Meaning, this is a four-corners

10:11 10   analysis --

11           THE COURT:  And I understood your point in regards to

12   the papers.

13           So, counsel, as I understand it, you have some

14   cross-examination for the agent on this particular video issue,

15   but, otherwise, counsel is arguing to me about what is in or

16   not in the four corners of the affidavit.

17           MR. GOLDSTEIN:  Yes, your Honor.

18           THE COURT:  Okay.

19           MS. FOLEY:  But one other point, your Honor.  To the

10:11 20   extent that the defense was claiming that even if the Court

21   were to find that the magistrate did not have probable cause in

22   that affidavit to issue a search warrant, then, nonetheless,

23   good-faith basis, the officers did not have a good faith basis

24   to believe that the search warrant was valid, and to the extent

25   that knowing what their knowledge was at that time does affect

the good faith argument, and so other information that was

known to law enforcement at that time is part of the equation

that the Court considers when determining whether good faith --

they had a good-faith basis to believe that that search warrant

that was issued by the federal magistrate was valid.

THE COURT:  Okay.

Well, counsel, for the -- to start, I understand that

the cross-examination, Mr. Kelleher -- of the agent would

concern this video information.  To the extent you think you

need to put more evidence on in regards to the good faith, I'll

hear it as it comes.  Okay?

MS. FOLEY:  Yes, your Honor.

THE COURT:  Counsel, I think it makes sense to start

with the Dion motion, Mr. Dion's motion.

If counsel wants to call -- the government wants to

call their witnesses.

Was there a request for sequestration, counsel?

MS. FOLEY:  Your Honor, I do have the officer outside

right now.

THE COURT:  Okay.

MR. BRENNAN:  I'm not asking for sequestration, your

Honor.

THE COURT:  Mr. Goldstein?

MR. GOLDSTEIN:  I don't think it's necessary to

exclude -- if this is Agent Kelleher, which I think it is, I

1    think that's fine.  Otherwise, I think we should have the

2    standard sequestration.  If he wants to sit at counsel table --

3            THE COURT:  I was accepting him as a representative of

4    the government.  I'll otherwise sequester the witnesses.  It

5    sounds like everyone else is outside.

6            MS. FOLEY:  Yes, your Honor.

7            THE COURT:  You can call your first witness.

8            MS. FOLEY:  Thank you.

9            (Pause.)

10:14 10         NICHOLAS BLAKE, having been duly sworn by the Clerk,

11   was examined and testified as follows:

12           THE CLERK:  Thank you.

13           THE COURT:  Good morning, sir.

14           THE WITNESS:  Good morning.

15           THE COURT:  Ms. Foley.

16                    DIRECT EXAMINATION

17   BY MS. FOLEY:

18   Q.   Can you please state your name and spell your name for the

19   record?

10:15 20   A.   Nicholas Blake, N-i-c-h-o-l-a-s B-l-a-k-e.

21   Q.   Where are you employed?

22   A.   At the police department as a police officer for the City

23   of Junction City, Kansas.

24   Q.   How long have you been a police officer with Junction City

25   Police?

A.    Just over ten years.

Q.    Are you also a sworn county deputy?

A.    Yes, ma'am.

Q.    What do those sworn county deputy privileges allow you?

A.    Being a sworn deputy in my area, it's common to work at a 50-man police department and several officers are also sworn deputies.  We're sworn in by the county just like we are at the city.  They classify us as a special deputy, and what that does is gives us the authorization to enforce laws within all of Geary County, Kansas.

Q.    And were you a sworn county deputy in June of 2013?

A.    Yes, ma'am.

Q.    Are you also a canine handler?

A.    Yes, ma'am.

Q.    And what are some of the roles and responsibilities of being a canine handler?

A.    Part of my duties are to use my canine in the detection of narcotics.  He's -- I'm on my second dog now.  Both of them are dual purpose, so we use them as tracking tools.  We use them to search areas in buildings for maybe hiding suspects or open doors on alarms, on commercial or residences.  We use them for article recovery, several things.

Q.    Do you have a specific patrol car that you are assigned to?

A.    Yes, ma'am.

1    Q.   And inside that patrol car are there any type of

2    electronic equipment?

3    A.   Yes, ma'am.

4    Q.   Can you explain if there's a computer system?

5    A.   Yes, I do have a computer.

6    Q.   And what does that computer system allow you to do?

7    A.   It accesses the internet, it also accesses the computer

8    system used by my department to handle our case files, log

9    calls, and things that are actively going on, known as the CAD

10:17 10   system, C-A-D.

11   Q.   Do you also have a radar in your patrol vehicle?

12   A.   Yes, ma'am.

13   Q.   And who calibrates that radar?

14   A.   We have an independent contractor who comes and does the

15   more thorough calibration annually.  I don't recall the name of

16   the person or the company.  I have the certificates, though.

17   And we are also provided tuning forks where the operator of the

18   vehicle can check the radar's calibration as well.

19   Q.   And in June, specifically, June 18th of 2013, was your

10:18 20   radar system in your patrol car calibrated?

21   A.   Yes, ma'am.

22   Q.   And do you recall the last time you had checked the

23   calibration on the system?

24   A.   With the tuning forks, I don't recall.  Usually I check it

25   a couple of times a week.  In this particular case, after the

1    stop, I would have checked it, and it was okay.

2    Q.   And when you say "okay," does that mean it was accurately

3    reading the travel speed of vehicles?

4    A.   Yes, ma'am, that's what I mean.  There was no default or

5    anything found to be out of whack, so to speak.

6    Q.   Were you working on June 18, 2013?

7    A.   Yes --

8    Q.   I'm sorry -- 2013, yes.

9    A.   Yes, ma'am, I believe I was.

10:19 10   Q.   Did you have your canine with you on that day?

11   A.   Yes, ma'am.

12   Q.   What -- were you on patrol?

13   A.   Yes, ma'am.

14   Q.   And what area were you patrolling?

15   A.   Interstate 70 runs through my city and county, and it's

16   about 26-and-a-half miles.  So that day I would have been,

17   generally speaking, patrolling the interstate.

18   Q.   All right.

19        And at some point on June 18, 2013, did you observe a

10:19 20   group of cars that were speeding?

21   A.   I did.

22   Q.   Can you describe what you saw?

23   A.   I was traveling eastbound around mile marker 292 there in

24   Geary County Kansas.  I observed two vehicles, two passenger

25   cars, followed by a pickup truck approaching my location.  It

1    appeared as if they were traveling at an accelerated speed as

2    the vehicles passed me.  I activated my rear radar antenna, I

3    have two up front and a rear.  The first reading I got was

4    79-miles-an-hour, it then increased to 80.  The radar that we

5    use and radar in general will give you the speed of the largest

6    target, and if there's a vehicle traveling faster than the

7    largest target, it will give you that reading, too.  So it will

8    give you the largest target and the fastest, and I only

9    received just the 79 and then 80-mile-an-hour readings.

10:20 10   Q.   Do you recall which was the largest vehicle in this group

11   of vehicles?

12   A.   Yes, I do.  It was a silver pickup truck with a topper,

13   silver or gray.

14   Q.   What was the posted speed limit?

15   A.   Seventy-five-miles-an-hour.

16   Q.   And do you recall the truck, you say was the largest

17   object, where it was vis-a-vis or in relation to the other

18   cars?

19   A.   It was third, third in line.  I don't recall -- it's a

10:21 20   two-lane highway for each direction of travel.  I don't recall

21   which lanes the vehicle went in, but I recall the truck was

22   behind the two passenger cars.

23   Q.   And what did you do when you observed the radar clock

24   these vehicles traveling at 79 then 80-miles-an-hour?

25   A.   Well, I didn't get a speed or a radar reading on the other

vehicles, so it would have just been the truck.  I slowed down,

I turned around in the median, and I pursued the vehicle to

make a traffic stop.

Q.   And when you were pursuing the truck, did you turn on your

sirens?

A.   I did not.  I usually and in this case, will activate my

rear deck lights.  I do that because we've had people when you

activate your lights and turn around to go after them jump

exits or do things.  You know, the fact that we're both

traveling at high rates of speed and the time it takes me to

slow down, turn around, gain my speed back up gives the vehicle

I'm pursuing a large distance ahead of me and time to make

movements or do things.  So I usually don't activate my

forward-facing lights because I don't want to give somebody the

immediate thought of, Oh, they're coming after me, maybe let me

jump this exit or do something else.

Q.   Did you eventually catch up with this truck?

A.   Yes, ma'am.

Q.   And did you pull it over?

A.   I did.

Q.   What were your initial observations of the truck when you

pulled it over?

A.   A gray pickup truck.  As we came to a stop, I noticed that

it was plated out of the State of Colorado.  I noticed a topper

with tinted windows on the bed of the pickup truck.

1    Q.    Could you see inside the truck through the tinted windows?

2    A.    At one point when I'm walking back to my vehicle, I do

3    peek inside the back window.  I recall seeing something, but it

4    wasn't clear and identifiable as an, oh, that's a this or that.

5    Q.    Without approaching and putting your face to the window,

6    could you see what or who was inside the vehicle?

7    A.    No, ma'am.

8    Q.    When you approached the truck, did you approach from the

9    passenger or driver's side?

10:23 10    A.    The passenger's side.

11    Q.    And who did you come in contact with?

12    A.    Mr. Dion, Marshall Dion.

13    Q.    Can you identify him in the courtroom today?

14    A.    He's seated right here wearing the brown clothing.

15         MS. FOLEY:  Your Honor, I'd like the record to reflect

16    an in-court identification of the defendant, Marshall Dion.

17         THE COURT:  It may.

18    BY MS. FOLEY:

19    Q.    Did you tell Mr. Dion why you stopped him?

10:24 20    A.    Yes, ma'am.

21    Q.    And what did you tell him?

22    A.    I told him that I had him at 79, just four or five over.

23    And he responded, Really?  And I said, Yes, I did.  And he made

24    a statement, something to the effect of he was just following

25    traffic or going with the flow of traffic.

1    Q.   When you activated your rear lights when you were pursuing

2    the truck, did activating the rear lights turn on a recording

3    system that was in your patrol car?

4    A.   No, ma'am, it did not.

5    Q.   At some point, did your recording system in your patrol

6    car turn on?

7    A.   Yes, ma'am.

8    Q.   Did you turn it on?

9    A.   It would have activated whenever I activated all of my

10   lights to make the traffic stop.

11   Q.   Okay.

12        And can you explain this recording system briefly?

13   A.   Sure.  It has -- it's a Digital Allied is the brand name.

14   It has a forward-facing camera inside the patrol vehicle and

15   also a camera that's inside that can record basically the front

16   seat area of my patrol car.  It has a one-minute buffer system,

17   and there's several ways that the camera system can be

18   activated: by activating all of your emergency equipment; you

19   can manually activate on the camera itself, it's mounted in the

20   rearview mirror; or I have a body mic that records sound and

21   you can activate it from there.  Those are the three ways you

22   can activate it.  So once the video is activated by one of

23   those three ways, you will get from that point back one minute,

24   but that one minute before doesn't have any sound.

25   Q.   Okay.

1    A.    So once it's activated from that point forward, you have

2    video and sound.

3    Q.    Did you also have a recording device that was part of your

4    uniform?

5    A.    For -- yes, I would have had a lapel microphone that was

6    with the -- or for the recording system in my patrol vehicle,

7    and then I also carried a pocket camera for recording separate.

8    Q.    And that records audio and video?

9    A.    The pocket camera does, yes, ma'am.

10:26 10    Q.    When you approached the truck and you -- after you told

11    Mr. Dion why you had stopped him, did you ask him to produce

12    anything?

13    A.    I did.  I asked for his driver's license and vehicle

14    documents.

15    Q.    And do you recall the state that his driver's license was

16    issued?

17    A.    I do.

18    Q.    What was that?

19    A.    Arizona.

10:26 20    Q.    And do you recall anything else unusual -- or anything

21    unusual about the license?

22    A.    I did, that his address, his residence was listed as a PO

23    box.

24    Q.    Did he also provide you with registration for the truck?

25    A.    Yes, ma'am.

1  Q.   And did the registration on the -- did the registration

2  for the truck have an address?

3  A.   It did.

4  Q.   Did you also ask the defendant, Mr. Dion, any other

5  questions about his travel?

6  A.   I did.  While he was gathering his documents, I asked him

7  basically where are you coming from, where are you going type

8  of questions.

9  Q.   Do you recall what his response was?

10:27 10  A.   I do recall.  He told me he was coming from Yardley,

11  Pennsylvania, where he had went and visited his CPA, or

12  Certified Public Accountant, and he was now headed home to

13  Tucson, Arizona.

14  Q.   At that point, did you explain to Mr. Dion what you

15  intended to do?

16  A.   I did.

17  Q.   And what did you tell him?

18  A.   I asked him to come back and sit with me in my patrol

19  vehicle, and that I intended on issuing him a warning citation

10:27 20  for speeding.

21  Q.   Why did you ask him to sit in your vehicle?

22  A.   Where I'm at, it's permissible, it's common practice, and

23  it's part of the way that I conduct business.

24  Q.   And you say that it's the way you conduct business.  Do

25  other officers from the Junction City Police Department and

1    other officers in Kansas have drivers who have been pulled over

2    for a traffic violation accompany them to the patrol car during

3    the pendency of the stop?

4    A.    I would say for Junction City Police Department, other

5    officers don't really work the highway in general, but in terms

6    of the sheriff's department where I'm at, myself and other

7    agencies within Kansas, that is a very common practice.

8    Q.    And was it a normal practice for you to have the driver

9    who's been pulled over for a traffic violation accompany you to

10:28 10  your patrol car?

11   A.    Yes, very normal.

12   Q.    When you told Mr. Dion that you were going to issue a

13   warning citation and asked him to come sit in your vehicle with

14   you, did you also ask him anything else about what was in his

15   truck?

16   A.    I don't remember.

17   Q.    Did he at some point offer you consent to search his

18   truck?

19   A.    He did.  As we were walking back to my patrol vehicle, I

10:29 20  asked him if he had any weapons on his person.  He replied that

21   he didn't, and then he offered to let me look in his truck,

22   which I found odd.

23   Q.    And once you got into the vehicle with Mr. Dion, was he

24   seated in the front passenger's seat with you?

25   A.    Yes, ma'am.

1          MS. FOLEY:  Your Honor, at this time I'm going to ask

2    to play Exhibit 1, which is the audio and video of the stop.

3          THE COURT:  Any objection, counsel?

4          MR. BRENNAN:  No, your Honor, none.  Thank you.

5          THE COURT:  And so we'll mark this as Exhibit 1.

6          (Exhibit 1 received into evidence.)

7          THE COURT:  You're playing it through the system?

8          MS. FOLEY:  I am.

9          (Played CD.)

10:31 10   BY MS. FOLEY:

11   Q.   And can you explain for the Court what is appearing right

12   now?

13   A.   Yes.  This is during the one-minute buffer system that I

14   testified to, so there's no sound.  I've already observed the

15   violation, and I've turned around, I'm traveling westbound

16   pursuing Mr. Dion's vehicle.

17          This is -- right here, we just passed exit 290 or

18   Milford Lake Road, and you will see in the left lane there is

19   like a turquois vehicle, that one was in front of Mr. Dion's

10:32 20   truck when I first observed the vehicles, and then Mr. Dion's

21   truck is in front of the vehicle that just made the lane

22   change.

23   Q.   So you passed the vehicle that he was following at the

24   time you initially clocked him.

25   A.   Yes.  He was in front of it.  If he passed -- I don't know

1    what happened or how that happened.

2    Q.   Is that vehicle that's on the screen right now Mr. Dion's

3    truck?

4    A.   Yes, ma'am.

5         (Played CD.)

6    Q.   Let me just ask you for a second.  When you looked inside

7    the truck, what were you looking for?

8    A.   Because I couldn't see what was in there, I had no idea if

9    it was people or anything.  So I was just trying to get an idea

10:35 10   of what was in there, more for officer safety purposes, but

11   just because I couldn't see, you know, from standing outside.

12   Because of the dark tint, I couldn't see what was in there.

13   Q.   Okay.

14         And when you asked the defendant, you testified

15   earlier, if he had any weapons, and he offered to let you look

16   in the car, is that what you just heard on the video?

17   A.   Yes, ma'am.

18   Q.   And is that common for people who you pull over for

19   speeding when you tell them you're going to issue them a

10:36 20   warning for them to allow you to search their car?

21   A.   It is not common.  I stop -- I make a lot of traffic

22   stops, and regards to the innocent motoring public it is not

23   common for somebody to offer me to look inside their vehicle.

24   Q.   At that point, when he offered to let you look inside his

25   vehicle, did that -- was that odd to you?

```
 1   A.    It was.
 2   Q.    And did it also -- well --
 3         (Played CD.)
 4   Q.    So at this point, are you getting into your car with the
 5   defendant?
 6   A.    Yes, ma'am.
 7   Q.    And is the other video that you provided which is the
 8   video inside your car, would that from this point on record the
 9   conversations you had with Mr. Dion?
10:37 10   A.    Yes, ma'am.
11         MS. FOLEY:  Your Honor, I'm going to switch to the
12   next video at this point.
13         THE COURT:  It's on the same exhibit?
14         MS. FOLEY:  Yes, your Honor, it is.
15         The first track that we were just listening to, it
16   would only provide audio.
17         (Pause.)
18         MS. FOLEY:  I apologize, your Honor, we did a test
19   run, it was running before, behaving before.
10:39 20         (Pause.)
21         THE COURT:  Counsel, I still have the copy you gave
22   me.  Would that help at all?
23         MS. FOLEY:  Your Honor, it might.
24         We did a test run before your Honor took the bench,
25   I'm not sure what happened.
```

1        (Pause.)

2        MS. FOLEY:  Your Honor, I am asking someone from my

3    office to bring a new computer down.

4        THE COURT:  Counsel, can we continue with questions

5    and then return to this?

6        MS. FOLEY:  Yes, your Honor, sure.

7    BY MS. FOLEY:

8    Q.   When Mr. Dion got into your car, what did you do?

9    A.   Once we initially got inside the vehicle, he had noticed

10:43 10   my Spiderman lunchbox that I brought for lunch that day.  We

11   had some brief conversation about that.  And then I got out a

12   warning ticket, and I started asking Mr. Dion about his travel

13   plans again.

14   Q.   Okay.

15        Now, have you ever asked someone to sit in your car

16   while you were writing their ticket or running their

17   information and a person has declined your offer?

18   A.   Yes.

19   Q.   And what happens at that point?

10:44 20   A.   At that point, what I usually do is just have them stand

21   outside the vehicle, around the front bumper area.

22   Q.   While you process the ticket or --

23   A.   Yes, ma'am, while I conduct my enforcement action.

24   Q.   And what is your law enforcement action?  What do you do

25   once you get the person's license and registration?

```
 1    A.    Generally speaking, handwrite a citation, run information

 2    through dispatch --

 3    Q.    And what information do you run through dispatch?

 4    A.    Driver's license info, criminal history and registration

 5    information is the general.

 6    Q.    And when Mr. Dion got into your car, did you begin to run

 7    his license through dispatch?

 8    A.    I did not run his information immediately, but at some

 9    point during the stop I did.

10:45 10    Q.    What were you doing between the time he got in your car

11    and the time you ran his information through dispatch?

12    A.    I started to get my citation ready, fill it out.  As he

13    was explaining to me geographically where he was coming from

14    and where he was going, I used my computer to look up where

15    Yardley, Pennsylvania was, I never heard of it, and where he

16    was going, you know, what the most likely route of travel was.

17    Q.    Why did you do that?

18    A.    Just so I know in my mind as part of the travel plan

19    questioning, so I can physically see on the map, because I

10:45 20    don't know where every city is in America, so I could see --

21    having an idea from a map standpoint geographically where he

22    said he had been and where he was coming from, where he was

23    going and the route.

24    Q.    And while you -- after you typed this information into

25    your computer, did you stop writing the ticket or processing
```

1    the warning violation?

2    A.   Yes, I mean, because I can't write and type on the

3    computer at the same time, but I'm doing all of those things,

4    and then I stopped writing to call in the traffic stop.  I had

5    stopped writing to call in his information to dispatch.  I had

6    stopped writing when I made a phone call to the El Paso

7    Intelligence Center, so on, so forth.

8    Q.   All right.

9         At some point, did the travel itinerary that Mr. Dion

10:46 10   explained to you, did it raise any questions or concerns in

11   your mind?

12   A.   It did.

13   Q.   Why?

14   A.   Because his route of travel was off, according to Google

15   Maps.  The more likely route would have been over on 70 down

16   interstate 44, and then west on interstate 40.  The reasoning

17   for his travel seemed odd to me.  He was very nervous during

18   the enforcement contact, extremely nervous.

19   Q.   How could you tell that he was nervous?

10:47 20   A.   I could see his carotid artery pounding in his neck, I

21   could see his pulse in the area of his stomach underneath his

22   shirt.  In fact, he was so nervous that at one point during the

23   traffic stop I made sure he heard me say I was only going to

24   issue him a warning citation.  His extreme nervousness never

25   subsided.

1          THE COURT:  Sir, excuse me for just a second.

2          (Discussion off the record.)

3          THE COURT:  Counsel, it's unclear why there's a phone

4    behind me, but for some reason it was ringing.

5          (Discussion off the record.)

6          MS. FOLEY:  I have the video now.

7    BY MS. FOLEY:

8    Q.   And does this commence when you get into your patrol car

9    with Mr. Dion?

10:49 10  A.   Yes.  This camera was manually activated by me as soon as

11   we both got inside the car.

12         (Played CD.)

13   Q.   What are you calling in right now to dispatch?

14   A.   I'm telling them right now where I'm at and the

15   registration information.

16         (Played CD.)

17   Q.   I'm going to pause right there for a second.

18         When you were on your radio, who were you conversing

19   with?

10:54 20  A.   On the hand-held?

21   Q.   Yes.

22   A.   I was conversing with dispatch.  I was relaying

23   information to dispatch.

24   Q.   About?

25   A.   About the location of the stop and the tag number on the

1    vehicle.

2    Q.    And is that the Colorado plates?

3    A.    Yes, ma'am.

4    Q.    And at some point, did you run the address that was listed

5    on the registration, the Colorado registration?

6    A.    What do you mean by "run it"?

7    Q.    Did you plug in the street address from the Colorado

8    registration and determine where the address was in Colorado,

9    whether it was residential or otherwise?

10:55 10    A.    At the time of the traffic stop I don't believe I did.

11              (Played CD.)

12    Q.    Let me just stop you right here.

13              When you asked Mr. Dion whether he had a criminal

14    record, is that a normal question that is asked during the

15    course of traffic violation?

16    A.    Yes.

17    Q.    And when he responded, You can check it if you want, what

18    did you take that to mean?

19    A.    That I -- I took that to mean I could use my tools I have

10:57 20    available to me to check on his criminal record.

21    Q.    And how did you check on his criminal record?

22    A.    I did it in two ways.  Through dispatch I had them run the

23    Triple I, or Interstate Interface Index, which they run through

24    the FBI and it comes back with all the reported arrests; and

25    also at one point during the traffic stop I called the El Paso

1    Intelligence Center via phone, which is another tool I have

2    available to me, and they have access to more detailed records,

3    more specifically, federal databases that include border

4    crossings, active cases through any federal agency, and

5    different types of history like that.

6    Q.   And the information when you were running his criminal

7    record, did you do that on the computer in your car or did you

8    call that in using your radio?

9    A.   I did that over the radio.  I asked dispatch to run it,

10:58 10   and then later they give me the information over the radio.

11   Q.   And when they give it back to you over the radio, is it in

12   some sort of coded language so that you understand what the

13   response is?

14   A.   Yeah, there's -- the previous state laws regarding drug

15   offenses started with the number 65- and whatever the code may

16   be for the particular offense.  So I refer to drug history as

17   65 history.  And so when dispatch first comes back with his

18   criminal history, she tells me, using the number, that he has

19   65 history, which I took to mean drug history, and she says for

10:59 20   both white and green, and I took that to be both marijuana and

21   cocaine.

22   Q.   Okay.

23   A.   I was just going to expand on that.  So once she gave me

24   that information, I ask her -- I want to clarify, is it just

25   for possessing it or is there some type of distribution?  And

1     she comes back and tells me it's for trafficking for both.

2     Q.    Okay.

3           (Played CD.)

4     Q.    What did you show Mr. Dion on your computer a couple of

5     frames ago when he responded, You can look in my truck?

6     A.    I showed him a picture of my screen saver, which would

7     have been of a large amount of drugs.  I believe it was

8     marijuana.  I don't believe the actual -- I don't remember the

9     actual picture, but I believe it was a large amount of

11:02  10    marijuana.

11    Q.    Okay.

12          (Played CD.)

13    Q.    Let me ask you, who are you calling now?

14    A.    The El Paso Intelligence Center.

15    Q.    Why were you calling the El Paso Intelligence Center?

16    A.    Just as I had just testified to.  It's an additional check

17    we can use.  Whenever I become suspect of criminal activity, I

18    use this tool because they have, like I said, access to many

19    more records and databases than just the typical criminal

11:04  20    history check.  They check border crossings, they check a lot

21    of stuff as far as contact, they check license plate readers

22    that are throughout the United States.  Like I said, they have

23    access to the federal databases.  They can tell me if he's

24    wanted by the marshals, if he has active cases through the FBI

25    or DEA, and also other history, more detailed than he's been

1    arrested for trafficking.  In this particular case, if I

2    remember, he had been caught with 800 pounds of marijuana, he

3    had $200,000 seizure, was one of the busts he got caught with a

4    significant amount of heroin, so forth.

5    Q.   So why were you suspicious at this point in the traffic

6    stop?

7    A.   Several reasons.  From the very start, the fact that the

8    vehicle was plated in Colorado, he had an Arizona driver's

9    license with a PO box; all the times he's offering to let me

11:05 10   search his truck; his extreme nervousness that never subsided;

11   his reasoning for travel was not implausible to me, he was off

12   route; he had a drug trafficking history, which he obviously

13   lied about.  He said that he had -- first he said, when asked,

14   if you had been arrested he said, Oh, yeah, all kinds of stuff.

15   For what?  He said for marijuana, that's about it.  Confirmed

16   he meant just possessing marijuana, he said, Yes, which was

17   very far from the truth.

18   Q.   Now, at this point, are you still waiting for information

19   back from dispatch to complete writing the warning violation?

11:06 20   A.   At this particular point in the video, yes, ma'am, I am.

21   Q.   By calling EPIC or asking for information from the El Paso

22   Intelligence Center, did that prolong the stop in any

23   measurable way?

24   A.   You can see in the video, I believe, when dispatch comes,

25   I believe I'm wrapping up the phone call with EPIC, and I'm

1   talking to both of them at the same time.  So I -- just based

2   off of memory, I don't recall exactly how much longer I was on

3   the phone with EPIC, but if you keep playing the video --

4   Q.   But up to this point, did any of your questioning or calls

5   to dispatch, was anything out of normal that you do pursuant to

6   a traffic stop?

7   A.   No, ma'am, this is all very normal.

8   Q.   And you were still waiting for dispatch to return

9   information on whether the defendant's license was valid or

11:06 10   not?

11   A.   Yes, and his criminal history and the registration

12   information, it belonged to which vehicle, who it was

13   registered to, it was current as far as, you know, payment and

14   that it belonged to him, or who the registered owner was.

15   Q.   And is that information, whether the registration is valid

16   in Colorado and whether the license is valid in Arizona, is

17   that information you need to receive before you can issue a

18   citation?

19   A.   Sure, it is.

11:07 20          (Played CD.)

21   Q.   When you just picked up your radio, who were you -- what

22   information were you receiving?

23   A.   I was receiving all the information that I had requested

24   from dispatch: the license information, the registration

25   information, and his criminal history, and there were

1    several -- other than just clarifying whether it was possession

2    or trafficking, I also asked for the years, and I don't recall

3    exactly -- I can't hear what was said, but it was around the

4    '70s, '80s, and '90s.  She told me -- she come back and said I

5    believe '94, around '90, something like that, then a pause and

6    then said we have another one '81, but I don't recall the exact

7    years that she said.

8            (Played CD.)

9    Q.   What were you asking for right there?

11:15 10   A.   I'm asking -- for every citation we write, we assign a

11   case number to the ticket, which dispatch uses their computer

12   to generate, so I asked her to give me a case number for the

13   ticket I was writing.

14           (Played CD.)

15           MS. FOLEY:  Your Honor, at this time, I'm going to

16   switch to the other video that was on Officer Blake's lapel so

17   we can observe what happens once they leave the patrol car.

18           (Played CD.)

19   Q.   Let me stop you and ask a quick question.

11:23 20        When you initially looked inside the cab of this

21   truck, and the picture clearly depicts there's a lot of items

22   in there, what was your initial impression as to what you saw

23   inside the truck?

24   A.   Are you actually referring to the bed, not the cab?

25   Q.   Yes.

A.    Yes, in the bed of the truck, to me it appeared like junk.

I mean, there was a box full of napkins, you know, there was a

bunch of road atlases, things that were -- some of the boxes

that were in there had been in there so long they had started

to deteriorate and the color had faded.  There was a

refrigerator in there that appeared new, aside from that, it

looked like nothing of any true value, other than the

refrigerator.

Q.    Do you know what a cover load is?

A.    I do.

Q.    What is that?

A.    It's a load that some criminals use to cover their

criminal activity.  They will -- and this is not the first one

that I've been involved with.  It's basically just items to

make it appear if they were to get stopped that they're moving

or, you know, that they're actually innocent motoring public

just moving, you know, from point A to point B.

Q.    And would you, in your opinion and experience, did you --

the items you saw the back of this cab, did you believe that

those items were designed to be a cover load?

A.    Yes, absolutely.

Q.    And note the two red containers of gasoline.  Do those

have any significance?

A.    In my opinion, they could be, obviously, used by both, you

know, innocent people and also people that maybe don't want to

1    stop for gas or want to make sure that they never end up

2    stranded out of gas.

3    Q.    Okay.

4            THE COURT:  Can I just ask a question?

5            THE WITNESS:  Yes, ma'am.

6            THE COURT:  I think you just said to Mr. Dion that

7    somebody else was on the way.

8            THE WITNESS:  Yes, ma'am.

9            THE COURT:  When had you called for the other

11:25 10  officers?

11           THE WITNESS:  So when I was on the phone with the El

12   Paso Intelligence Center, he heard dispatch telling me how much

13   drug trafficking history Mr. Dion had, so he sent me a text

14   message on my phone asking me, Do you want me to head that way?

15   So on the video you can see me looking at my phone, and I'm

16   texting him back, Yes, please start heading this way.

17           THE COURT:  Thank you.

18   BY MS. FOLEY:

19   Q.    And when Mr. Dion said that the stuff had come from

11:25 20  Boston, had you -- had he ever mentioned Boston or stopping in

21   Boston before?

22   A.    The city, no, but you can hear in the video where he says

23   he has a residence in Massachusetts.  But, no, he had never

24   mentioned being there at all prior on this trip.

25   Q.    Okay.

1          (Played CD.)

2     Q.   What was he talking about what's happening in Boston?

3     A.   When I had asked him if he had any weapons, I did use a

4     little bit of sarcasm in saying AK-47s or missile launchers, or

5     anything like that.  I was serious wanting to know if he had

6     any weapons.  He jokingly told me that he some bombs.  In my

7     mind I'm thinking, Are you serious?  He refers, you know,

8     Boston.  I took that to mean the Boston Marathon bombing.

9     Again I say, I really need to know if you're serious, do you

11:26 10    have bombs?  He said, No, of course I don't.

11         (Played CD.)

12    Q.   So I'm going to stop right here.

13         Did you continue to search the truck at this point

14    with your captain?

15    A.   He's not my captain, he's a captain, but, yes, we

16    continued searching the vehicle.

17    Q.   And at this point, where is Mr. Dion?

18    A.   In the back seat of one of their patrol units.

19    Q.   And at that point, were you -- you were heard saying on

11:36 20    the recording, Do you have any -- I'm checking you for weapons.

21    At that point, were you placing him under arrest?

22    A.   No, he was not under arrest, but he was certainly

23    detained.

24    Q.   Okay.

25         And did you check him?  Did you pat him down at that

1   point?

2   A.   I did.

3   Q.   Now, when the dog was brought around the truck, the dog

4   gave you an indication that he detected the odor of narcotics?

5   A.   Yes, ma'am, in two different places.

6   Q.   And is that when you told that to Mr. Dion, what had

7   happened?

8   A.   Yes, ma'am.

9   Q.   And you asked him if he had any heroin, cocaine, ecstasy?

11:37 10   A.   I did.

11   Q.   And his response was, No.

12        And then you asked him about a large amount of

13   currency, and he said, Pardon me?

14   A.   Yes, and then he fumbled on some more words and then said

15   he had a couple of deposits to make.

16   Q.   Did he say how much cash he had the truck?

17   A.   I think he said about $6,000.

18   Q.   When you searched the truck with the captain, did you find

19   currency?

11:37 20   A.   Yes.

21   Q.   How much?

22   A.   In the truck was -- it was over $800,000.  I believe it

23   was $810,000, and I don't recall the three digits after that,

24   just based on memory.

25   Q.   And how was the currency packaged?

1    A.   It was in four FedEx boxes, two of them were in front of

2    the refrigerator, which was on the left, it was laying longways

3    in the bed on the driver's side of the truck; two of them were

4    stuffed down in front of the refrigerator, about half of the

5    box was protruding above the refrigerator itself so you could

6    see it once you looked in that area, and there were two that

7    were on the driver's side, similar in nature to the two that

8    were in front.

9    Q.   And after you found and located these boxes that contained

11:38 10   the cash, what did you do?

11   A.   Called for somebody to come out and drive the vehicle.  In

12   a situation like this, when we find what we believe to be

13   contraband, we get off the side of the highway.  We have a

14   warehouse adjacent to the police department that has access to

15   tools, places we can store people that are detained or

16   arrested, and we do that to get off the side of the highway and

17   continue thoroughly searching the vehicle, you know, with

18   access to a lot more tools than we would have roadside.

19   Q.   And after you returned to the warehouse, did you also

11:39 20   interview Mr. Dion?

21   A.   I did.

22   Q.   And was that a lengthy interview?

23   A.   Yes.

24   Q.   And once the truck was back at the warehouse, did you also

25   search the truck more completely?

A.    Yes, ma'am.

Q.    And did you locate documents that were inside of the truck?

A.    There was a large magnitude of documents within Mr. Dion's truck.

Q.    Did you also find inside the truck a Garmin GPS device?

A.    Yes, ma'am.

Q.    And did you also find a laptop computer?

A.    Yes, ma'am.

Q.    Did you also find a cell phone?

A.    Yes, ma'am.

        MS. FOLEY:  Your Honor, may I approach?

        THE COURT:  You may.

BY MS. FOLEY:

Q.    I'm showing you what's been marked for identification Government's Exhibit 2, 3, 4, and 5.  Can you please look at these documents?

        (Pause.)

A.    Okay.

Q.    Do you recognize these documents?

A.    I do.

Q.    Are these documents that you found inside the defendant's car?

A.    Yes, ma'am.

        MS. FOLEY:  Your Honor, I ask that Government's

1    Exhibits 2 through 5 be admitted into evidence.

2              THE COURT:  Any objection?

3              Mr. Brennan?

4              MR. BRENNAN:  No objection to any of the documents,

5    your Honor.

6              THE COURT:  Okay.  They may be admitted 2 through 5.

7              (Exhibits 2, 3, 4, 5 received into evidence.)

8              MR. GOLDSTEIN:  So those are being admitted pursuant

9    to Mr. Dion only, is my understanding, your Honor.

11:41 10           THE COURT:  Yes.  Counsel, otherwise I would have

11   solicited your position.

12             MR. GOLDSTEIN:  Thank you.

13   BY MS. FOLEY:

14   Q.   Exhibit Number 2, can you explain to the Court briefly

15   what that is?

16   A.   It's listed or titled as Tucson/Boston necessities and to

17   do for trip.  It appears to be a checklist of some sort to me.

18   Q.   Okay.

19             And is one of the items on the checklist "tarp" then

11:41 20   "to cover product in bed from rain"?

21   A.   Yes, ma'am.

22   Q.   Exhibit Number 3, can you briefly describe what that is?

23   A.   Yes.  It appears to be a list of transportation

24   authorities, Turnpike Authority within, generally speaking, the

25   New England area, some West Virginia, Illinois, and Indiana,

1    but --

2    Q.   Are they toll booths where Fast Lane pass will allow the

3    person to go through the tolls without stopping to pay in cash?

4    A.   Yes, ma'am.

5    Q.   Exhibit Number 4.

6    A.   Exhibit 4 is like an Excel spreadsheet that has four

7    pages -- I'm sorry, six pages.  It has several contacts,

8    different names of businesses with addresses and phone numbers.

9    Q.   And this document, was it in this form when you found it

11:43 10   inside the truck?

11   A.   Yes, it was a hard copy just like that.

12   Q.   It wasn't stored on any electronic device?

13   A.   That's correct, it was not.

14   Q.   And Exhibit Number 5.

15   A.   Exhibit 5 is four pages of what appears to be documented

16   trips, talks about stop locations, date, time, temperature,

17   mileage.  One page that's handwritten and the other three are

18   typed.

19   Q.   All right.

11:43 20        And the page that is handwritten, what are the dates

21   on that?

22   A.   The earliest date I can see is June 14th, and the latest

23   date is June 18th.

24   Q.   And the typed pages, are those from dates in 2013?

25   A.   No, ma'am, there's 2006, 2007, 2008, 2009, and 2010.

1   Q.   So those are historic records, the typed ones, and the

2   handwritten ones were from June?

3   A.   Yes, ma'am.

4   Q.   Showing you also Exhibit Number 6, do you recognize this?

5        (Pause.)

6   A.   I do.  It's the same format as the ones I just testified

7   to.  These are typed.  I see dates from years 2001, 2002, 2004,

8   2005, 2006, 2002.

9        MS. FOLEY:  I ask --

11:45 10   Q.   And was this found inside Marshall Dion's truck at the

11   time you stopped him?

12   A.   Yes, ma'am.

13   Q.   In this form?

14   A.   Yes, ma'am.

15        MS. FOLEY:  Your Honor, I asked that Exhibit 6 be

16   admitted into evidence.

17        THE COURT:  Any objection?

18        MR. BRENNAN:  No, thank you.

19        (Exhibit 6 received into evidence.)

11:45 20        THE COURT:  Counsel, just going to Mr. Goldstein's

21   question before, I assume these are all being admitted to

22   Mr. Dion?

23        MS. FOLEY:  Yes, your Honor, they are being admitted

24   as to Mr. Dion regarding the evidence that was seized from his

25   truck.  However, one of the exhibits, which was number 4, was

1    also information -- has Mr. Landolfi's name in it, and was used

2    by the FBI and agents in Boston later to obtain search

3    warrants.

4            THE COURT:  Okay.

5            Counsel, any objection -- well, Exhibit 6 is not being

6    offered against you?  Any objection to 6?

7            MR. GOLDSTEIN:  Well, I would object to any exhibits

8    coming in as to Mr. Landolfi, your Honor.  This is a

9    four-corners analysis, and the Court should not be considering

11:46 10    documents that weren't either included or attached to the

11    affidavit.  So to the extent these documents are not part of

12    the affidavit, I would object to the Court's consideration of

13    them in light of the motion.

14            MS. FOLEY:  Your Honor, the affidavit in its four

15    corners mentioned and made note of the contact list, which was

16    seized from Mr. Dion's truck which had Mr. Landolfi's name, the

17    phone number that Mr. Dion called Mr. Landolfi over from jail,

18    and the address for Mr. Landolfi that was his previous address,

19    and that information is in the affidavit.  And all of these

11:46 20    documents were later submitted to a separate magistrate to

21    obtain a search warrant to search computers and other

22    electronic devices, and all of those -- that affidavit had all

23    of these documents attached to it.  So it was within the four

24    corners of the affidavit as well.

25            MR. GOLDSTEIN:  Your Honor, my understanding is the

1    government is not looking to use evidence derived from the

2    computers, that's why we have not moved to suppress the

3    computers.

4         Whatever is in the affidavit is in the affidavit.  I'm

5    not hearing Ms. Foley say this document was attached to the

6    affidavit, therefore, it wasn't considered by Magistrate

7    Hennessey, it's, therefore, irrelevant to the Court's analysis

8    of the legal viability of the warrant obtained in this case.

9         THE COURT:  Well, counsel, I'll hear you on this issue

11:47 10  later when I hear argument on Mr. Landolfi's motion.

11         I'll admit it, as I said before, as to Mr. Dion.

12         MS. FOLEY:  Your Honor, I would also like to note that

13    Mr. Goldstein does not have standing to challenge any documents

14    that were taken from Mr. Dion's truck.

15         THE COURT:  As I said, the other exhibits are

16    admitted, I think we were up to Exhibit 6.  I will admit that.

17    BY MS. FOLEY:

18    Q.   Turning your attention back to Exhibit 5, the first page

19    of Exhibit 5, which is the handwritten notations, the last

11:48 20  entry in that, can you tell the Court what date and the time

21    that it was entered?

22    A.   Handwritten June 18th at 5:24.  Rest, it appears.  Some

23    stuff I can't read.  I 70 126 or 128 A Jefferson City, in time,

24    529, 66 degrees -- I'm sorry, maybe that's mileage, 52,266 and

25    out mileage 54 -- 2,267, I believe.

```
 1    Q.   All right.
 2              And what time -- you -- the stop of Mr. Dion's truck
 3    occurred on June 18th.
 4    A.   Yes, ma'am.
 5    Q.   At what time?
 6    A.   Approximately 9:33 in the morning.
 7              MR. GOLDSTEIN:  Your Honor, I'm sorry to interrupt.
 8    May my client be excused for a few moments?
 9              THE COURT:  Personal care matter?
11:49 10         MR. GOLDSTEIN:  Yes.
11              THE COURT:  Yes.
12              Counsel, you're fine with proceeding in his absence?
13              MR. GOLDSTEIN:  Absolutely, your Honor.
14              THE COURT:  Okay.
15              Ms. Foley.
16              MS. FOLEY:  Thank you, your Honor.
17    BY MS. FOLEY:
18    Q.   Exhibit 6, have you reviewed the entries in Exhibit 6?
19    A.   Not in great detail, but I have reviewed some of them.
11:49 20    Q.   And in some of them, do they note where police officers
21    have pulled over other vehicles?
22    A.   I would have to view them to refresh my memory.
23              MS. FOLEY:  Your Honor, the exhibit is entered into
24    evidence, I won't take any more time for that.
25    Q.   When you returned to -- after you interviewed Mr. Dion,
```

1   did you ask him during that --

2            Did you conduct a search of the GPS device that was in

3   the truck that Mr. Dion was driving?

4   A.   I personally did not, but one of the detectives from my

5   department did.

6   Q.   All right.

7            And did you also search the cell phone that Mr. Dion

8   had in his truck at the time of the stop?

9   A.   The same as my previous statement, a detective with our

11:50 10  police department did.

11  Q.   And was there a computer that was also reviewed by someone

12  in your department?

13  A.   Yes.

14  Q.   And subsequent to the initial review of the computer, did

15  you obtain a search warrant to search the full contents of the

16  laptop computer?

17  A.   Yes, ma'am.

18  Q.   Did you also obtain a warrant to search the GPS and the

19  cell phone?

11:51 20  A.   No, ma'am.

21  Q.   At the time that your office and the officers searched the

22  GPS device, what was your understanding of the law in Kansas,

23  federal and state law, at that time as to whether you could

24  search the GPS device after -- that was in the truck at the

25  time of the arrest?

A.   Our understanding was that it was permissible as we could
search a cell phone incident to arrest and where the defendant
was still in our custody, so we viewed a GPS as a lot less
complex and a lot less intrusive, as the GPS only stores
location information, and also viewed it the same as maybe a
road atlas with highlighted maps or something to that effect.

Q.   And this GPS that we are discussing right now, did it have
the capability of storing anything other than routes that were
taken and destinations and the times of those destinations?

A.   I don't remember if it did, but I can't say there was --

Q.   Do you remember what was taken from the GPS?

A.   Location information.

Q.   What did do you with the location information that you
obtained from the GPS?

A.   I later provided it to Special Agent Kelleher.

Q.   Did you provide the GPS locations to anyone else?

A.   Yes, I did.

Q.   Who was that?

A.   I also provided it to a task force officer in Tucson,
Arizona with DEA, Joe Bianculli.

Q.   And the information you provided to the Tucson task force
officer, were those for locations that were located in Tucson,
Arizona and the surrounding area of Tucson?

A.   Yes, ma'am.

Q.   And the locations that you provided to Agent Kelleher, did

1    you provide them with the destinations that were in Boston?

2    A.    Yes, I did.

3    Q.    Once you and your -- the captain and you were searching

4    the truck when it was still roadside, when you came across the

5    boxes that had the money inside of it, were you and your

6    captain excited about finding this money?

7    A.    Yes.

8    Q.    And what was your understanding or belief as to the source

9    of this money?

11:54 10    A.    Based off of everything that had come up to that point, I

11    believed that it that it was contraband, either used as a

12    direct source or derivative from the sale of narcotics or used

13    to fund or buy drugs or some type of contraband or criminal

14    activity or both.

15    Q.    At that point, what did you believe Mr. Dion's role was in

16    having the money in his truck?

17    A.    That -- when we actually found it, I didn't really know,

18    but I believed that his involvement was criminal in nature.

19    Q.    How long do traffic stops for speeding or any other

11:54 20    traffic violation generally take from the time you stop the

21    vehicle until the time the ticket is issued?

22    A.    For me, they vary, but, generally speaking, my traffic

23    stops last about 10 to 20 minutes.

24    Q.    And you testified that you found the defendant's offering

25    for you to search his truck suspicious.

A.   In the timing that he did it and the number of times that
he did it and in context that he did it, yes, I found it very
odd.

Q.   And the context being?

A.   Being when I asked him if he had any weapons on his
person, he offers to let me search his truck; that's odd to me.
Then when we're talking about other things, and he brings up
search my truck, just -- you know, times that have been played
on the video when he offers me several times to search his
truck.

Q.   Why was that suspicious to you?

A.   Because it's not normal.  It's not -- in my experience and
the people I have contact with, the innocent motoring public on
a daily basis, that is not normal.

            MS. FOLEY:  May I have a moment, your Honor?

            THE COURT:  You may.

            (Discussion off the record.)

            MS. FOLEY:  No further questions, your Honor.

            THE COURT:  Cross-examination?

            MR. BRENNAN:  Thank you.

                        CROSS-EXAMINATION

BY MR. BRENNAN:

Q.   Good afternoon.

A.   Hello.

Q.   Hello.

1        You said that your speeding tickets vary from 10 to 20

2   minutes.  Do you ever give a speeding ticket in under ten

3   minutes?

4   A.   I was referring to my traffic stops in general, not just

5   for speeding, but all types of violations; and I would say,

6   based off of my memory, generally speaking, they're all about

7   10 to 20 minutes, traffic stops, but I'm sure that there's a

8   time that I wrote one in nine minutes or eight and a half or

9   something to that effect.

11:57 10  Q.   What is it that takes 20 minutes in a routine speeding

11  ticket, other than calling in the information and writing the

12  ticket?

13  A.   In a traffic stop where it is truly the innocent motoring

14  public and there are no signs of criminal activity or no

15  questions that I need to expand upon, then that is where the

16  lesser time comes in.

17       There's other factors that go into it: how fast the

18  dispatch is working, things of that nature; if there's more

19  than one subject, if you run more than one person or not; a lot

11:57 20  of factors go into the time it takes to complete a traffic

21  stop.

22  Q.   So the way you conducted this traffic ticket, you said

23  that was a routine way in which you do it in every case?

24  A.   No, it would not be every case, but it is very normal and

25  routine.

1    Q.   What are the cases when you don't do that whole type of

2    search and the call?  What are the cases that you just get a

3    ticket and give it to the person and just let them go?

4    A.   There's quite a few scenarios, one being maybe, you know,

5    a mother with a small child.

6    Q.   Why is a mother with a small child given a ticket more

7    quickly than an elderly man?

8    A.   I'm sorry, I thought you were asking a different question.

9    Can you repeat your question, please?

11:58 10   Q.   Sure.  I wanted to know a typical scenario for you, you

11   said it varies in time, sometimes it's a shorter duration where

12   you'll just give a ticket to somebody for speeding and let them

13   go.

14   A.   Yes, there would be where there's no visible signs that

15   I'm suspicious of criminal activity.

16   Q.   Do you let some of the people you stop for speeding to

17   stay in their car?

18   A.   Yes, and that's what I was starting to testify to.

19   Q.   Okay.

11:59 20        So there are occasions where you treat people

21   differently and let them stay in the car rather than remove

22   them and have them go to your car.

23   A.   Yes.  Can I explain?

24   Q.   I haven't asked the question.

25        Is there ever a case when you have more than one

1    person in a car?

2    A.    Sure.

3    Q.    And when you have more than one person in the car, you

4    don't put them both in your cruiser, do you?

5    A.    That's correct, sir.

6    Q.    So you have engaged in many speeding citations where

7    you've allowed the person who was speeding to remain in their

8    car, haven't you?

9    A.    Yes, I have.

11:59 10   Q.    You treated Mr. Dion differently in his case than you did

11   in the cases where you let the person remain in their car,

12   didn't you?

13   A.    Sure.

14   Q.    When you make this determination, does your motive of what

15   you're looking for or what you want to find affect your

16   decision whether you're going to order somebody out of the car

17   or into your cruiser?

18        MS. FOLEY:  Objection, your Honor.

19        THE COURT:  Overruled.

12:00 20        You can answer.

21   A.    Okay.

22        My motive is to do my job, which consists of traffic

23   enforcement, looking for criminals, and things of that nature.

24   So in terms of my motive, it's always the same.

25   Q.    So in every case when you're stopping somebody, you're

1    looking for drugs?

2    A.    I'm stopping them under enforcement of traffic --

3    Q.    I'm asking what your motive is, your state of mind.  In

4    every case when you stop somebody for speeding, are you looking

5    or hoping to find drugs?

6    A.    I'm always looking for criminal activity.

7    Q.    Are you looking to find drugs?

8    A.    No, not necessarily.  I'm looking to find criminals.

9    Q.    You're not a routine patrol officer, are you?

12:01 10   A.    Although I'm assigned to the patrol division, I generally

11   don't take calls for service.

12   Q.    You served as a patrol officer for three-and-a-half years

13   after you started at Junction City, didn't you?

14   A.    Yes.

15   Q.    And then you were changed to be the canine handler.

16   A.    Yes, that's correct.

17   Q.    And as the canine handler, you are involved in the

18   detection of illegal narcotics through highway interdiction and

19   other traffic stops, aren't you?

12:01 20   A.    Sure, that is part of my duties.

21   Q.    And that's why you have a drug dog with you?

22   A.    That's not the only reason, but it's a reason, yes, sir.

23   Q.    So when you're on the highway stopping people, you're

24   not -- when you're on the highway stopping people, you're not

25   simply writing traffic tickets, it's fair to say you're looking

1    for drugs, aren't you?

2    A.   Oh, no.  It's fair to say I write a lot of traffic tickets

3    and no drugs are found.

4    Q.   When Mr. Dion was in your car and you were showing him

5    your screen saver, that screen saver had a picture of drugs,

6    didn't it?

7    A.   It did.

8    Q.   And when you pointed to him at 13:38 of the video, didn't

9    you say to him, In addition to traffic enforcement, I'm looking

12:02  10   for that type of stuff right there?

11   A.   Yes, sir, I did.

12   Q.   And that would be drugs?

13   A.   Yes, sir.

14   Q.   And later on, before you let Mr. Dion get out of your car,

15   you said, I'm out here looking for people who are hauling it,

16   right?

17   A.   That's correct, sir.

18   Q.   So when you're out there looking for people that are

19   hauling it, what you're looking for is people that are hauling

12:02  20   drugs, right?

21   A.   As I stated in the video, in addition to traffic

22   enforcement, yes, I'm looking for criminals and smugglers.

23   Q.   I'm asking if you're looking for people that are hauling

24   drugs?  Is that what you're looking for?

25   A.   Part of my duties, yes, sir.

1    Q.   Do you remember in that video, in the video back at the

2    warehouse when you're speaking to Mr. Dion in the video 02AV1,

3    you said to him, I love it.  I don't want to do anything else.

4    I don't want to investigate or be a detective.  I don't want to

5    be a school resource officer.  I don't want to answer calls on

6    patrol.  I don't want any of that, man.  I want to look for

7    smugglers.

8    A.   I do recall a statement to that effect, yes, sir.

9    Q.   So with that state of mind that you had in mind, let's

12:03 10   talk about the stop of Mr. Dion.

11             When you first saw a line of cars speeding, you said

12   you had a radar on your car?

13   A.   Yes, I did.

14   Q.   It's not a radar gun, it's an affixed radar system on the

15   side of your car, right?

16   A.   It's mounted inside the vehicle.  I have two antennas for

17   measuring speed.  It's a cylinder-type object.  There's one

18   right at the top left of my windshield and there's one in my

19   rear deck.

12:03 20   Q.   And the way radar worked, as you described it, it's sent

21   from your car, it hits either the fastest or the largest

22   object, and it bounces back.

23   A.   No, I did not testify to that.

24             The radar goes out and hits vehicles that target --

25   target vehicles.

1    Q.   So you can't target a specific vehicle with that type of

2    radar in your car when there is a line of cars?

3    A.   I don't understand what you're asking.

4    Q.   When you are sending a signal out to see if someone is

5    speeding and there's a line of cars, you can't specify one car

6    that you'd like to look at the speed on, can you?

7    A.   No, I cannot tell it to pick out this or that vehicle, no,

8    sir, I cannot.

9    Q.   Right.

12:04 10        THE COURT:  Counsel, just give me one second.

11              (Discussion off the record.)

12              THE COURT:  Counsel.

13              MR. BRENNAN:  Thank you.

14   BY MR. BRENNAN:

15   Q.   You claimed on your direct examination that the radar

16   locked onto Mr. Dion's vehicle, didn't you?

17   A.   I did not say that it locked on to anything, sir.

18   Q.   Did you say that the speed that you saw was for Mr. Dion's

19   vehicle?

12:05 20   A.   I said that I observed the vehicles approaching my

21   location.  My first visual observations were that the vehicles

22   appeared to be traveling at an accelerated speed.  After they

23   passed my location, I activated my rear radar, and based off of

24   knowing how the radar works, the speed given back, because

25   Mr. Dion's vehicle was the largest of the three vehicles,

1    indicated to me that was the vehicle that was traveling the

2    fastest.

3    Q.   Did you see the truck behind him with the trailer on it

4    that's in the video?

5    A.   Not after the vehicles passed me.  I believe that vehicle

6    came --

7    Q.   Did you see the 18-wheeler that was in front of him?

8    A.   I did upon pursuing his vehicle.

9    Q.   Was that in front of him or behind him when you first had

12:05 10  the register on the radar?

11   A.   I don't recall.

12   Q.   Was there any other one of those vehicles that had a plate

13   that was from out of state other than Mr. Dion's?

14   A.   I don't know, sir.

15   Q.   So, as far as you know, Mr. Dion was the only vehicle with

16   an out-of-state plate?

17   A.   I had no idea what state his plate was at the time that I

18   observed his vehicle or checked his speed.

19   Q.   You made a note at some point that it was an out-of-state

12:06 20  plate?

21   A.   Yes, sir.

22   Q.   That didn't raise your suspicion of criminal activity, did

23   it?

24   A.   Based on the plate alone, no, sir, it did not.  We live

25   right outside a military base, and out-of-state plates are very

1    common.

2    Q.    People travel through your highway all the time with

3    out-of-state plates, don't they?

4    A.    Sure they do.

5    Q.    There's nothing odd of consequence of that, is there?

6    A.    No.  If they're just driving through my area with an

7    out-of-state plate in and of itself with no other factors is

8    not odd.

9    Q.    When you first stopped him, you saw him pull over to the

12:06 10   side of the road?

11   A.    Yes, sir.

12   Q.    You put on your lights, he pulled his truck over to the

13   side of the highway, the shoulder, right?

14   A.    That's right.

15   Q.    There was nothing furtive or suspicious about the way he

16   pulled over, was there?

17   A.    No, sir.

18   Q.    When you walked up to the passenger side of his motor

19   vehicle, you introduced yourself and told him that you were

12:07 20   speeding?

21   A.    Yes, sir.

22   Q.    You asked him for some documents, didn't you?

23   A.    I believe that he started producing them automatically

24   after I told him the reason why I stopped him.

25   Q.    His license?

```
 1   A.   Yes, sir.

 2   Q.   And his license was from Arizona, wasn't it?

 3   A.   Yes, sir.

 4   Q.   There was a post office box instead of an address?

 5   A.   Yes, sir.

 6   Q.   Have you ever had any experience with the Arizona Registry

 7   of Motor Vehicles?

 8   A.   Personally, direct experience with that division, no, sir.

 9   Q.   So there's nothing that you know of that's improper or

10   irregular about having a post office box as an address on an

11   Arizona license, is there?

12   A.   No, not in the context that you've asked that.

13   Q.   Okay.

14        And he also gave you insurance paperwork and his

15   registration.

16   A.   Yes, sir, he did.

17   Q.   There wasn't any furtive movements or anything suspicious

18   that you saw?

19   A.   No, sir.

20   Q.   You didn't smell anything irregular?

21   A.   No, sir.

22   Q.   So at this point, you decided that you were going to treat

23   Mr. Dion a little differently than some of the people, and you

24   asked him both to get out of your car and directed that he

25   would go to your cruiser, right?
```

```
 1   A.    I treated him like the majority of the people that I
 2   treat; and, yes, I asked him to get out.
 3   Q.    And you told him that he was going to sit in your cruiser?
 4   A.    Yes.
 5   Q.    You didn't tell him that he didn't have to sit in your
 6   cruiser, did you?
 7   A.    No, sir, I did not.
 8   Q.    You didn't say you can stand on the side of the road and
 9   wait around if you want?
10   A.    I did not.
11   Q.    Or even that you can go inside the car?
12   A.    In his own vehicle?
13   Q.    Right.
14   A.    No, sir.
15   Q.    At this point, given the motive that we talked about, the
16   fact that you're looking for drugs, you were interested in
17   drugs, weren't you?
18   A.    Sure.  I'm always interested in looking for major
19   criminals.
20   Q.    So rather than focusing on the traffic ticket, what you
21   did is you walked to the back of his truck and you tried to
22   look in, didn't you?
23   A.    I did.
24   Q.    That had nothing to do with him speeding, did it?
25   A.    No, sir.
```

Q.   You wanted to see if you can find anything that was

related to drugs, didn't you?

A.   No, that's not correct.

Q.   You didn't have a safety concern, did you?

A.   Sure, I did.  I had no -- I mean, we've stopped vehicles

that are hauling people and all different sorts of things, and

without seeing what's in there -- sure, that's definitely

officer safety.

Q.   Wouldn't Mr. Dion standing directly behind you, someone

you've never met before, be more of a safety concern than

somebody in a shut, enclosed cab of a truck?

A.   If that were the case, I may agree, but at the time I

looked in his vehicle, he was still in the driver's side of his

vehicle; he was not standing behind me.

Q.   You couldn't see where he was, could you?

A.   At the time that I looked through there, no, I could not.

Q.   So in your concern for your safety, rather than look at

Mr. Dion or his hands or if he had any weapon, you decided you

were going to look in his truck in case someone jumped out; is

that what you're saying?

A.   That would not be my testimony in that context, no, sir.

Q.   You asked him if he had weapons?

A.   Yes, sir, I did.

Q.   And he responsively said, No?

A.   Yes, sir.

1   Q.   And said you could look.

2   A.   Yes.  He offered to let me look in his truck when I asked

3   him if he had any weapons on his person.

4   Q.   When we talk about the safety concern, he was inside your

5   cab without handcuffs on for almost 25 minutes, right?

6   A.   Yes, sir.

7   Q.   At no time before you put him within reaching distance of

8   you did you pat him down.

9   A.   I did not.

12:10 10   Q.   When you left your cruiser with Mr. Dion and went over to

11   his car to look in his car, you walked up to the back of his

12   car and had your back to Mr. Dion, didn't you?

13   A.   I'm sorry, I did what now?

14   Q.   You walked up to the back of his truck and had your back

15   to Mr. Dion, didn't you?

16   A.   If that's what the video reflects, then that would be an

17   accurate representation of what happened.

18   Q.   And this was during your ongoing safety concern, you say?

19   A.   Well, if we're referring to looking in the back of the

12:10 20   vehicle, no, that didn't have anything do with that part.

21   Q.   I see.

22         What type of -- what happened to dispel the safety

23   concern from the point that you thought you needed to look in

24   the back of his truck before he got in your cruiser to the

25   point that where you both got out of your cruiser, you turned

1    your back to him?

2    A.    I hear what you're saying, sir, but I don't understand

3    exactly what you're asking.

4    Q.    You said that when you first looked in the back of his

5    truck, you did so because you had a safety concern.

6    A.    Yes.  In addition to not being able to see -- it wasn't

7    just officer safety, it was, you know, I could not see what was

8    in there.  So part of it was to make sure there wasn't people

9    and/or, you know, if I were able to see anything at all.

12:11 10   Q.    You were looking for drugs.

11   A.    No, I was not.

12   Q.    Well, you weren't going to find evidence of speeding in

13   the back of that truck, were you?

14   A.    No, sir.

15   Q.    When you were at the back of his truck and you were

16   bending down in the wheel well, you were not only crouched, but

17   you had your back to Mr. Dion, didn't you?

18   A.    I don't believe I looked in the wheel well.  I believe I

19   was looking in the bed, and I would have had -- he would have

12:11 20   been to my left.

21   Q.    You don't remember crouching down and looking above the

22   wheel saying, This is where they sometimes put it?

23   A.    No, that inaccurate.

24   Q.    Didn't happen?

25   A.    No, sir.

1    Q.    Okay.

2    A.    I was looking in the bed, the tailgate portion.  I would

3    be facing the vehicle, and he would have been to my left.

4    Q.    So that video, as far as your memory is, that you didn't

5    have your back to him, crouched down?

6    A.    I didn't look in the wheel well, and maybe at one point

7    from whenever I walked from the back of the vehicle and turned,

8    my back, for a small portion of time, may have been to him, but

9    as I was looking in the tailgate, no, sir, I don't believe my

12:12 10   back was to him.

11   Q.    Let me ask you some questions about what Mr. Dion told you

12   before you started interrogating him.

13          After you asked for the license, registration, and

14   insurance, which all came back as legitimate, didn't they?

15   A.    Yes, sir, they did.

16   Q.    You asked him where he was coming from, and he said

17   Pennsylvania?

18   A.    Yes, sir.

19   Q.    Told you he lived in Arizona and had a place in

12:12 20   Massachusetts?

21   A.    That's correct.

22   Q.    And he told you he was traveling to Arizona.

23   A.    Yes, sir.

24   Q.    From the point that you took his information and he told

25   you these simple things, where he was and where he was going,

1  do you recall that you asked him over 40 questions of a

2  personal nature?

3  A.   I didn't count them, but if the video reflects that, then

4  that would be accurate.

5  Q.   At the very beginning of your interaction with Mr. Dion

6  when he was in your cruiser, do you remember asking him what he

7  did for a living?

8  A.   I do.

9  Q.   And what did that have to do with whether he was speeding

12:13 10  or not?

11  A.   In terms of just speeding itself, in that line of context,

12  it didn't have anything to do with speeding.

13  Q.   It had to do with your eagerness to learn whether or not

14  he was involved in narcotics?

15  A.   It had to do with my normal procedure of travel plan

16  questioning in that line.

17  Q.   So you normally, for the people that at least you put in

18  your cruiser, will go into a question sequence about travel

19  plans?

12:13 20  A.   Yes, sir.

21  Q.   And you do that in every case?

22  A.   Well, there's cases, and for reasons that you haven't let

23  me explain yet, that, no, that people don't come back.  So in

24  those cases, travel plans are not asked.

25  Q.   So some people you ask travel plans, some people you do

```
 1   not?

 2   A.   I would say most people I ask travel plans, a small few I

 3   don't.

 4   Q.   How about the people on the side of the road?

 5   A.   What are you referring to?

 6   Q.   The people who don't go into your cruiser but stay by the

 7   side of the road, do you ask them about travel plans?

 8   A.   Yes, sir.

 9   Q.   Do you ask them about money, their income?

10   A.   Yes, sir.

11   Q.   So when you ask people about routine travel plans, that

12   includes about their profession, their job, and their income?

13   A.   Yes, sir.

14   Q.   And you routinely do that to people you stop for speeding?

15   A.   For traffic violations, yes, sir.

16   Q.   Let's talk about speeding, because he was speeding, right?

17   A.   Correct.

18   Q.   So you routinely ask people about their profession, their

19   job, and their income on a regular speeding traffic

20   enforcement --

21   A.   On a most-case basis, yes, I do.

22   Q.   What do you mean by most case?  You do it in every case or

23   you don't?

24   A.   I do not do it in every case.  Can I explain?

25   Q.   No.
```

1  A.   Okay.

2  Q.   So in addition to asking about profession and location and

3  travel plans and money, what other questions, personal

4  questions, do you ask people on your roadway when you're

5  stopping somebody simply for a traffic ticket?

6  A.   The majority of it starts with travel, and the things that

7  you just -- you just said, travel, job, to and from, things of

8  that nature.

9  Q.   Okay.

12:15 10      What else do you ask people when they're stopped for a

11  speeding ticket as a routine matter?

12  A.   Other than the things that we've just said, I can't think

13  of an actual question.

14  Q.   Okay.

15      When you said to Mr. Dion, You must have plenty of

16  money, is that a typical question when you're asking about

17  someone's income?

18  A.   That is not verbatim what I said.  I believe I said -- I

19  questioned him, Oh, you have a lot of money.

12:15 20  Q.   And is that a typical interrogation you'll engage in on a

21  traffic ticket with somebody?

22  A.   Well, I said that in response to him telling me that he

23  was not worried about money, so, I said, Oh, so you have a lot

24  of money.  I was just trying to get the context of what he had

25  just said to me.

1  Q.   Why was that important for his speeding ticket?

2  A.   In terms of speeding, it was part of my line of

3  questioning, which is routine.

4        THE COURT:  Counsel, just because we've been going

5  since 10:00, we're going to take 15 minutes.  We'll come back

6  and do the final half an hour.  Okay?

7        Sir, you can step down.  We'll be in recess for 15

8  minutes.

9        Thank you.

12:16  10        THE CLERK:  All rise.

11        (Recess taken.)

12        MR. BRENNAN:  May I, your Honor?

13        THE COURT:  You may.

14  BY MR. BRENNAN:

15  Q.   Officer, when I had asked you earlier what you do as far

16  as your role with the police department, there's a website for

17  your police department, isn't there?

18  A.   Yes, sir.

19  Q.   And on that website there's a picture of you with your

12:31  20  canine?

21  A.   Yes, sir.  I'm on my second dog now, so the picture may

22  not be of the one in this case.

23  Q.   I believe this is Barney, which is your present canine?

24  A.   Yes, that's correct.

25        MR. BRENNAN:  May I approach, your Honor?

1          THE COURT:  You may.

2   BY MR. BRENNAN:

3   Q.   Can I ask you to take a look at this picture?

4          Do you recognize that, sir?

5   A.   Yes, I do.

6   Q.   And does that accurately reflect the website and the role

7   that the department sets out for you?

8          (Pause.)

9   A.   Yes, sir, it's accurate.

12:32 10         MR. BRENNAN:  Your Honor, I'd like to introduce this

11  as an exhibit.

12          THE COURT:  Any objection?

13          MS. FOLEY:  No, your Honor.

14          THE COURT:  This would be 7, I believe.

15          (Exhibit 7 received into evidence.)

16  BY MR. BRENNAN:

17  Q.   You mentioned that oftentimes you'll ask people about the

18  trips they've taken or where they're coming from.

19  A.   Yes, sir.

12:32 20  Q.   Is there some point in your mind when you're asking these

21  questions that the stop and the purpose for your stop changes

22  from a traffic ticket to a criminal investigation?

23  A.   No, sir.

24  Q.   So, in your mind, this is all part of the traffic ticket

25  routine procedure.

1  A.   Yes, sir.

2  Q.   When you asked him to talk about your trip and why he went

3  to visit his CPA, that's part of the routine procedure for you?

4  A.   Yes, sir.

5  Q.   When you asked him what he did during his trip, the

6  activities he engaged in, that's part of your routine procedure

7  for a traffic ticket?

8  A.   Yes, sir.

9  Q.   When you asked him where he stayed, where he slept, that's

12:33 10  part of your routine procedure for a traffic ticket?

11  A.   Yes, sir.

12  Q.   When you questioned him about whether they have CPAs in

13  Tucson, suggesting it didn't make sense he would go to

14  Pennsylvania for a CPA, is that the type of questioning you

15  would engage in on a routine traffic ticket stop?

16  A.   After learning the purpose of his trip and following up on

17  that being implausible to me, yes, that would be routine.

18  Q.   When you asked him the amount of days he was there and how

19  long his trip was, that's part of the routine traffic stop as

12:33 20  well?

21  A.   Yes, sir.

22  Q.   You mentioned that your traffic stops are routinely 10 to

23  20 minutes.  Do you know what the routine average time is for

24  the other officers in your department, the ones that don't have

25  canine dogs or involved in the type of investigations that you

1    like to do?

2    A.    No, sir, I have no clue.

3    Q.    When he had given you his route from Pennsylvania to where

4    you had stopped him, there wasn't anything suspicious about the

5    fact he drove from Pennsylvania through Kansas, was there?

6    A.    He did not give me his route, but the mere fact of that

7    statement on its own, that he traveled through Pennsylvania and

8    he made it to my location, no, sir, that was not suspicious.

9    Q.    And despite the fact that not being suspicious, you wanted

12:34 10    to run it through Google Maps so that you could visualize his

11    route?

12    A.    Yes.  Whenever he told me where he was coming from, yes, I

13    wanted to visualize where that was at, and then when I learned

14    where he was going --

15    Q.    Do you do that with all people out of town who tell you

16    that they've come from a certain location?

17    A.    No, sir, not all.

18    Q.    You did it with Mr. Dion?

19    A.    Yes, sir.

12:34 20    Q.    And you did that because of his answers as to why he went

21    to Pennsylvania?

22    A.    I did it because it's common for me and so that I have a

23    visualization of looking at a map where they're coming and

24    going.

25    Q.    So you do or don't regularly do this type of thing, Google

1   map people when they're from out of town and they tell you

2   where they're coming from?

3   A.   Yes, I regularly do it.

4   Q.   You regularly Google map people?

5   A.   Yes, sir.

6   Q.   When he told you he was coming from Pennsylvania and you

7   Google mapped it, at that point had you called in his

8   information to dispatch?

9   A.   No, sir, I had not.

12:35 10   Q.   And that was about eight minutes into the actual stop when

11   you Google mapped him; is that fair to say?  Actually, seven

12   minutes and 35 seconds.

13   A.   Just based off of memory, I don't remember the exact time,

14   but that sounds like a fair statement.

15   Q.   So the purpose for stopping him for a traffic ticket was

16   to write him a traffic ticket, correct?

17   A.   Sure.

18   Q.   And in order to write a traffic ticket, you must call into

19   dispatch?

12:35 20   A.   Yes, sir, that's part of it.

21   Q.   And you run a criminal check.

22   A.   Yes, sir.

23   Q.   Seven minutes, thirty five seconds into this routine

24   traffic stop you had not called into dispatch, right?

25   A.   That's correct.

1    Q.    Nor had you tried to get his criminal record checked?

2    A.    That's correct.

3    Q.    When you did a criminal record check, you did what's

4    called a Triple I?

5    A.    Yes, sir.

6    Q.    And that is a widespread check to see if someone has any

7    criminal history?

8    A.    Yes, sir.  It's a request to -- I believe, the FBI

9    maintains those records, and it's a request to them for the

12:36 10   arrest history on the subject.

11   Q.    You said that they came back with information that he was

12   involved in heroin?

13   A.    Not on the Triple I, no, sir, that was not my testimony.

14   Q.    From another check someone said that?

15   A.    From the El Paso Intelligence Center check.

16   Q.    The El Paso Intelligence check said that?

17   A.    Yes.

18   Q.    Do you have any documentation or information supporting he

19   was involved in heroin?

12:36 20   A.    No, I don't have any with me.

21   Q.    Did you ever see any?

22   A.    No, sir.

23   Q.    You said he was involved, according to your intelligence,

24   in cocaine?

25   A.    That was on the Triple I.

1    Q.   That he was involved in cocaine?

2    A.   Yes, sir, that's what my dispatch told me.

3    Q.   I see.  Did you see that?

4    A.   I probably did.

5    Q.   Do you have a memory of seeing it?

6    A.   Based off my memory, no, sir, I don't recall.

7    Q.   At that point, when you were developing your state of mind

8    regarding this traffic citation, what was your understanding of

9    his involvement with cocaine?

12:37 10    A.   Based off the information dispatch gave me, like I

11    testified to, they first told me that he had history for

12    marijuana and cocaine, and then I inquired of whether it was

13    distribution, and they said trafficking.  So, at that point, in

14    my mind, based off of the information dispatch gave me, I was

15    under -- I was understanding that he had had history for

16    trafficking both marijuana and cocaine.

17    Q.   Do you have any support for your understanding other than

18    your memory of speaking to dispatch?

19    A.   Hearing it on the video when it was played, that's what I

12:37 20    have.

21    Q.   You don't have any documents to support that?

22    A.   I did not bring a copy of his criminal history with me,

23    no, sir.

24    Q.   When you were saying that he had this criminal history, is

25    that for your benefit or is that in your routine something

you'll interrogate a person you stopped for speeding about?

A.   I would say it was routine because I had asked him if he had been arrested, and then in wanting to know if that was the truth and what his history was would be the reason for running the Triple I.

Q.   So when you stop somebody for a routine traffic citation in Kansas, you'll ask if they have a criminal history?

A.   Yes, sir.

Q.   And you'll ask them to detail that criminal history?

A.   If they say that they have been arrested, I will inquire what they have been arrested for.

Q.   And you do that in every case?

A.   No, sir, not every case.

Q.   Oh, I see.  So some people you choose to ask about the criminal history, and some people you choose not to?

A.   Yes, and there are reasons for that.

Q.   Okay.

     So if you had the mother with the child in the car, would you ask her if she had a criminal history?

A.   Well, I would need more information than just a mother in a car.

Q.   Okay.

     What would be the determining factor whether you were going to ask somebody about their criminal history during a routine traffic violation for speeding?

1    A.   It is routine to ask for criminal history.  It just

2    doesn't happen every single stop.

3    Q.   Why would --

4    A.   Most of the time.

5    Q.   Why wouldn't you do it in some stops?

6    A.   There are stops where maybe a call comes in and I don't

7    have time to wait for it to come back and we cut them loose.

8    Several scenarios like that.

9    Q.   So if the time is right for you, and you have the

12:39 10   opportunity, you'll ask everybody you stop for speeding whether

11   or not they have a criminal history?

12   A.   Yes, sir.  If I'm seated with them and we're speaking and

13   I'm conducting my enforcement action, it is routine me for to

14   ask about their criminal history.

15   Q.   You say "enforcement action," you're enforcing a speeding

16   ticket, nothing else, right?

17   A.   Yes, sir.

18   Q.   You're not on a mission to try and find drugs, are you?

19   A.   I wouldn't say that -- I'm on a mission to do my job.

12:39 20   Q.   And part of your job is to speak with a potential persons

21   and fish and see if you can find something that may lead you to

22   something else, right?

23   A.   I wouldn't call it "fishing."

24   Q.   What word would you like to use, "snooping"?

25   A.   No, sir.

1    Q.    How would you describe it?

2    A.    I would describe it as looking beyond the traffic stop.

3    Q.    And is that -- you mention you followed the rules of

4    Kansas, is that the rule in Kansas on routine speeding tickets,

5    you can look beyond the traffic stop?

6    A.    My understanding, there is a plethora of case law that

7    supports questioning somebody for things other than the reason

8    why you stopped them.

9    Q.    And other than drugs, what were you looking for beyond the

12:40 10   traffic stop?

11   A.    In this particular case, I wasn't looking for drugs.  I

12   look for criminals.

13   Q.    I see.

14   A.    Which involves a lot of things other than drugs as well.

15   Q.    When you saw that he had a criminal record, that doesn't

16   implicate him in a current, ongoing crime, does it?

17   A.    No, sir.  Just based off of that alone, no.  That tells

18   what he has done before.

19   Q.    Did you call dispatch before or after you called in for

12:41 20   his criminal history?

21   A.    Well, I spoke to dispatch on several occasions, so which

22   occasion are you referencing?

23   Q.    I'm asking you.  You need to have a routine call in to

24   dispatch to verify his information, don't you, when you're

25   giving somebody a speeding ticket?

A.   Yes, sir.

Q.   And what happens is you call in and see if it's confirmed, if it is, you give them their ticket and they go on their way; is that right?

A.   The scenario for traffic stop can be dictated in many ways.  Just on that statement alone, no, it doesn't happen like that all the time.

Q.   Let me ask you, when you're writing a simple speeding ticket for somebody, how long do you usually wait to call dispatch?

A.   My -- the way that I standardly operate is I will fill out about half of the warning citation, and once I input the information of the driver license number on there is when I call it into dispatch.

Q.   And how long is that citation?  How big is it?

A.   I have a copy of it.  I can't describe how big it is.

Q.   You have a copy?

A.   Yes.

Q.   Can I see it?

A.   Sure.  Of the one I wrote him?

Q.   Sure, why not.

        (Pause.)

Q.   For the sake of time, not that I don't want to see it, Officer --

A.   I found it.

```
 1   Q.   Okay.

 2           MR. BRENNAN:  May I approach, your Honor?

 3           THE COURT:  You may.

 4           (Discussion off the record.)

 5   BY MR. BRENNAN:

 6   Q.   And so it's about half a page of information, right?

 7   A.   In reference to what, sir?

 8   Q.   The ticket, takes up about half a page.

 9   A.   The ticket itself is -- the size is indicated on the

10   paper.

11   Q.   Okay.

12           So in order to fill in his name, his street address,

13   date of birth, driver's license status, you look at his license

14   for that information, right?

15   A.   Yes.  In this case, he had a PO box, so I had to ask him

16   what his physical address was.

17   Q.   So you fill in half of this, then you make a call into

18   dispatch to get the information verified, correct?

19   A.   Generally speaking, yes, sir.

20   Q.   Would it be fair to say it would take about 30 seconds to

21   fill in that information once you have the license?

22   A.   No.

23   Q.   How long would it take you to fill out that background

24   information on the ticket?

25   A.   Several minutes, three, four minutes, maybe.
```

1   Q.   I don't want to take your ticket, but I'd like to

2   introduce this as an exhibit.  Do you mind?

3   A.   I don't mind.

4        MR. BRENNAN:  Your Honor, may I introduce this as an

5   exhibit?

6        THE COURT:  Any objection?

7        MS. FOLEY:  No, your Honor.

8        THE COURT:  This would be 8, counsel.

9        (Exhibit 8 received into evidence.)

12:44 10   BY MR. BRENNAN:

11   Q.   So do you know how many minutes had passed before you

12   called into dispatch with this information?

13   A.   Based off my memory, no, sir.

14   Q.   Before you called dispatch, did you then ask him again

15   about money and ask him about his source of income, about 13

16   minutes into the call?

17   A.   Are you asking -- I'm sorry --

18   Q.   Before you called dispatch, did you then for a second time

19   start asking him about his source of money and source of income

12:45 20   again?

21   A.   Well, I called dispatch several times.  So the first

22   time -- I don't recall, based off of memory, when I asked -- if

23   I asked that question before I called dispatch, on the several

24   times that I called them because I'm not sure about which time

25   you're referring to.

1    Q.    You mentioned he was nervous.  What part of that video was

2    when you were seeing his artery pump and you decided that he

3    was nervous in a way that was suspicious to you?

4    A.    I testified extreme nervous, and it was throughout the

5    entire contact.

6    Q.    So, as we saw in that video, you felt he was extremely

7    nervous the entire time?

8    A.    Absolutely.

9    Q.    When you had seen all these suspicious factors of his

12:45 10   driving and his trip and things like that, that didn't amount

11   to any type of reason to charge him with a crime, did it?

12   A.    It didn't amount to what, sir?

13   Q.    To charge him with a crime.

14   A.    No, sir.

15   Q.    It didn't amount to having a reason to detain him, did it?

16   A.    Well, I think based off of some of the conversations that

17   I've had here, I would ask you to explain what is your -- your

18   version of a detention, because, in my mind, and in case law in

19   my state, somebody is detained for a traffic infraction.

12:46 20   Q.    Well, you were going to let him go, weren't you?

21   A.    Yes, once the traffic stop was complete.

22   Q.    I see.  So after all those questions that he answered and

23   all the interrogation and about his record and his money and

24   things like that, none of that amounted to holding him any

25   longer, did it?

1    A.   Well, I didn't hold him longer because he had stayed and

2    talked to me, and all the way up to the point of the dog alert,

3    in my mind, was a consensual encounter, I wasn't keeping him.

4    Q.   Let's take a step back and go step by step.

5         At some point you told him you could leave.

6    A.   No, I didn't use that verbatim, but I explained to him

7    that the traffic stop was over, if he chose to stay and talk to

8    me, then he could.

9    Q.   When you told him the traffic stop was over, was he free

12:47 10  to leave at that point?

11   A.   No.  In my mind, he was not.

12   Q.   I understand.  That answers the question, I was confused.

13        When you had said the traffic stop was over, you

14   really had other plans, didn't you?

15   A.   Well, he -- yeah, I had plans to take him up on his

16   multiple offers to search his truck.

17   Q.   You texted your partner to come to the scene.

18   A.   I responded to a text that he sent me.

19   Q.   And that was before Mr. Dion said that you could look in

12:47 20  his car at the end of the conversation in your car, wasn't it?

21   A.   No.  He offered to let me search his car from the time he

22   got out of the truck and several times --

23   Q.   I understand that.  I want to get to the point where you

24   said to him, This is just a warning and that's the end of the

25   traffic stop.  At that point, you then again asked if you could

1    -- you started to mention something, he said that you could

2    search his car, correct?

3    A.   Yes.  I believe my exact terms were, Let me ask you this.

4    And he says, You want to look in my truck?

5    Q.   I get it.  I get it.

6         And so before that question and answer, you had

7    already texted your partner that he should come to the scene.

8    A.   I did, because I knew I was going to take him up on the

9    offer.

12:48 10   Q.   Did you produce any of those texts that you had with your

11   colleague to the prosecutor in this case?

12   A.   I did not, and they weren't requested either.

13   Q.   Do you still have those texts?

14   A.   I've gotten a new phone since then, so my answer would be

15   I don't know.

16   Q.   You didn't save them as evidence?

17   A.   I did not.

18   Q.   When you brought your dog around the car, what points did

19   it alert to drugs?

12:48 20   A.   I referred to his behavior changes as an indication, and

21   he immediately upon when I walked up to the driver's side of

22   the vehicle and he starts checking out the wheel well would be

23   the first time.  And then as I walk down --

24   Q.   Let me stop and ask you a question for clarification.  An

25   indication is different than an alert, isn't it?

1   A.   It is.

2   Q.   So when he went by the driver's side front wheel, there's

3   an indication because he slowed down and showed interest?

4   A.   Yes, because he had the behavior change.

5   Q.   How does he alert, that particular dog, Figo, that you

6   were using?

7   A.   He's trained as an aggressive alert.  So once he locates

8   the source of the odor that he is trained to recognize, he will

9   either -- he's trained to scratch, but naturally sometimes he

12:49 10   would bite or bark.

11   Q.   Okay.

12        He didn't scratch, bite, and bark when he walked by

13   the front wheel well on the left side, on the driver's side,

14   did he?

15   A.   No, sir.

16   Q.   When you went by the other side, where do you say that he

17   made another indication?

18   A.   On the front of the bed of the truck behind the cab.

19   Q.   The front of the bed of the truck behind the cab.  So not

12:49 20   on the wheel, but on the cab?

21   A.   Correct.  On the area in between where the cab meets the

22   bed of the truck.

23   Q.   And that was an indication as well, wasn't it?

24   A.   Yes, sir, a change in behavior.

25   Q.   Not an alert.

1   A.   Correct.

2   Q.   And when he gave that indication, you repeatedly brought

3   him back to that position, didn't you?

4   A.   Which side?  I did that on both sides.

5   Q.   The passenger's side.

6   A.   Yes, I did.

7   Q.   Aren't you trained that you're supposed to have a fluid

8   motion around the car and not stop and jerk the dog toward a

9   particular area because sometimes they may want to please you

12:50 10   if they have that indicator?

11   A.   No, sir, that would be an inaccurate statement.

12   Q.   I see.

13        And so you had an indicator on both sides, but no

14   alert on either side.

15   A.   That's correct.

16   Q.   When you took the documents and information from

17   Mr. Dion's car, you took a cell phone, a GPS, and a computer,

18   didn't you?

19   A.   Yes, sir.

12:50 20   Q.   And then you directed one of your colleagues to download

21   all of that information, correct?

22   A.   Yes, sir.  Well, I asked for him to -- I directed him and

23   asked him to search the cell phone, and he grabbed the GPS as

24   well.

25   Q.   Did you write a report in this case?

          1    A.    Yes, sir.

          2    Q.    Did you review that report?

          3    A.    I have.

          4    Q.    By the way, you had the computer out at the warehouse,

          5    didn't you?

          6    A.    The laptop?

          7    Q.    Yes.

          8    A.    Yes, sir.

          9    Q.    And you looked through that personally, didn't you?

12:51    10    A.    I did a cursory look through it, yes, sir.

         11    Q.    When you say "cursory," did you look through it?

         12    A.    I did.

         13    Q.    Did you have a warrant when you looked through the

         14    computer?

         15    A.    No, sir, I did not.

         16    Q.    When you had your colleagues look through the GPS and cell

         17    phone and his documents, you didn't have a warrant for those

         18    either, did you?

         19    A.    No, sir.

12:51    20    Q.    And that information you shared with the Phoenix DEA?

         21    A.    I believe it was Tucson.

         22    Q.    Tucson DEA.

         23          And then you received a call from this gentleman in

         24    front of me?

         25    A.    The first call that I had received was from -- I don't

1    remember his name, but it was an HSI agent in Douglas, Arizona.

2    Q.   Okay.

3    A.   And then through that conversation, he put me in contact,

4    I believe, with Special Agent Kelleher.

5    Q.   I see.

6         When you spoke to the agent in Arizona, did you tell

7    him about everything that you saw in the car, as far as the

8    money and the GPS and the information?

9    A.   I certainly told him about the money.

12:52 10   Q.   Probably more importantly, when you spoke to Mr. Kelleher,

11   did you share with him all the information you took from

12   Mr. Dion's car?

13   A.   Certainly wasn't all of it, but I shared with him some.

14   Q.   You sent him a copy of your police report?

15   A.   Yes, sir, at some point I did.

16   Q.   And you sent him a copy of your affidavit?

17   A.   Yes, I imagine so.

18         MR. BRENNAN:  Your Honor, I'd like to move to

19   introduce the affidavit and the police report.

12:52 20         THE COURT:  Any objection?

21         MS. FOLEY:  No, your Honor.

22         THE COURT:  Okay.

23         Counsel, we'll make those 9 and 10.

24         (Exhibits 9 and 10 received into evidence.)

25         MR. BRENNAN:  Here's the affidavit.  I'll need a

1       moment to find the police report, and I know time is an issue,

2       so I'd like to finish the examination.

3               THE COURT:  That's fine.  We'll hold number 10 as the

4       police report.

5               (Discussion off the record.)

6               MR. BRENNAN:  Thank you.

7               (Discussion off the record.)

8               (Defendant conferred with counsel.)

9               MR. BRENNAN:  Your Honor, I have no further questions.

12:54 10        Thank you.

11              MS. FOLEY:  I just have a couple of questions.

12              THE COURT:  Sure.

13                          REDIRECT EXAMINATION

14      BY MS. FOLEY:

15      Q.   Officer Blake, at the end of the recording that we played

16      earlier of the stop, before Mr. Dion and you got out of the

17      vehicle, at the time where you said -- you returned his

18      documents to him, what were you doing when you returned his

19      documents to him and trying to make it clear to him that the

12:54 20     stop was over?

21      A.   I was finishing my enforcement action, and in my mind

22      creating an environment that I thought a reasonable person

23      would feel like they were free to leave if they were in the

24      same situation.

25      Q.   At the end, when you returned the documents, Mr. Dion

1    says, I could have shut you down, not answered any questions.

2    Was he right?

3              MR. BRENNAN:  Objection.  I withdraw that.

4              THE COURT:  Okay.

5              You can answer.

6    BY MS. FOLEY:

7    Q.    Could he have refused to answer questions?

8    A.    He never refused.

9    Q.    What I'm asking is, on direct you testified that if

12:55 10   somebody did not want to get into your patrol car, you would

11   allow them to stand outside.  Could Mr. Dion have said, No, I

12   don't want to get in the patrol car with you?

13   A.    He could have, yes, ma'am.

14   Q.    At some point, when you were asking him questions about

15   what he was doing in Pennsylvania, if he would have said to

16   you, I really don't want to go into that, it's kind of

17   personal, would you have respected that answer?

18   A.    I would have had to.  There's a few things that he's

19   obligated to share with me, like, since his license had a PO

12:56 20   box on it, his personal information which would be needed for a

21   traffic ticket, but aside from that, yes, he could have refused

22   to answer anything.

23   Q.    So when he says, I could have shut you down and not answer

24   any questions because I'm not under arrest, was he right?

25   A.    He was right, yes, ma'am.

1    Q.   I think on cross you admitted that you ask some people

2    more questions than you ask other people.

3    A.   That's correct.

4    Q.   Do your questions and follow-up questions, are they -- do

5    they rely on the answers that you receive?

6    A.   They do.

7    Q.   And under what circumstances would you not ask someone

8    questions about what they do or where they're coming from?

9    A.   In terms of general travel plan questions, I ask that of

12:56 10    the majority of the people that I stop, and then, based off of

11    travel plan questions and answers, there are times where I

12    expand upon that, when there are suspicious -- or things that I

13    find odd in somebody's responses.

14    Q.   You testified on direct that at the time you approached

15    Mr. Dion's truck, immediately when you pulled him over, you

16    detected that you could see his carotid artery thumping.

17    A.   Yes, that's correct.

18    Q.   Aren't people normally nervous when a police officer pulls

19    them over?

12:57 20    A.   There are times when people are nervous.  And with the

21    innocent motoring public, when you tell them, I'm just going to

22    give them a warning citation and everything is good with their

23    license, there are no warrants or anything like that, generally

24    speaking, that nervousness will subside substantially.

25    Q.   And in your ten years' experience in being a police

1    officer and patrolling the interstates and conducting routine

2    traffic stops, who generally continues to be nervous?

3    A.    Criminals, somebody with something to hide.

4    Q.    Every time you stop a car on the side of the highway for

5    speeding, do you always run your dog around the car?

6    A.    I do not.

7    Q.    When do you run your dog, your canine, around the car to

8    do an exterior sniff?

9    A.    When I feel that I have reasonable suspicion that a crime

12:58 10    is occurring.

11    Q.    In this case with Mr. Dion, at the end of the traffic stop

12    when he offered to let you search his car, did you at that time

13    believe you had a reasonable articulable suspicion that a crime

14    was ongoing?

15    A.    Yes, I did.

16    Q.    And what was that based on?

17    A.    Based off of everything up until that point, the totality

18    of the circumstances.

19    Q.    The stretch of highway that you were patrolling on June

12:58 20    18, 2013 where you stopped Mr. Dion, is that a stretch of

21    highway that is considered a high trafficking, drug trafficking

22    corridor?

23    A.    I would say so, yes.

24    Q.    And you say that from your own experience or from

25    something else?

1  A.   Both, my own experience and having knowledge of other

2  officers that work in my state in my area.

3  Q.   At some point, did you check the license that was on the

4  Colorado registration that the defendant had given to you that

5  belonged to his truck?

6  A.   Yes.  The registered address?

7  Q.   Yes.

8  A.   Yes.

9  Q.   And do you recall what address that is?  Is it to a

12:59 10  residence?

11  A.   No, it lists a number, a street name, and then has, like,

12  number two something, I don't remember the exact number, kind

13  of like an apartment address would be listed.  And when I later

14  looked it up, it's a strip mall in Grand Junction, Colorado.

15  Q.   When you checked your radar prior to stopping Mr. Dion,

16  could you tell which group of cars your radar was detecting the

17  speed for?

18  A.   There was right -- it may be visible in the video, right

19  at around the 292 mile marker there's a curve.  So vehicles

01:00 20  traveling west would be around that curve, I believe, at the

21  time that I checked these.  So my testimony would be that the

22  vehicles that I checked were the three, including Mr. Dion's

23  vehicle, and that there were no other vehicles within the

24  radar's range, so to speak.

25  Q.   And to be clear, your job is to enforce all laws; is that

1    correct?

2    A.   Yes, ma'am.

3    Q.   Do you feel it's your duty to ask questions of certain

4    people who are pulled over for traffic violations who are

5    traveling on the interstate in Kansas?

6    A.   Yes, ma'am.

7         MS. FOLEY:  No further questions.

8         THE COURT:  Any recross?

9         MR. BRENNAN:  Yes.

10                       RECROSS-EXAMINATION

11   BY MR. BRENNAN:

12   Q.   You mentioned the highway that you patrol and you stopped

13   Mr. Dion on is a trafficking corridor, in your opinion?

14   A.   Yes, sir.

15   Q.   Is that why you're stationed there?

16   A.   No, sir.

17   Q.   How much of your time do you spend on that highway when

18   you do your -- whatever it is you do?

19   A.   I would say that I spend a majority of my time on the

20   interstate.

21   Q.   With your canine.

22   A.   Yes, sir.

23   Q.   You said that a person like Mr. Dion does not have to

24   answer your questions or cooperate.

25   A.   That was part of a statement I made, yes, sir.

Q.   Did you ever tell Mr. Dion he did not have to answer your
questions?

A.   I did not.

Q.   Do you ever explain to somebody what questions they have
to answer and which ones they don't have to answer?

A.   I do if they're refusing to give me their personal
information, which has happened before.

Q.   Other than that, you wouldn't say you no longer have to
answer these questions, these are more personal, only if you
want to answer them?

A.   Yeah, I don't volunteer that, no, sir.

Q.   When Mr. Dion, the second time you asked him about money,
showed some reluctance, didn't your voice kind of change and
you just said, I'm just trying to find out what your story is,
man?  Did you say something like that?

A.   I think we were talking about where he had a residence at
when this statement was made.  Yes, there was a point where he
seemed like he didn't understand why I was asking those type of
questions.

Q.   Or frustrated that you were asking those questions?

A.   It appeared like that could be possible.

Q.   And you became a little more forceful and insistent in
your voice, didn't you?

A.   I don't believe I did.  I believe I explained to him
exactly what I was doing.

1    Q.   Citizens who have done nothing wrong who are being stopped

2    for speeding are not nervous, in your opinion?

3    A.   I would say a very high percentage of the ones that you

4    tell them you're going to give them a warning ticket, their

5    nervousness goes away.

6    Q.   So when you see somebody and they're nervous, you don't

7    know if they're a citizen who is just speeding or someone who

8    is involved in the type of crimes you're looking for, do you?

9    A.   Upon initial contact, I have no idea.

01:03 10  Q.   So nervousness doesn't really tell you anything, does it?

11   A.   It does after you tell them you're going to give them a

12   warning.

13   Q.   I see.  When they're in your car and you're really not

14   going to give them a warning because you're going to make them

15   stay there, right?

16   A.   In this particular case, I did give him a warning, and --

17   Q.   You said you led him to believe the stop was over, or you

18   tried to lead him to believe the stop was over, right?

19   A.   Yes, that was my purpose for returning the documents and

01:03 20  explaining the lights and all that.

21   Q.   But it wasn't over.

22   A.   It wasn't because I was going to take him up on his offer

23   to search his vehicle.

24   Q.   You said earlier, when I asked you if he was at that point

25   free to go, you said, No.  Do you remember that?

A.   Yes.  In my mind, at that very moment, if he had told me,

No, you cannot search my vehicle, I would have asked to run my

dog.  If he had refused that, I would have detained him,

believing that I had reasonable suspicion a crime was

occurring, and I would run my dog and I would have detained him

another 30 seconds.

Q.   So when you said that he could go, that wasn't true, was

it?

A.   I don't believe I used that language.

Q.   Whatever language you used, when you said the stop was

over, it really wasn't over, was it?

A.   No.

          MR. BRENNAN:  Thank you.

          THE COURT:  Thank you, sir.  You can step down.

          THE WITNESS:  Thank you.

          (Discussion off the record.)

          THE COURT:  Counsel?

          Counsel, I understood that you had other witnesses.

          MS. FOLEY:  Yes, your Honor.  The government does have

additional witnesses.

          THE COURT:  And how long did you anticipate with the

witnesses?

          MS. FOLEY:  Your Honor, I believe Agent Kelleher will

probably be about 45 minutes to an hour.

          THE COURT:  Okay.

1          MS. FOLEY:  And Trooper Burke, probably 20 minutes.

2          THE COURT:  Okay.

3          Counsel, did you want to say something?

4          MR. BRENNAN:  I think I just need to make the Court

5     aware and the government aware, I had spoken to the prosecutor

6     earlier and said I was not contesting the dog sniff part of

7     probable cause.  And from the discovery I had, it was my

8     understanding there was an alert by the dog.  And what I've

9     learned on cross-examination is there was an indication, not an

01:05 10     alert, which is an extraordinarily enormous difference.  I

11     don't want the government to be disadvantaged when the witness

12     might be leaving town to the fact that I now have a different

13     position.  I don't mean to now reengage in that, but I did not

14     expect that answer or information, I didn't think or appreciate

15     that it was simply an indication.  And given that, I think

16     that's --

17          THE COURT:  Well, counsel, given that I understood

18     Officer Blake is from out of town, is that something we can

19     take up now?  We have a little time now, counsel.

01:06 20          MR. BRENNAN:  I don't have any further questions on

21     it, I just don't want the government to be disadvantaged if I

22     reengage in that argument.  I don't know what they would intend

23     on doing with him, if anything.

24          THE COURT:  Counsel, is there any other testimony you

25     need regarding the officer who's from out of town?

1          MS. FOLEY:  Your Honor, I would just ask probably five

2     or ten questions about what an indication is and what that

3     means to him when the dog acted the way he did at the time.

4          I'm assuming there's not going to be challenges to the

5     qualifications of the canine or the training.

6          MR. BRENNAN:  None.

7          MS. FOLEY:  So if I could have the witness back on the

8     stand just for a few questions.

9          THE COURT:  That's fine, counsel.

01:07 10          MR. BRENNAN:  My apologies, I just didn't see that in

11     discovery, your Honor.

12          THE COURT:  And I think after that, counsel, we'll

13     have to break for the day.

14          But, Officer Blake, you can come forward.

15          Officer, I just remind you that you're under oath.

16          THE WITNESS:  Yes, ma'am.

17          THE COURT:  Ms. Foley, just the scope limited on this

18     particular issue.

19          MS. FOLEY:  Yes, your Honor, of course.

01:07 20                    FURTHER REDIRECT EXAMINATION

21     BY MS. FOLEY:

22     Q.   On June 18, 2013, how long had you been working with Figo?

23     A.   Approximately five-and-a-half years.

24     Q.   Approximately how many searches had Figo done during his

25     career?

1    A.    Real life street deployments, hundreds.

2    Q.    And was Figo trained to detect any odors other than

3    narcotics?

4    A.    No, he was not.

5    Q.    When you were walking Figo around the car, the truck, it

6    looked like you were doing something with your feet.  Can you

7    explain what that was, when you were stomping up and down with

8    your feet.

9    A.    Right.  What I was doing was giving the dog the perception

01:08 10   that I was still walking, that my movement hadn't stopped.

11   Q.    And why do you do that?

12   A.    Because there has been arguments made that if you stop, it

13   cues the dog.  So in training, they trained us even though he

14   has stopped, keep trying to move or walk in place, and gently

15   tug on the leash to try to get him to leave that area, because

16   if he doesn't, you know, immediately leave the area, that goes

17   more to the weight that he's recognized an odor that he's

18   trying to alert to.

19   Q.    And an indication -- how does an indication differ from an

01:09 20   alert?

21   A.    What I refer to as an indication is the dog's natural

22   responses to smelling odors that he's trained to recognize.

23   The alert I classified or referred to as his trained behavior

24   once he has located the source of that odor.

25         So an indication is he smells drug odor, he just

1    doesn't know where that odor is coming from or the actual

2    source of it.

3    Q.   And you talked about his natural responses to an odor he's

4    trained to locate.  What are those natural responses?

5    A.   With Figo it was that movement towards the vehicle,

6    smelling the vehicle.  His body becomes stiff, his breathing is

7    shallow and rapid, and he is checking a certain area very

8    meticulously, like it's around here somewhere, I just can't

9    find exactly where it's at.

01:10 10   Q.   And it's your testimony that he exhibited these behaviors

11   in the front of the truck as well as in the rear?

12   A.   At the front driver's side wheel area and on the

13   passenger's side in the area between the bed and the cab.

14   Q.   After the stop, did you remove the money that had been

15   taken from the truck and place it in a room?

16   A.   We did conduct what we refer to as a controlled sniff of

17   the money in an attempt to see if it contained drug odor.  And

18   we did that with the money taken from the rear of the vehicle

19   in the four FedEx boxes, and then also we had removed cash from

01:10 20   the cab of the vehicle, I don't remember the exact amount, but

21   there were two sets of money, and we did independent sniffs on

22   both.

23   Q.   And when you set this money up in a room, was the room

24   cleared of any prior drug smells?

25   A.   Yes, that would be our normal procedure.  I would take my

1  dog, in this case I took Figo through a training room at the
2  sheriff's department and had him sniff the room.  He alerted or
3  indicated to no odors or narcotics being present.  I then had
4  Captain Coffman hide the money that we found in the rear of the
5  truck in the room, unknown, the location was unknown to my
6  canine and I, and we also had them hide the money found in the
7  cab of the truck in a hallway just outside the training room
8  there, also the location unknown to my canine and I.
9  Q.   And the money that was found in the rear of the truck in
01:11 10  the FedEx boxes, when it was placed in this controlled
11  environment, did Figo alert?
12  A.   Yes, he did.  He exhibited his trained behavior, which was
13  an aggressive alert.  The money had been hidden inside a podium
14  pushed up against a wall, and he started to scratch and bite at
15  that podium.
16  Q.   Now, when your dog Figo indicated in two areas of the
17  truck, as his trainer for five-and-a-half years, what did that
18  say to you?
19  A.   That said to me that drug odor was coming out Dion's
01:12 20  vehicle, but, based on his behavior, I didn't know what the
21  source or where it was actually coming from.
22  Q.   And in the training of Figo, did you provide all of his
23  certificates from the courses then, the training classes that
24  he's attended?
25  A.   Yes, I provided -- I did provide his -- our initial

1    training certificates, and then we also had certified annually,

2    and I provided all of that documentation.

3    Q.    And you attend those training courses with him?

4    A.    Yes, ma'am.

5    Q.    And in the training courses, do you learn how to detect

6    whether a dog is indicating?

7    A.    You do.  And a lot of it is from your own observations of

8    how the dog reacts to certain things in your controlled

9    environments on, like, training days, where we get together and

01:13 10   somebody will hide some drugs in a room and then we'll go use

11   our dog as a controlled environment, and through those

12   repetitions of time and time again over five years, you

13   recognize when your dog smells drug odor.

14   Q.    And on this day, when he indicated in the two areas, that

15   was consistent with the behavior you had experienced before

16   with Figo when he identifies an odor but not the source.

17   A.    Correct.

18             MS. FOLEY:  No further questions.

19             THE COURT:  Cross-exam, Mr. Brennan?

01:13 20             MR. BRENNAN:  No questions, your Honor.

21             Thank you.

22             THE COURT:  Sir, you're excused.  Thank you.

23             (Discussion off the record.)

24             THE COURT:  Counsel, we're going to have to pick

25   another date.

1          Have you had any discussion about that?

2          MR. GOLDSTEIN:  How far -- what's the Court's

3     calendar?

4          THE COURT:  Well, let me just grab the calendar.

5          (Discussion off the record.)

6          THE COURT:  Counsel, Monday, this coming Monday in the

7     morning, the 24th.

8          MR. BRENNAN:  Your Honor, I have a case in Nantucket

9     on Monday morning.

01:15 10          I think, counsel, that means we're going to have to go

11    into the next month.

12          Ms. Hourihan, Monday, the 1st at 10:00, can we do

13    that?

14          THE CLERK:  Yes.

15          THE COURT:  December 1st at 10:00.

16          MR. GOLDSTEIN:  I have two court appearances that

17    morning, your Honor.

18          THE COURT:  How about the 2nd, Ms. Hourihan, in the

19    morning?

01:15 20          MS. FOLEY:  Your Honor, I believe that Agent Kelleher

21    is unavailable the first two weeks in December.

22          THE COURT:  Okay.

23          Nantucket.

24          MR. BRENNAN:  It's not as nice in the winter as it is

25    in the summer.  I'm not looking forward to it.

1           THE COURT:  Any chance -- is that a solid date,

2      counsel?

3           MR. BRENNAN:  It is, but if you tell me to be here, I

4      will call Nantucket and tell them I won't be there.

5           THE COURT:  Civil matter?

6           MR. BRENNAN:  No, it's a criminal matter.

7           The reason why it's sensitive is that resolution is

8      going to affect a resolution in Lawrence on Wednesday, so it's

9      going to move both courts off their dates, but if you want me

01:16 10    to, I can --

11          THE COURT:  Counsel --

12          (Discussion off the record.)

13          THE COURT:  What about Friday afternoon, 2:00,

14     counsel?

15          MR. BRENNAN:  On the 21st, your Honor?

16          THE COURT:  On the 21st.

17          MR. BRENNAN:  I'm available.

18          THE COURT:  Mr. Goldstein?

19          MR. GOLDSTEIN:  I'm also available.

01:17 20    MS. FOLEY:  Ms. Foley?

21          THE COURT:  Yes, your Honor.

22          Why don't we -- we'll do that on Friday afternoon.

23          Counsel, I think -- and I don't know -- I think this

24     might be in regards to Mr. Burke, as counsel on both sides may

25     be aware, I used to work in the Middlesex DA's office.  One of

1    my responsibilities was overseeing the PAC unit.  I think it

2    was Officer Burke or Trooper Burke who is a member of that

3    unit.  The name is not ringing a bell to me, but I just wanted

4    to mention it.

5              MR. BRENNAN:  Thank you very much.

6              THE COURT:  And I have no personal information about

7    this case, but I just wanted to flag it now.

8              MR. BRENNAN:  Thank you, your Honor.

9              THE COURT:  Thank you, counsel.

01:17 10              THE CLERK:  All rise.

11              (Court adjourned at 1:17 p.m.)

12

13                    - - - - - - - - - - -

14                        CERTIFICATION

15         I certify that the foregoing is a correct transcript

16    of the record of proceedings in the above-entitled matter to

17    the best of my skill and ability.

18

19

20

21    /s/Debra M. Joyce              December 2, 2014
      Debra M. Joyce, RMR, CRR       Date
22    Official Court Reporter

23

24

25

1                                    INDEX

2

3    WITNESS                                                    PAGE

4

     NICHOLAS BLAKE
5
         Direct Examination                                   12
6        By Ms. Foley
         Cross-Examination                                    51
7        By Mr. Brennan
         Redirect Examination                                 90
8        By Ms. Foley
         Recross-Examination                                  95
9        By Mr. Brennan
         Further Redirect Examination                        100
10       By Ms. Foley

11

12
                            E X H I B I T S
13

14   Exhibit No.            Description              Received

15
         1            Tape of stop of Marshall Dion        23
16
     2, 3, 4, 5       Documents found in search of         42
17                    Mr. Dion's truck

18       6            Document seized from Mr. Dion's truck 44

19       7            Page from Junction City website       71

20       8            Citation for speeding for Mr. Dion    82

21   9 and 10         Officer Blake affidavit and police    89
                      report
22

23

24

25